89 Cal.Rptr.2d 146 (1999)
75 Cal.App.4th 500
Marilyn MERRILL et al., Plaintiffs and Appellants,
v.
NAVEGAR, INC., Defendant and Respondent.
No. A079863.
Court of Appeal, First District, Division Two.
September 29, 1999.
As Modified October 28, 1999.
Review Granted January 19, 2000.
*151 Orrick, Herrington & Sutcliffe, Frederick Brown, Carl W. Chamberlin, Center to Prevent Handgun Violence, Dennis A. Henigan, Brian J. Siebel, Wash., D.C., Morrison & Foerster, James B. Bennett, Cam Baker, San Francisco, Cotchett & Pitre, Frank M. Pitre, Mark Molumphy, Burlingame, McCutchen, Doyle, Brown & Enersen, Jane Lovell, San Francisco, Vaca, Vaca & Ritter, Christopher G. Ritter, San Francisco, Law Offices of Mitchell J. Green, Mitchell J. Green, Jaffe, Trutanich, Scatena & Blum, San Francisco, Fred M. Blum, Alper & McCulloch, Dean A. Alper, San Francisco, for Plaintiffs and Appellants.
Latham & Watkins, Ernest J. Getto, Los Angeles, for Defendants and Appellees.
*152 KLINE, J.

INTRODUCTION
On July 1, 1993, Gian Luigi Ferri (Ferri) entered 101 California Street, a high-rise office building in San Francisco, armed with two semiautomatic assault weapons manufactured and distributed by respondent Navegar, Inc. (Navegar), 250 rounds of 9-millimeter ammunition, as well as a third weapon, a .45-caliber semiautomatic pistol. Proceeding to the 34th floor premises of a law firm against which he held a grudge, Ferri cold-bloodedly opened fire on persons in the offices and hallways of this and two lower floors, ultimately killing eight men and women and wounding six others before fatally shooting himself in a stairwell.
Appellants, the survivors and representatives of some of those who died, brought suit against Navegar on three theories of liability: common law negligence, negligence per se, and strict liability for ultrahazardous activities. Their complaints survived Navegar's demurrers but, on May 6, 1997, the trial court granted Navegar's motion for summary judgment as to all three causes of action. Appellants appeal this ruling as to their claims of ordinary negligence and ultrahazardous activity, but not as to their claim for negligence per se.
We conclude Navegar owed appellants a duty to exercise reasonable care not to create risks above and beyond those inherent in the presence of firearms in our society and that there are triable issues of fact as to whether it breached that duty. Accordingly, we reverse the judgment insofar as it relates to the cause of action for ordinary negligence. We affirm the grant of summary judgment, however, as to the cause of action alleging an ultrahazardous activity.

FACTS
Navegar is a gun manufacturer located in Miami, Florida.[1] Among the weapons it manufactures are two semiautomatic assault weapons,[2] the TEC-9 and the TEDC9,[3] the manufacture, distribution and sales of which are restricted in California under the Roberti-Roos Assault Weapons Control Act of 1989 (AWCA). (Pen.Code, § 12275 et seq., see especially § 12276, subds. (b)(4), (e) and (f).)
During January and February 1993, Ferri, a Southern California resident, made three or four visits to the Pawn and Gun Shop in Henderson, Nevada. During these visits he examined and made inquiries about "a wide variety of guns" available for purchase. The salesman understood Ferri wanted to purchase a weapon for "home protection." Sometime later, *153 Ferri paid another visit to the same store. He spent several hours examining and discussing guns before purchasing a used TEC-9. Later that day he returned the weapon, stating he had decided he wanted a new rather than a used gun. The salesperson testified he discussed "maybe 10" guns with Ferri overall.
Ferri bought a new TEC-DC9 at Super Pawn, a gun store in Las Vegas, Nevada, on April 25, 1993. Ferri told the salesperson and another customer (Ward Messing) that he wanted to buy a gun for target practice, or "plinking." The salesperson showed Ferri only the TEC-DC9 and a more expensive gun manufactured by Glock. Ferri did not appear interested in any other guns. She could not recall whether she or he first pointed out the Glock, but acknowledged she tended to steer customers towards better quality weapons. She could not recall a single instance where she had suggested a TEC-9 to a customer. Ferri questioned Messing about the TEC-9 or TEC-DC9 and the Glock. Messing told Ferri if he took a TEC-9 or TEC-DC9 to a shooting range, "they'd probably laugh at him because it wasn't really an accurate weapon" and that "it would be a waste of his time [to use the gun on a target range] because it's not made for that." Messing also told Ferri that if Messing were going "plinking" he wouldn't buy a 9-millimeter gun because "I couldn't afford to shoot it." Ferri chose the TEC-DC9.
When the salesperson asked for proof of residency, he claimed to be a Nevada resident and produced a fake or counterfeit Nevada driver's license. A week later Ferri returned to Super Pawn seeking to buy a sling for the gun. The salesperson told him they had none and could not get one.
On May 8, Ferri purchased a second TEC-DC9 at a gun show in Las Vegas, again providing a false Nevada address and showing an invalid Nevada driver's license.[4]
The weapon Ferri purchased from Super Pawn was sold by Navegar to a gun distributor in Prescott, Arizona. The second weapon was sent by Navegar to a gun distributor in Lebanon, Ohio, who then sent it to a Utah gun dealer, from whom Ferri bought it at the Las Vegas gun show. As required by federal law, the Utah dealer transferred the gun to a Nevada retailer who then delivered it to Ferri. All of the distributors and retailers just mentioned were apparently licensed by the BATF, and, so far as appears from the record, all of the transactions culminating in Ferri's acquisitions, which occurred outside California, were legal under applicable federal and state gun control laws,[5] except that Ferri's use of false identification *154 in purchasing both weapons violated federal law. (18 U.S.C. § 922(a)(6).)
On June 18, Ferri accepted an invitation from a Southern California friend to go to the Mojave Desert for "an early morning target shooting trip." The two of them, plus a third man, went to a "shooting range in the Mojave ... where Ferri fired one of his TEC 9's."
On June 25, six days before the 101 California Street shooting, Ferri returned to the Pawn and Gun Shop in Henderson and purchased a Norinco Model 1911A1 semiautomatic pistol and many rounds of "Black Talon" hollowpoint bullets for this weapon. He then brought all three guns with him into California. On July 1 Ferri took these weapons, together with hundreds of rounds of ammunition preloaded into 40- and 50-round magazines, into 101 California Street. There, with his TEC-DC9s equipped with "Hell-Fire" triggers that made them function like automatic weapons, and using separately purchased "combat slings" to hang the weapons from his neck, Ferri moved through offices on three floors, commencing a series of machine-gun like fusillades that in a few minutes killed or wounded the 14 victims of the tragedy.
The intensive discovery in this case focused upon the characteristics of the TEC-DC9. Appellants' experts provided deposition testimony and declarations establishing that the TEC-DC9 is a "military-patterned weapon" of the type "typically issued to specialized forces such as security personnel, special operations forces, or border guards." Even though it is nominally a semiautomatic, the standard 32-round magazine "can be emptied in seconds." According to the undisputed testimony of police chief Leonard J. Supenski, a nationally recognized firearms expert, the TEC-DC9 differs from conventional handguns in several ways. A large capacity detachable magazine, "designed to deliver maximum firepower by storing the largest number of cartridges in the smallest ... space," provides a level of firepower "associated with military or police, not civilian, shooting requirements." The TEC-DC9 has a "barrel shroud," also peculiar to military weapons, which disperses the heat generated by the rapid firing of numerous rounds of ammunition and allows the user to grasp the barrel and hold the weapon with two hands, which facilitates spray-firing. The barrel is threaded, allowing the attachment of silencers and flash suppressors, which are restricted under federal law (18 U.S.C. § 921(a)(24) and (a)(30)(C)(ii)), and are primarily of interest to criminals. The threaded barrel also permits the attachment of a barrel extension, enabling the weapon to be fired with higher velocity and at greater distances, while still allowing it to be broken down into smaller concealable parts. The weapon comes with a "sling swivel" that permits it to be hung from a shoulder harness, known as a "combat sling," when firing rapidly from the hip. The sling device also permits the rapid firing of two weapons simultaneously, as was done by Ferri in this case. The relatively compact size of the TEC-DC9 allows a shooter to transport maximum firepower with relative case, and with far greater concealability than almost any other weapon having similar firepower. The TEC-DC9 is also compatible with the "Hell-Fire" trigger system, which, when properly installed, permits the weapon to be fired virtually at full automatic rate 300 to 500 rounds per minute. As noted, Ferri installed such trigger systems on the TEC-DC9s he used at 101 California Street, and he also used the unusually large 40- and 50-round magazines the weapons were designed to accommodate.
Chief Supenski stated that the TEC-DC9 is "completely useless" for hunting, is never used by competitive or recreational shooters and "has no legitimate sporting use." The weapon is designed to engage multiple targets during rapid sustained fire. It has no practical value for self-defense and is hazardous when used for that purpose due to its weight, inaccuracy, *155 and firepower, he stated. The fact that the TEC-DC9 is designed primarily for "spray fire" would present a "severe threat" to innocent bystanders, who would also be endangered by the full-metal jacketed ammunition recommended for the weapon, which "will penetrate a human body and keep on moving." Supenski agreed with a BATF statement that assault weapons such as the TEC-DC9 "were designed for rapid fire, close quarter shooting at human beings. That is why they were put together the way they were. You will not find these guns in a duck blind or at the Olympics, They are mass produced mayhem."
Supenski directed research for an association of police chiefs of large American cities in 1992 which showed that the TEC-9 was "far and away" the leading assault weapon seized by law enforcement agencies in such cities in 1990 and 1991, "accounting for 24% of all assault weapons seized, and 42% of all assault pistols seized." These figures do not, however, include seizures in certain major cities, including New York, Chicago and Houston, nor does it include seizures by federal agencies.
Supenski validated an analysis of BATF data in 1988 and 1989 by Cox Newspapers, which also reported that due to its unsurpassed firepower, concealability and low price (then about $380), the TEC-9 was the most favored weapon of the most dangerous criminals, particularly violence prone drug gangs in large metropolitan areas. The Cox report concluded, among other things, that assault weapons are 20 times more likely to be used for criminal purposes than are conventional weapons, and in certain cities, such as Los Angeles, the frequency of assault weapon use in crime is twice the national average. While assault weapons represented merely 0.5 percent of the 200 million privately owned firearms in the United States during the period of the study, they constituted 10 percent of all weapons traced to crime during that time. Just ten models account for 90 percent of the crimes in which assault weapons are used, and one out of every five was a TEC-9, putting it at the top of the list. According to BATF's Tracing Center, the TEC-9 or TEC-DC9 accounted for 3,710 of the firearms traced to crime by law enforcement officials nationwide during 1990-1993, mainly cases involving narcotics, murder and assault, and these weapons were in the top ten firearms traced.
Based on the Cox Newspapers study and BATF tracing data, James Fox, Dean of the College of Criminal Justice at Northeastern University, concluded that "the TEC-9 is disproportionately associated with criminal activity, i.e., it is much more likely to be used by criminals relative to its numbers produced than are other handguns." "Even more indicative of the danger involved with the TEC-9," according to Fox, "is the fact that the disproportionate tracing rate for the TEC-9 is particularly great for violent incidents and is the greatest for homicides.... This suggests that the TEC-9 is especially a weapon of choice for violent offenders."
San Francisco Police Inspectors Napoleon Hendrix and Earl Sanders, who led the investigation of the crimes committed by Ferri at 101 California Street, stated in declarations that materials the police found at Ferri's apartment included two TEC-DC9 technical manuals, "numerous indicia of weapons and ammunition purchases," "various sales and promotional materials" from Navegar and "numerous magazines advertising weapons and paramilitary equipment," including "Soldier of Fortune" magazine and "Guns" magazine, as well as "Strike Force" and other "survivalist-type magazines." Although they found some 10 to 50 such magazines, investigators "did not attempt to bring all of these materials back to San Francisco. Instead, we selected materials that might be useful to our investigation" and booked them into the evidence room at police headquarters. According to Inspector *156 Sanders, investigators "took a couple [of magazines], maybe, if at all."
Based on his interviews and inspection of the physical evidence at the scene of the killings, Hendrix believed "Mr. Ferri had a very specific strategy in mind for the use of the weapons. During the assault, particularly while on the 34th floor, he used the two TEC-DC9s to maximum advantage by relying on their high firepower. He used the weapons to lay down a field of fire that would either wound or immobilize his victims before using the .45-caliber pistol to finish them off in a more direct and personal manner."[6] Hendrix opined that "the TEC-DC9's Mr. Ferri used played a significant role in the timing of the murders. Had Mr. Ferri not used the TEC-DC9s, and instead used a conventional semiautomatic pistol, he would not have been able to fire as many shots as fast as he did. As a result, I believe, it would have taken Mr. Ferri longer to carry out his crime had he not been armed with the two TEC-DC9's. Said otherwise, without the TEC-DC9's, I believe Mr. Ferri would not have arrived on the 33rd and 32nd floors when he did and instead would have arrived at a later point in time."
This view was confirmed by Inspector Sanders, who testified that the "extended magazines" of the TEC-DC9, which held up to 50 rounds "gave [Ferri] an opportunity to fire a much longer period of time [and] many more shots than he would have been capable of with ... what might be determined to be a standard semiautomatic pistol." These extended magazines enabled Ferri "to lay down a blanket of fire rather than fire one individual shot, recover and then fire another individual shot, with the TEC-DC9. He was able to lay down what, in essence, would be a blanket of fire which would cover a large area, thus cutting the chances of intended targets to escape."
The record includes evidence Navegar deliberately targeted the marketing of the TEC-9 and TEC-DC9 to certain types of persons attracted to or associated with violence. Michael Solodovnick (also known as "Mike Solo"), who served as national sales and marketing director for Navegar from 1989 to 1993, testified at deposition that he was aware of reports connecting the company's assault weapons to violent crime. Though he did not allow that Navegar directed its advertising to such persons, he stated that its "target market" for the TEC-DC9 were "militaristic people," including the "survivalist community," as well as "Walter Mittyish" individuals, who "play military." Solodovnick defined such an individual as one who pretends "he's a soldier ... he eats, sleeps and breathes it as a secret life, and yet, ... nobody knows what he really is."
Navegar's advertising targeted "militarists" and "survivalists" by advertising the TEC-DC9 in magazines they favored, such as Soldier of Fortune, SWAT, Combat Handguns, Guns, Firepower, and Heavy Metal Weapons. Navegar advertised the TEC-9 and TEC-DC9 in a wide variety of publications it knew would be sold in California. Navegar also displayed its weapons at "gun shows" which are attended primarily by people who read these magazines. According to Solodovnick, the substance of Navegar's advertising and its other promotional activities was deliberately calculated to attract "military-type thinking people" likely to use the weapon offensively by referring to the TEC-DC9, for example, as an "assault-type pistol." Navegar's advertisements emphasized the "paramilitary" appearance of the weapon, including references to "[m]ilitary nonglare" finish and "combat-type" sights. Among the advertising methods employed *157 for the TEC-DC9 were using the slogan, "tough as your toughest customer," in promotional materials sent to dealers and distributors, but accessible to the general public, and pointing out that the surface of the weapon had "excellent resistance to fingerprints." Solodovnick acknowledged that people who were not knowledgeable about fingerprints could interpret the latter representation as meaning fingerprints would not be left on this weapon. Promotional materials also called attention to other design features of the TEC-DC9 that would be of interest to persons interested in carrying out violent assaults or other illegal activities, such as the "combat sling" and the threaded barrel, which permitted the attachment of a silencer, flash suppressor or barrel extension.
Solodovnick stated, for example, that many people were attracted to the TEC-DC9 because of its compatibility with the "Hell-Fire" trigger system, which enabled the weapon to be fired much faster than an ordinary semiautomatic weapon. Hell-Fire Systems, Inc., which produced this device, stated in its advertising that its product could be used with 19 semiautomatic weapons, including the TEC-DC9, and Navegar's officers knew such advertising increased sales of their weapon. They were also aware of the availability of all the information necessary to convert the TEC-DC9 into a truly automatic weapon. An organization known as Minuteman Publications publishes a manual entitled "Full Auto" providing all the "engineering data, manufacturing procedures, and machinists drawings," necessary to convert Navegar's family of semiautomatic weapons "into ultra-compact, fully automatic submachineguns which fire from an open bolt."
Some of the evidence supported appellants' claim that Navegar sought to increase sales by making the foregoing information known to a wider audience of interested persons. In 1991, while he was national marketing director for Navegar, Solodovnick was indicted in federal district court for the Southern District of Florida, where Navegar is based, for conspiracy to violate federal gun laws. (18 U.S.C. § 922(o).) The overt acts alleged to have taken place in furtherance of this conspiracy included the transferring of manuals and videotapes relating to the conversion of the TEC-DC9 "into fully automatic firearms (machine guns)...." Solodovnick pled guilty to the charges.
Solodovnick was aware that news reports of the TEC-DC9 being used in a sensational murder or other crime, and condemnation of the weapon by law enforcement and other government officials, invariably helped sales. He acknowledged having been correctly quoted in a 1992 New York Times article, as follows: "`I'm kind of flattered,' Mr. Solo[dovnick] said when he was asked about condemnations of the TEC-9. It just has that advertising tingle to it. Hey, it's talked about, it's read about, the media write about it. That generates more sales for me. It might sound cold and cruel, but I'm sales oriented." He also acknowledged saying, with reference to an assault at a school in Stockton, that "whenever anything negative has happened, sales have gone tremendously high."
To stimulate the interest of consumers thought to be attracted to the weapon because of its connection to violence, Navegar gave or loaned TEC-DC9s to the producers of violent films, such as "Robocop" and "Freejack," and television programs, such as "Miami Vice," who wanted a weapon that had "that flashing intimidating look." In Solodovnick's opinion, use of the weapon in such films and television programs was "beneficial to sales of the weapon."
Carlos Garcia, the president of Navegar until 1995 and then chairman of its board of directors, confirmed Solodovnick's view of the company's target market. He also acknowledged that within the market to which he directed the TEC-DC9 were people who believe the weapon is effective protection against a government "takeover," *158 such as the communist takeover in Cuba, and against "corrupt law enforcement agencies." Garcia acknowledged that the threaded barrel, which allowed attachment of silencers and flash suppressors, was one of the features of the TEC-DC9 emphasized in Navegar's advertising and that some advertisements actually stated the weapon featured a "flash suppressor." Garcia could think of no reason a law abiding citizen using the TEC-DC9 would be interested in accessories such as silencers or flash suppressors, because that would suggest "a criminal purpose." He also acknowledged that the TEC series of weapons had the most firepower of weapons that could be concealed in a briefcase. Like Solodovnick, Garcia was aware of studies and news reports indicating the TEC-9 was the gun of choice of drug offenders and organized crime.
J. Reid Meloy, Ph.D., a forensic and clinical psychologist specializing in "affective violence and predatory violence during mass murder," submitted a twenty-two page declaration in support of appellants' opposition to Navegar's motion for summary judgment. Meloy is Chief of the Forensic Mental Health Division of the Office of Court Services in San Diego, a consultant to numerous federal and state law enforcement agencies, an adjunct professor of psychiatry at the University of California San Diego School of Medicine, the author of numerous books and articles in professional journals and has made over 300 forensic evaluations.
Meloy did not believe the availability of the TEC-9 was the only or necessarily the chief reason Ferri carried out his attack at 101 California Street, but it was his opinion that "the availability of the TEC-9 military style assault weapon was a substantial factor in causing Ferri to undertake his assault at 101 California." He based this opinion on a distinction between "affective aggression," which is "a defensive mode of violence," and "predatory aggression," which is "an attack mode of violence." According to Meloy, persons who meet all or most of ten forensic criteria for predatory violence, as in his opinion did Ferri, "are reasonably certain to have engaged in a planned, purposeful and emotionless attack form of aggression." Meloy explained the meticulous detail in which Ferri planned his assault over a nine-week period and why the availability of the TEC-9 and the advertising of the weapon "fueled" the "fantasy-based violence" he planned against the law firm located at 101 California Street. As examples, Meloy pointed to statements in the owner's manual that the TEC-9 and TEC-DC9 represented "a radically new type of semiautomatic pistol, designed to deliver a high volume of fire power," and that, due to the extended magazine capacity, a firing cycle could be completed in .08 seconds. Meloy believed such boasts, as well as many other advertising statementssuch as the claim that the weapon was "as tough as your toughest customer," and that the surface of the weapon has "excellent resistance to fingerprints"are "exactly what appeals to individuals who engage in such fantasy-based violence." In Meloy's opinion, the capabilities of the TEC-DC9 and the "military style physical appearance" of the weapon "likely emboldened Ferri to undertake mass killings without fear of failure."
Holly Newberry, who became director of sales and marketing for Navegar after Solodovnick, stated in a declaration that she was "unaware" of any marketing or advertising of Navegar's products "intended to attract criminals, drug dealers, survivalists or any other particular group of persons to purchase Navegar's products." She also stated that she was unaware of any actual marketing or advertising of Navegar's products in connection with "high-capacity aftermarket magazines," the Hell-Fire trigger system, kits designed to convert Navegar's products into fully automatic firearms, or silencers.
Eugene J. Wolberg, a "forensic firearms criminalist," stated in a declaration introduced by Navegar that he was informed *159 that Navegar uses an electroless nickel finish on its firearms known as "TEC-KOTE," and that such a finish simply prevents body oils and perspiration from penetrating and "etching" the surface of the firearm and "has no effect whatsoever on the police's ability to `lift' fingerprints from a firearm." Wolberg also stated that he was "aware of no facts which suggest that the TEC-DC9, or `assault weapons' generally, are disproportionately used to commit violent criminal acts." Challenging the statistical validity of BATF studies of firearm use, Wolberg stated that, in his experience, "`assault weapons' constitute a negligible portion of all firearms used to commit violent crimes."

PROCEDURAL BACKGROUND
As indicated, appellants do not appeal the grant of summary judgment on their cause of action for negligence per se, but claim it was error to grant Navegar such relief on the two other causes of action alleging ordinary negligence and ultrahazardous activity. We address these issues in turn.

The Cause of Action for Ordinary Negligence
Navegar moved for summary judgment on appellants' cause of action for ordinary negligence on the ground that appellants could not establish that Navegar had a duty to them or to their decedents under the applicable test set forth in the seminal opinion in Rowland v. Christian (1968) 69 Cal.2d 108, 70 Cal.Rptr. 97, 443 P.2d 561 (hereafter Rowland,). Under Rowland whether a particular defendant owes a tort duty to a given plaintiff depends upon a variety of factors, of which the major ones are "the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved." (Id., at p. 113, 70 Cal.Rptr. 97, 443 P.2d 561.)
Earlier, the trial court had overruled Navegar's demurrer, rejecting Navegar's theory that an analysis of these factors could not as a matter of law justify the establishment of a duty of care. In particular, the court had stated that the four most relevant factorswhich in the order stated by the court were "(1) the morally offensive nature of defendant's alleged conduct; (2) the foreseeability of the harm; (3) the connection between the alleged conduct and plaintiffs' injury; and (4) the policy of preventing future harm"all justified imposition of duty. The trial court revisited this issue, at Navegar's request, in connection with the motion for summary judgment, and did not change its view. On the contrary, the trial court reiterated its rejection of Navegar's argument that its conduct was not morally offensive because its marketing did not target criminals, finding a factual issue as to the interpretation of Navegar's advertising in the marketplace. The court noted that advertising the fact that the TEC-DC9 has "excellent resistance to fingerprints" supported appellants' claim that Navegar was deliberately targeting its advertising to persons contemplating violence.
The trial court also rejected Navegar's claim that its conduct was not morally offensive "because it did not develop the TEC-DC9 in an effort to sell assault weapons to California citizens in contravention of the AWCA," determining that even after enactment of the AWCA, the TEC-DC9 was sold to California residents from inside and outside the state. Finally, the court explicitly rejected Navegar's contention that "even if it did advertise assault weapons in violation of the AWCA, it was not foreseeable that those advertisements would cause plaintiffs' injuries." The court observed that "because Navegar's *160 advertising allegedly targeted criminals, it was reasonably foreseeable that criminals would in fact purchase and use Navegar's firearms to commit violent crimes. But even if plaintiffs are unable to prove that Navegar's advertising campaign `targeted' criminals, it was still foreseeable to Navegar that its assault weapons would be used to kill people, particularly in light of their commando-style design." In finding foreseeability, the trial court specifically noted the testimony of Navegar's president that he knew the guns he produced "end up killing people" but that he was "not responsible for that," and the testimony of Solodovnick, the marketing director, indicating Navegar knew its advertisements "would reach persons who might see themselves as the hero in their own version of a Rambo movie."
Despite its refusal to grant summary judgment on the grounds asserted by Navegarthat the policy considerations set forth in Rowland v. Christian, supra, 69 Cal.2d 108, 70 Cal.Rptr. 97, 443 P.2d 561, could not support the imposition of a duty, and that there were no disputed issues of material fact as to whether its conduct breached that dutythe trial court granted Navegar summary judgment because the common law has thus far declined to impose liability for injuries caused by a third party using legally manufactured and distributed firearms. In essence, the trial court viewed the judicial branch as lacking authority to impose upon a gun manufacturer a duty or standard of care relative to the manufacture, distribution or sale of firearms which exceeds the duty or standard of care imposed on such a person by applicable gun control laws. Emphasizing that "Navegar's weapons were legally manufactured and legally sold," the court observed that "[i]f plaintiffs want to change the law as it relates to the manufacture and sale of firearms, the way is through the Capitol, not the Court." (Italics in original.) The court granted summary judgment on appellants' common law negligence claim because "[t]he Court may not, in the absence of judicial or legislative authority, expand a manufacturers' liability for dangerous products beyond established law."

The Cause of Action for Strict Liability for Ultrahazardous Activity
Whether an activity is ultrahazardous is a threshold question of law for the court. (Luthringer v. Moore (1948) 31 Cal.2d 489 at p. 498, 190 P.2d 1.) Initially, when it overruled Navegar's demurrer, the trial court concluded that the manufacture of the TEC-DC9, combined with its targeted marketing in California, could in concert constitute an ultrahazardous activity. The court reconsidered this ruling in connection with the motion for summary judgment and changed its mind. The court concluded that the marketing of a product plays no role in determining whether an activity is ultrahazardous, but relates only to negligence. Because "Navegar's control over its marketing activities takes this part of the case out of the Strict Liability arena and places it squarely in the Negligence ring," the court decided that it "will not consider further whether marketing efforts, no matter how odious they may appear, fall in the category of ultrahazardous activity."
Concluding that "the manufacture of assault weapons[ ] is not inherently dangerous," the court also determined that it is not inherently dangerous "to put a product into the stream of commerce even if, as plaintiffs contend here, that product has no legitimate or social value." (Original italics.) Accordingly, the court granted Navegar summary judgment with respect to appellants' claim of strict liability based on ultrahazardous activity.

DISCUSSION

I.

The Standard of Review
Because summary judgment is a drastic remedy that should be used with caution (Murillo v. Rite Stuff Foods, Inc. *161 (1998) 65 Cal.App.4th 833, 840, 77 Cal. Rptr.2d 12), we subject the grant of such relief to a high level of scrutiny. The moving party's papers are strictly construed, while the opposing party's papers are liberally construed. (Ibid.; Brantley v. Pisaro (1996) 42 Cal.App.4th 1591, 1601, 50 Cal.Rptr.2d 431.) "Summary judgment is appropriate where there are no issues of material fact, and the moving party is entitled to judgment as a matter of law. (Code Civ. Proa, § 437c.) A defendant moving for summary judgment must show either that the plaintiff cannot establish an essential element of the cause of action or that the defendant has a complete defense. (Brantley v. Pisaro, supra, 42 Cal.App.4th 1591, 1594, 50 Cal.Rptr.2d 431 ... § 437c, subd. (o)(2).) The burden then shifts to the plaintiff to establish the existence of a genuine issue of material fact as to the existence of the element challenged by the defendant. (42 Cal.App.4th at p. 1594, 50 Cal.Rptr.2d 431.) To defeat the motion for summary judgment, the plaintiff must show `"specific facts,'" and cannot rely upon the allegations of the pleadings. (Ibid.)" (Snyder v. United States Fidelity & Guaranty Co. (1997) 60 Cal.App.4th 561, 565, 70 Cal.Rptr.2d 498, fn. omitted; see Scheiding v. Dinwiddie Construction Co. (1999) 69 Cal.App.4th 64, 69, 81 Cal. Rptr.2d 360.)
The trial court's ruling on a summary judgment motion is subject to de novo review. (Ann M. v. Pacific Plaza Shopping Center (1993) 6 Cal.4th 666, 674-675, 25 Cal.Rptr.2d 137, 863 P.2d 207; 580 Folsom Associates v. Prometheus Development Co. (1990) 223 Cal.App.3d 1, 14, 272 Cal.Rptr. 227.) We review a summary judgment ruling under the same general principles applicable in the trial court, independently determining the construction and effect of the facts presented to the trial judge as a matter of law. (Saldana v. Globe-Weis Systems Co. (1991) 233 Cal. App.3d 1505, 1511-1515, 285 Cal.Rptr. 385.)
With these principles in mind, we separately inquire whether summary judgment was properly granted with respect to the two causes of action at issue.

II.

Ordinary Negligence
"In cases that are dramatic and involve `hot' issues, there is a tendency for the parties to describe themselves as raising new issues that are remarkable in their legal context. But in fact, such cases are usually best looked at in the most traditional of ways. Courts must see how these cases fit into old categories before considering whether it is either necessary or proper to expand these old categories or to create new ones. And so it is with the case before us." (McCarthy v. Olin Corp. (2d Cir.1997) 119 F.3d 148, p. 161 (dis. opn. of Calabresi, J., fn. omitted).)
The elements of an action for negligence are the existence of duty (to conform to a standard of care to protect others against unreasonable risks of harm); breach of duty (conduct below the standard of care); causation (between the defendant's act or omission and the plaintiffs injuries) and damages. (Prosser & Keeton, Torts (5th ed.1984) § 30, pp. 164-165.) The issues at the present stage of these proceedings are the existence and scope of Navegar's duty and the sufficiency of the evidence that its allegedly negligent activities were a cause-in-fact of appellants' injuries.

A.

Duty
With respect to the threshold question of duty, the seminal California cases establish the "general rule" that "each person has a duty to use ordinary care and `is liable for injuries caused by his failure to exercise reasonable care in the circumstances....' (Rowland v. Christian, supra, 69 Cal.2d 108, 112, 70 Cal. Rptr. 97, 443 P.2d 561; Civ.Code, § 1714.) *162 Whether a given case falls within an exception to this general rule, or whether a duty of care exists in a given circumstance, `is a question of law to be determined on a case-by-case basis.' (Isaacs v. Huntington Memorial Hospital (1985) 38 Cal.3d 112, 124 [211 Cal.Rptr. 356, 695 P.2d 653])" (Parsons v. Crown Disposal Co. (1997) 15 Cal.4th 456, 472, 63 Cal.Rptr.2d 291, 936 P.2d 70.) "[L]egal duties are ... merely conclusory expressions that, in cases of a particular type, liability should be imposed for damage done." (Tarasoff v. Regents of University of California (1976) 17 Cal.3d 425, 434, 131 Cal.Rptr. 14, 551 P.2d 334.) The existence of a duty is a question of law to be determined by the court alone. (Ann M. v. Pacific Plaza Shopping Center, supra, 6 Cal.4th 666 at p. 674, 25 Cal. Rptr.2d 137, 863 P.2d 207; Ballard v. Uribe (1986) 41 Cal.3d 564, 572, fn. 6, 224 Cal.Rptr. 664, 715 P.2d 624.)
It must be noted at the outset that appellants do not assert a duty in this case on the basis of a special relationship, as is usually the case in suits against the seller or manufacturer of a firearm for injuries sustained as a result of its use by another. (See, e.g., Jacoves v. United Merchandising Corp. (1992) 9 Cal.App.4th 88, 114-115, 11 Cal.Rptr.2d 468; Reida v. Lund (1971) 18 Cal.App.3d 698, 96 Cal.Rptr. 102.) The duty appellants assert arises instead from the general rule that "[e]very one is responsible ... for an injury occasioned to another by his want of ordinary care or skill in the management of his property or person...." (Civ.Code, § 1714, subd. (a).)
Navegar is alleged in the complaint to have "acted negligently by manufacturing, marketing, and making available for sale to the general public the TEC-9 and TEC-DC9." According to the complaint, Navegar knew or in the exercise of reasonable care should have known that (1) the TEC-DC9 "ha[s] no legitimate sporting or self-defense purpose and is particularly well adapted to a military-style assault on large numbers of people"; (2) certain features of the TEC-DC9 "make the weapon more attractive to criminals"; (3) the weapon "is disproportionately associated with criminal activity"; and (4) "the TEC-9 and TEC-DC9 would be used to kill or injure innocent persons in violent criminal acts such as the mass killing committed by Ferri." The complaint alleges that Navegar's conduct breached its "duty not to advertise the TEC-9 and TEC-DC9 for sale to the general public." It also alleges that the advertising of the TEC-DC9 "targets a criminal clientele."
Appellants maintain that the three theoretically distinct activities of "[m]anufacturing, marketing, and making available to the general public the TEC-9 and TEC-DC9," are interrelated. Appellants contend Navegar was negligent by not restricting sales of the TEC-DC9 to trained military and law enforcement personnel, who might responsibly employ it for the assaultive purpose for which it was designed; that the failure to restrict the availability of the weapon cannot reasonably be divorced from the manner in which Navegar marketed the product; and that Navegar's targeted marketing of the TEC-DC9 to a "criminal clientele" further increased the risk of harm created by the relatively unrestricted distribution of this weapon.
Our dissenting colleague portrays appellants as having disclaimed reliance upon the element of marketing in demonstrating negligence. This view was not shared by the trial court or by Navegar, which repeatedly refers to the issue in its briefs here and below. It is also belied by the language of the complaint quoted above and by virtually all of appellants' other pleadings. For example, appellants argued below in opposition to summary judgment, "[e]verything about Navegar's advertising and marketing reflected its efforts to appeal to purchasers in need of firepower of the sort ordinarily associated with battlefield uses. Navegar used the phrase `assault-type pistol' to describe the TEC-9 `because it could be used in an *163 offensive type situation' and to convey the idea that it could be used to `initiate fire.'.... Simply put, Navegar sought out customers that viewed themselves as needing military-style firepower that would enable them to fire scores of rounds very quickly in order to kill or wound multiple targets in a limited amount of time." Pointing to advertisements that called attention to features of the TEC-DC9 that would be of interest only to criminals, such as the claim that the finish of the weapon provided "excellent resistance to fingerprints," appellants claim Navegar deliberately sought out a "criminal clientele." Contrary to the portrayal by the dissent, appellants' counsel's remarks at oral argument, while they disavow reliance upon a theory of negligent marketing per se, do not disclaim reliance on Navegar's marketing practices as a factor in their negligence cause of action. Rather, these comments appropriately place marketing within the context of the overall duty they assert Navegar breached.
It must be acknowledged that the risk of harm from the criminal misuse of firearms is always present in a society such as ours, in which the presence of firearms is fairly widespread and many individuals possess the capacity to criminally misuse them. It follows that the manufacturer and distributor of a legal and nondefective firearm may not be found negligent merely because it manufactured and/or distributed the weapon. This does not mean, however, that those who manufacture, market and sell firearms have no duty to use due care to minimize risks which exceed those necessarily presented by such commercial activities, which can be accomplished without unreasonably depriving responsible citizens of the right to purchase and use firearms. The allegation of appellants' complaint that Navegar breached its duty not to advertise the TEC-9 and TEC-DC9 for sale to the general public must be read together with the allegations concerning Navegar's knowledge of the extraordinary risks of misuse posed by the weapon as designed and marketed. Thus, implicit in appellants' claim of ordinary negligence is that the manner in which Navegar manufactured and marketed the TEC-DC9 and made it available to the general public created risks above and beyond those citizens may reasonably be expected to bear in a society in which firearms may legally be acquired and used and are widely available. Appellants' complaint can best be understood as presenting a theory of negligence based on Navegar's breach of a duty to use due care not to increase the risk beyond that inherent in the presence of firearms in our society.[7]
In another context, such a duty not to increase the risk of harm inherent in an activity has been recognized. Knight v. Jewett (1992) 3 Cal.4th 296, 11 Cal.Rptr.2d 2, 834 P.2d 696, involved a plaintiff injured during a game of touch football. The issue in the case was the interplay of the doctrines of assumption of risk and comparative fault. The court determined that the doctrine of assumption of risk bars a plaintiffs recovery in situations where the defendant's conduct did not breach any duty to the plaintiff, while assumption of risk is merged into the comparative fault scheme in cases where the defendant does owe a duty of care toward the plaintiff. (Id., at p. 308, 11 Cal.Rptr.2d 2, 834 P.2d 696.) In this context, the court recognized that although generally a defendant may have a duty to use due care to avoid injury to others (see Civ.Code, § 1714) and may be required to eliminate dangerous conditions under some circumstances, certain activities are inherently dangerous. (3 Cal.4th at p. 315, 11 Cal.Rptr.2d 2, 834 P.2d 696.) The court concluded: "Although defendants *164 generally have no legal duty to eliminate (or protect a plaintiff against) risks inherent in [a] sport itself, it is well established that defendants generally do have a duty to use due care not to increase the risks to a participant over and above those inherent in the sport." (Knight v. Jewett, supra, 3 Cal.4th at pp. 315-316, 11 Cal. Rptr.2d 2, 834 P.2d 696, italics added.)
While Knight v. Jewett concerned the dangers inherent in sporting activities, its reasoning extends to the facts here. Sporting activities, like handguns, are inherently dangerous in a variety of ways, but they are viewed as socially desirable and useful, and are therefore permitted to be free of the general duty to eliminate all integral risks of harm. The court in Knight v. Jewett recognized that the dangers inherent in an activity, such as touch football or skiing, may be an important part of the activity itself and therefore cannot be removed without also eliminating the social desirability of the activity. "In this respect, the nature [of the activity] is highly relevant [to] the duty of care owed by the particular defendant." (Knight v. Jewett, supra, 3 Cal.4th at p. 315, 11 Cal.Rptr.2d 2, 834 P.2d 696.) Similarly, the nature of a commercial enterprise presenting an inherent danger may be relevant in determining a defendant's duty of care. Like the provision of certain sporting facilities, making handguns "available to the general public," as alleged by appellants, contains an element of danger that cannot be eliminated without effectively barring the activity. Manufacturers and distributors of firearms, however, can be expected to refrain from affirmatively increasing the inherent risk of danger posed by the furnishing of their product.
We recognize, of course, that the issue in Knight was not duty per se but the role of duty in determining the applicability of the doctrine of assumption of risk. Unlike our dissenting colleague, however, we do not view reliance upon Knight's discussion of duty as untenable for this reason. Knight's analysis of the definition of duty was not controlled by its consideration of the doctrine of assumption of risk; rather, it concluded that a standard duty analysis was a prerequisite to determining whether to apply assumption of risk or comparative fault principles to a given case. Our point is simply that the duty to use due care not to increase the risks inherent in a sport recognized as "well established" in Knight logically applies, by analogy, to other activities that are also inherently dangerous.
Moreover, the concept of increasing the risk as a component of a duty analysis is not unique to Knight. (See, e.g., Baker v. City of Los Angeles (1986) 188 Cal.App.3d 902, 907, 233 Cal.Rptr. 760 [one who voluntarily comes to the aid of another may be liable if his or her conduct increases the risk of harm]; Peterson v. San Francisco Community College Dist. (1984) 36 Cal.3d 799, 812, 205 Cal.Rptr. 842, 685 P.2d 1193 [landowner may be liable for injury inflicted by a third party's criminal act where the property was maintained in such a way as to increase the risk of such criminal conduct].) We realize that, like Knight, most such cases involve "special relationships" and state the rule that defendants generally do not owe a duty not to increase the risk inherent in any activity plaintiffs may be pursuing absent a special relationship. This is not necessarily true, however, where, as here, the risk of harm was allegedly increased as a result of the defendant's misfeasance rather than nonfeasance. For example, the concept of increasing the risk of harm was employed in a duty analysis without a predicate special relationship in Pamela L. v. Farmer (1980) 112 Cal.App.3d 206, 209-211, 169 Cal.Rptr. 282. The court explained that the principle that "generally a person has no duty to control the conduct of a third person ... in the absence of a `special relationship' either to the third person or to the victim ... has no application where the defendant, through his or her own action (misfeasance) has made the plaintiffs position worse and has created a foreseeable risk of harm from the *165 third person." (Id., at p. 209, 169 Cal. Rptr. 282.) "In such cases the question of duty is governed by the standards of ordinary care." (Id., at p. 209, 169 Cal.Rptr. 282, italics added.)[8]
The need for a special relationship as a prerequisite to liability is, in other words, greatest where the conduct of the defendant is unintentional and the risk of harm not clearly foreseeable. Conversely, as Pamela L. demonstrates, where the defendant's misfeasance was intentional and a high degree of harm was foreseeable, such "special circumstances" may eliminate the need for a special relationship. At a minimum, the analogy to the duty not to increase risks recognized in Knight and other cases is justified in situations, as here, in which the defendant is alleged to have affirmatively increased the risk by "inviting or enticing" another to engage in the dangerous activity, thereby creating "special circumstances" that are the functional equivalent of a special relationship. (Avis Rent A Car System, Inc. v. Superior Court (1993) 12 Cal.App.4th 221, 223, 15 Cal. Rptr.2d 711, discussed, post, at p. 168.)
As earlier noted, the major policy considerations that bear upon whether a court should depart from the principle that a person is liable for injuries caused by failure to exercise care were identified in Rowland v. Christian, supra, 69 Cal.2d at p. 113, 70 Cal.Rptr. 97, 443 P.2d 561: "the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved." (Id., at p. 113, 70 Cal.Rptr. 97, 443 P.2d 561.) We now turn to consideration of these factors, which are the foundation of our duty determination.

1. The Injuries in This Case Were Foreseeable.

Navegar contends that Ferri's criminal acts could not reasonably have been anticipated because they did not involve the ordinary use of its product, and were highly unusual. For a variety of reasons, we are unpersuaded.
While Navegar may not have been able to specifically foresee that Ferri would use the TEC-DC9s in the manner he did at 101 California Street, "a court's taskin determining `duty' is not to decide whether a particular plaintiffs injury was reasonably foreseeable in light of a particular defendant's conduct, but rather to evaluate more generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed on the negligent party." (Ballard v. Uribe, supra, 41 Cal.3d at *166 p. 573, fn. 6, 224 Cal.Rptr. 664, 715 P.2d 624, original italics.)[9]
Navegar's officers were aware of reports in the media and BATF data showing that the high firepower, low price, concealability, and certain other characteristics of the TEC-DC9 made it the "weapon of choice" of certain types of criminals, and that it was often used in criminal assaults, many of which had been widely publicized. The evidence suggests that the favored status and frequent criminal use of the TEC-9 and TEC-DC9 was also the result of Navegar's advertising, which called attention to features of the weapon that would be of interest only to criminals, such as the threaded barrel that accommodated silencers and flash suppressors, and the claim that the surface of the weapon has "excellent resistance to fingerprints." Navegar made the weapon available for use in movies and at least one television program in which it was used by violent characters for criminal purposes. Given these facts, it could hardly have surprised the company that a TEC-DC9 would be used in a violent criminal assault such as the one Ferri perpetrated.
We reject Navegar's assertion that Ferri's use of the TEC-DC9 was unforeseeable because it was such an "unusual" use. The record is not only replete with evidence of the high criminal use of the TEC-DC9, but bereft of any persuasive evidence that it is suitable or commonly employed for any other civilian use. In this important respect, the TEC-DC9 is distinguishable from most conventional handguns and rifles, which are useful not just for criminal purposes but also for hunting, target practice or self-defense. The closest Navegar came to establishing that the TEC-DC9 has any utility whatsoever was the deposition testimony of the chairman of its board of directors that the weapon provided effective protection against a government "takeover" and "corrupt law enforcement agencies" and could also be used for "plinking," casual shooting for fun at random targets, such as bottles and cans. The first two of these putative uses are exceedingly implausible if not preposterous. The record does not show any danger or public perception our government may be forcibly "overthrown," that our military forces provide insufficient protection against such a possibility, creating a need for individual citizens to arm themselves, or that the TEC-DC9 would provide an effective means of defending against an organized insurrection in the unlikely event one occurred and citizens were called upon. Nor is there any evidence of a felt need for Americans to arm themselves for protection against rogue law enforcement agencies or that an assault weapon would be appropriate for that purpose. Furthermore, there is no evidence Navegar ever promoted the weapon as a useful means of combating the anticipated communist takeover Garcia referred to in his testimony, or against the corrupt law enforcement agencies he also mentioned.
Garcia's testimony that the TEC-DC9 is useful for "plinking" was rebutted by Chief Supenski, who pointed out that "the size, weight, and configuration of the TEC-9 presents a challenge to any shooter to shoot accurately. Since the purpose of `plinking' targets is to hit them, the TEC-9 is not even useful for that purpose." Furthermore, Supenski stated, "In most gun industry publications, the TEC-9 (and weapons of that ilk) are referred to as `fun guns' or sometimes `plinkers.' They are `fun' because they can shoot prodigious amounts of ammunition in rapid fire fashion; *167 `plinkers' because you can use them informally to shoot targets from bottles to cans. However, since the TEC-9 uses 9mm parabellum ammunition at roughly $11.00 per box of 50 rounds, the `fun' can get quite expensive in short order." It is also worth noting that the federal agency that regulates firearms and is charged with determining whether certain types have a "sporting purpose" (see 18 U.S.C. § 925(d)(3)), such as "plinking," clearly believes assault weapons such as the TEC-9 and TEC-DC9 have no such purpose (U.S. Dept. of the Treasury, Study on the Suitability of Modified Semiautomatic Assault Rifles (April 1998) at pp. 12-14),[10] and this is also the view of our Legislature, which has declared that the TEC-9, TEC-DC9, and other weapons restricted under the AWCA "serve no ... sporting purpose for honest citizens." (Stats. 1989, ch. 19, § 5, pp. 69-70.)
The record does not show that recreational shooters commonly use the TEC-DC9 for "plinking" or that Navegar ever promoted the use of the weapon for that purpose. The salesperson who sold Ferri a TEC-DC9 never told him the weapon was useful for plinking and Messing, the customer with whom Ferri discussed his purchase, told him "they'd probably laugh at him" if he ever brought it to a shooting range. Dr. Meloy expressed the view that Ferri's use of the weapon for target practice in the Mojave Desert was a "rehearsal" for the massacre.
Considering the widespread and well publicized use of the TEC-DC9 in violent criminal enterprises; the question that has been raised as to whether there is any other suitable civilian use for the weapon; and the manner in which Navegar targeted the marketing of the weapon to persons with violent propensities, we conclude that appellants satisfactorily established that use of the TEC-DC9 in violent assaults of the type carried out by Ferri at 101 California Street was foreseeable.
The fact that Ferri's acts were criminal does not necessarily render them unforeseeable. "It is often said that an actor may assume that others will act lawfully and carefully. Rightly understood this is sound enough, and no more than a corollary of the general principle [that one has an obligation to take into account the conditions and the conduct of others]. As a broad generalization, people probably do obey the law, so that unlawful conduct is more or less deviational and unusual. In many situations, therefore, the assumption mentioned no more than reflects the real factual probabilities as to what another person's conduct will be. If the assumption is made only in cases where it reflects the facts it is useful and proper. But in this connection two things must be noted. The first is that such an assumption does not always correspond to the facts. It does not in situations where a law is generally disobeyed. It does not where the facts in a specific case would show to a reasonable person in the actor's position that another person will probably disobey the law this time. And it does not wherever the actor's conduct exposes some interest to risk from a large and indeterminate group of people that will probably include some who will be negligent or commit crime, so that the likelihood of some negligence or some crime is considerable, though the number of those who will be responsible for it is relatively small. The second thing to be noted is that the assumption has often been applied rather mechanically, without any real regard to the factual probabilities of the situation." (3 Harper, James & Gray, The Law of Torts (2d ed.1986) § 16.12 at pp. 495-496, fns. omitted.)[11]
*168 As previously indicated, generally "absent a special relationship, an actor is under no duty to control the conduct of third parties." (Weirum v. RKO General, Inc. (1975) 15 Cal.3d 40, 48, 123 Cal.Rptr. 468, 539 P.2d 36.) However, "this rule has no application if the plaintiffs complaint, as here, is grounded upon an affirmative act of defendant which created an undue risk of harm." (Ibid.) The critical question is whether the conduct of the third person is foreseeable. Thus, Richards v. Stanley (1954) 43 Cal.2d 60, 271 P.2d 23 (hereafter Richards), found that a defendant who had left a car unlocked, with the keys in the ignition, had no duty to protect the plaintiff from the negligent driving of a thief. The plaintiff was injured when hit by the defendant's car, which had been stolen. The court noted that the car had not been parked in an area posing any special risk that it might be stolen and held that "[e]ven if [the defendant] should have foreseen the theft, she had no reason to believe that the thief would be an incompetent driver." (Id., at p. 66, 271 P.2d 23.) By contrast, in Richardson v. Ham (1955) 44 Cal.2d 772, 776, 285 P.2d 269 (hereafter Ham), defendants who had left a bulldozer unattended and partially locked in a manner that did not prevent it from being started, were held to have a duty to "exercise reasonable care to protect third parties from injuries arising from its operation by intermeddlers." The plaintiffs in that case were injured when intoxicated young men started the bulldozer, were unable to stop it, and abandoned it to cause damage along its path. Ham distinguished Richards, noting evidence that (unlike a car) bulldozers attracted curiosity and were relatively uncommon, so that an intermeddler who started one might not know how to stop it. (Ibid.)
The more recent opinion of Justice Chin, when he was a member of this court, in Avis Rent A Car System, Inc. v. Superior Court, supra, 12 Cal.App.4th 221, 15 Cal. Rptr.2d 711, is particularly illuminating. The Avis court found no duty on the part of a car rental agency to control the conduct of a thief who stole a car from a negligently attended lot and subsequently injured another motorist while being chased by the police. After reviewing the cases, including Richards and Ham, Avis concluded that the conduct of leaving cars with keys in the ignition in a negligently attended lot, while it increased the risk of theft, did not create a duty to control the conduct of a thief. In the course of his opinion Justice Chin relied on the observation in Ham, supra, that the owner of a vehicle is under no duty to persons on the highway to exercise reasonable care to keep his car out of the hands of a thief because "`the owner will ordinarily have no reason to foresee that a thief will be an incompetent driver....'" (Avis, supra, at p. 226, 15 Cal.Rptr.2d 711.) According to Justice Chin, an owner only "has a duty not to invite or entice others to tamper with vehicles they are incompetent to drive" (id. at p. 229, 15 Cal.Rptr.2d 711), and "Avis in no way invited or enticed incompetent drivers to use its cars." (Id., at p. 230, 15 Cal.Rptr.2d 711.) Justice Chin's opinion suggests that "inviting or enticing an incompetent driver to tamper with a vehicle" is the equivalent of the "`special circumstances' which create a special relationship between or among the parties." (Id., at p. 233, 15 Cal.Rptr.2d 711.)
The facts of the present case are, of course, dramatically different from those in Avis. Not only does the evidence show Navegar had substantial reason to foresee that many of those to whom it made the TEC-DC9 available would criminally misuse it to kill and injure others, but as well that its targeted marketing of the weapon "invited or enticed" persons likely to so *169 misuse the weapon to acquire it. In short, the conduct alleged in the present case and preliminarily shown by the evidence is far more consequential and amenable to the imposition of a legal duty than that of the defendants in Avis, supra, and Richards, supra.
The fact that the intervening acts that injured appellants were criminal rather than negligent is immaterial in light of their foreseeability. California courts have rejected the blanket rule that an intervening criminal act is by its very nature a superseding cause (see, e.g., Bigbee v. Pacific Tel. & Tel. Co. (1983) 34 Cal.3d 49, 58, 192 Cal.Rptr. 857, 665 P.2d 947; Ham, supra, 44 Cal.2d at p. 777, 285 P.2d 269; Mosley v. Arden Farms Co. (1945) 26 Cal.2d 213, 218, 157 P.2d 372; Rosh v. Cave Imaging Systems (1994) 26 Cal. App.4th 1225, 1236, 32 Cal.Rptr.2d 136), instead adopting the Restatement view that "`[i]f the realizable likelihood that a third person may act in a particular manner is the hazard or one of the hazards which makes the actor negligent, such an act whether innocent, negligent, intentionally tortious or criminal does not prevent the actor from being liable for harm caused thereby.'" (Ham, supra, 44 Cal.2d at p. 777, 285 P.2d 269, italics added, citing Rest.2d Torts, § 449.) Here, the likelihood that a third person would make use of the TEC-DC9 in the kind of criminal rampage Ferri perpetrated is precisely the hazard that would support a determination that Navegar's conduct was negligent.[12] As the Restatement language quoted in Ham, supra, indicates, it is immaterial whether the hazardous conduct of the third person is negligent or criminal. (Ibid.)

2. Imposition of Duty is also Justified by the Three Other Relevant Criteria Set Forth in Rowland v. Christian.[13]

Morally Blameworthy Conduct.
The evidence indicating that the marketing of the TEC-DC9 was calculated to bring the TEC-DC9 to the attention of violent persons likely to use it for a criminal purpose, and the indifference of Navegar's most senior officer, Carlos Garcia, to the criminal use of the company's product, shows morally blameworthy conduct. Also blameworthy was the conduct of Solodovnick, Navegar's national sales and marketing director, who violated federal gun laws by conspiring to furnish manuals and videotapes instructing interested persons how to illegally convert the TEC-DC9 into a fully automatic weapon. The trier of fact could infer Navegar knew of and approved this activity, as Solodovnick's criminal conduct appears to have taken place while he was national marketing director of Navegar and to have been calculated to increase sales of its product.

Policy of Preventing Future Harm.
The social cost of the deaths and injuries resulting from the use of firearms in our society is enormous. A report published in the Journal of the American Medical Association in August, 1999, concludes that "medical costs of treating the gunshot injuries *170 received during 1994 in the United States was $2.3 billion. The average medical cost of a gunshot injury was approximately $17,000, of which 49% was borne by taxpayers, 18% by private insurance, and 33% by other sources. While medical costs are a relatively small component of the total burden imposed on society by gun violence, they represent a substantial cost to the medical care system." (Cook, Lawrence, Ludwig & Miller, The Medical Costs of Gunshot Injuries in the United States (1999) 282 J.A.M.A. 447, 454, fas. omitted.) The additional tangible and intangible social costs of gun violence, which are not easily calculable but must be monumental, "include lost wages and productivity from both the victims and family members who must care for them, physical and mental pain and suffering, police resources, funeral expenses, and the psychological insecurity we all suffer from living in a gun-infested society." (McClurg, The Tortious Marketing of Handguns: Strict Liability is Dead, Long Live Negligence (1995) 19 Seton Hall Legis. J. 777, 792.) This insecurity is suffered not just by ordinary citizens but as well by the law enforcement officials they rely upon for protection. The "rising level of lethality" the police face from assault weapons on the street was described to Congress by the representative of a national police officers organization, who testified that "[I]n the past, we used to face criminals armed with a cheap Saturday Night Special that could fire off six rounds before loading. Now it is not at all unusual for a cop to look down the barrel of a TEC-9 with a 32 round clip.... The six-shot .38 caliber service revolver, standard law enforcement issue for years, [is] just no match for a criminal armed with a semiautomatic assault weapon." (H.R.Rep. No. 103-489, supra, at pp. 13-14.)
There is, needless to say, a strong policy of preventing the death and injuries which impose these tangible and intangible costs on our society, a policy expressed not just on innumerable occasions by the courts (see, e.g., Warner v. Santa Catalina Island Co. (1955) 44 Cal.2d 310, 317, 282 P.2d 12; Jensen v. Minard (1955) 44 Cal.2d 325, 328, 282 P.2d 7), but as well by Congress (18 U.S.C. § 922(q)(1)) and by our own Legislature. (Pen.Code, § 12275.5.)

The Burden to the Defendant and Consequences to the Community of Imposing a Duty to Exercise Care With Resulting Liability for Breach.
As our Supreme Court recently explained in Parsons v. Crown Disposal Co. (1997) 15 Cal.4th 456, 473-77, 63 Cal. Rptr.2d 291, 936 P.2d 70, the burden to the defendant that must be evaluated under Rowland relates to the reasonable preventive measures the defendant would have to take to guard against a particular danger if there were a duty to exercise care and whether such measures would unduly interfere with a societal interest.
In Parsons a rider was thrown from his horse after the horse was frightened by loud noises from a garbage truck operating in a parking lot located near a public bridle path. The rider sought recovery for his injuries from the garbage company, but the trial court granted summary judgment for the defendant. The Supreme Court upheld this ruling. The gravamen of Chief Justice George's opinion is that imposing "an expansive duty to guard against frightening horses" (id., at p. 477, 63 Cal.Rptr.2d 291, 936 P.2d 70) would unreasonably increase the burden on those who operate garbage trucks or other socially beneficial machines that might frighten horses. For example, the court rhetorically inquired, "[s]hould a homeowner whose property abuts ... [a] bridle path (or who has horse owning neighbors) be obligated to peek over his or her six-foot fence to make sure that no horse is near before starting a power lawn mower?.... Should a homeowner or building contractor be obligated to undertake similar procedures before and during use of chain saws, leaf blowers, or other loud power tools? What about *171 noise from passing cars and trucks on the adjacent highways, or from a picnicker's radio, or from an emergency siren or alarm, or from a jetliner's sonic boom?" (Id., at p. 475, 63 Cal.Rptr.2d 291, 936 P.2d 70.) Imposing a duty to guard against fright to a horse, the court concluded, "might well subject all manner of actors to the same duty and potential liability, with obvious and detrimental consequences stifling to the community." (Ibid.)
No such adverse consequences would result from the imposition of liability on gun manufacturers who make a particularly lethal weapon having little or no legitimate civilian use available to the public and target the marketing of the weapon to persons likely to misuse it. The reasons are not just the case with which such a duty can be discharged, the relatively small number to whom it would even apply, and the need to protect life and health, but the fact that the activity that would be burdened has little discernible social value. As stated in Parsons, "when addressing conduct on the part of a defendant that is `deliberative, and ... undertaken to promote a chosen goal, ... [c]hief among the factors which must be considered is the social value of the interest which the actor is seeking to advance.'" (Id., at 473, 63 Cal.Rptr.2d 291, 936 P.2d 70, original italics, quoting Prosser & Keeton, Torts, supra, § 31, p. 171.) Where the defendant's conduct has great social utility, the adverse consequences to the community of imposing a duty to guard against injury may provide one of the "`overriding policy considerations'" that will support a legal conclusion that the defendant has no dutyeven with respect to foreseeable injuries. (Parsons, supra, at p. 476, 63 Cal.Rptr.2d 291, 936 P.2d 70, citing Bily v. Arthur Young & Co. (1992) 3 Cal.4th 370, 398-399, 11 Cal.Rptr.2d 51, 834 P.2d 745; Elden v. Sheldon (1988) 46 Cal.3d 267, 274, 250 Cal.Rptr. 254, 758 P.2d 582; Borer v. American Airlines, Inc. (1977) 19 Cal.3d 441, 446, 138 Cal.Rptr. 302, 563 P.2d 858.)[14]
It follows that where the defendant's conduct has little or no social utility, and the imposition of liability would therefore have minimal adverse social consequences, it is correspondingly easier to reach the legal conclusion that he or she has a duty to exercise care not to increase or encourage the risk of foreseeable injuries.
The evidence before us indicating the absence of any legitimate civilian use for the TEC-DC9 is consistent with the expressed view of the California Legislature. The AWCA states that the TEC-9 (and assault weapons generally) has "such a high rate of fire and capacity for firepower that its function as a legitimate sports or recreational firearm is substantially outweighed by the danger that it can be used to kill and injure human beings." (Pen. Code, § 12275.5.) In an uncodified portion of the AWCA, the Legislature additionally "finds and declares that the weapons enumerated in Section 12276 of the Penal Code [one of which is the TEC-9] are particularly dangerous in the hands of criminals and serve no necessary hunting or sporting purpose for honest citizens. It is the intent, therefor, to ban the weapons enumerated in Section 12276 of the Penal Code and any other models which are only variations of these weapons ..." (Stats. 1989, ch. 19, § 5, pp. 69-70.)
The United States Congress shares the view of our Legislature. In passing the *172 Violent Crime Control and Law Enforcement Act of 1994 (Pub.L. No. 103-322), which, with certain exceptions, made it unlawful to manufacture, transfer or possess the TEC-9, TEC-DC9, and other semiautomatic assault weapons, Congress was presented with evidence demonstrating that such firearms were "the weapons of choice among drug dealers, criminal gangs, hate groups, and mentally deranged persons bent on mass murder" (H.R. No. 103-89, supra, at p. 13), and that the characteristics of such weapons "distinguish them from sporting guns." (Id., at p. 17.)
It is also worth noting that the social value of assault weapons to civilians, if there be any at all, pales in comparison to that of scores of consumer products such as asbestos, silicone breast implants, and birth control deviceswhose manufacturers have been exposed to liability under our tort law at great cost.[15] It is true that the mass tort cases that have given rise to such liability involve defective products rather than the sort of negligent manufacturing, marketing and distribution alleged in this case. But insofar as strict product liability in such cases may turn upon a risk/benefit analysis (Barker v. Lull Engineering Co., Inc. (1978) 20 Cal.3d 413, 143 Cal.Rptr. 225, 573 P.2d 443), as does the determination of duty in a negligence case, the analogy is justified.[16] We do not believe manufacturers of firearms, and particularly those who manufacture and sell assault weapons that appear to have no legitimate civilian use, should be entitled to any greater protection against liability under the law of negligence than that accorded manufacturers of products having far greater social utility absent an unambiguous legislative directive to the contrary. We conclude that imposition in this case of the common law duty to exercise care would neither unreasonably burden Navegar nor adversely affect the community.
Considered collectively, the considerations just discussed militate in favor of imposing a duty upon Navegar not to manufacture, market and distribute the TEC-DC9 in such a way as to increase the inherent risks posed by such a weapon. A contrary conclusion, as Navegar advocates, would result in exempting from tort liability conduct even more egregious than that alleged here. "All human conduct fits along a continuum which passes from totally innocent conduct through slight negligence, negligence, gross negligence, willful and wanton or reckless conduct, and finally to intentional misconduct. [Citation.]" (American Employer's Insurance Co. v. Smith (1980) 105 Cal. App.3d 94, 100, 163 Cal.Rptr. 649.) Gross negligence or reckless misconduct occurs "when a person with no intent to cause harm intentionally performs an act so unreasonable and dangerous that he knows, or should know, it is highly probable that harm will result. [Citations.]" (Donnelly v. Southern Pac. Co. (1941) 18 Cal.2d 863, 869, 118 P.2d 465.) "It involves no intention, as does willful misconduct, to do harm, and it differs from negligence in that it does involve an intention to perform an act that the actor knows, or *173 should know, will very probably cause harm. [Citations.]" (Ibid.) Under Navegar's analysis of duty, even conduct approaching the most culpable end of this spectrumfor example, manufacturing a semiautomatic weapon called "The Copkiller," and advertising it as capable of piercing the bulletproof vests used by law enforcement officerswould not be actionable.

3. The Imposition of a Duty Does Not Conflict With the AWCA

Navegar also maintains that a duty may not be imposed in this case because the manufacture, marketing, and sale of the TEC-DC9s used by Ferri did not violate the AWCA or any other gun control statute and liability for negligence cannot be imposed for the distribution of a nondefective product that may be sold legally.
One of the strange aspects of this case is the extent to which Navegar attempts to avoid liability on the basis of a gun control statute designed to ban its activities. Navegar states in its brief, for example, that its conduct cannot be deemed morally blameworthy because the AWCA "did not declare all firearms defective or their manufacture morally blameworthy, and, ... specifically allowed out-of-state sales." Because the out-of-state sales of TEC-DC9s to Ferri did not violate (or, as Navegar would have it, "complied with") the AWCA, Navegar claims we must also reject appellants' argument that the TEC-DC9 has no social utility. While it concedes that the AWCA proscribes the sale of assault weapons, Navegar repeatedly emphasizes that it does so only in California. In enacting the AWCA, Navegar maintains, "the Legislature expressly confirmed Navegar's right to do exactly what it did heremarket and sell `assault weapons' outside the State." (Citing Pen.Code, § 12290 ["Any licensed gun dealer ... who lawfully possesses an assault weapon ... may ... sell it to a resident outside the state, ..."].) For this reason, Navegar insists that "to impose liability on [it] in this instance would be to ban retroactively its then-legal activities by `judicial fiat.'" In Navegar's view, "[appellants' arguments attempting to affect [sic] such a change in the legal landscape simply are addressed to the wrong forum." As we have said, the trial court accepted this view of the case. Emphasizing the undisputed facts "that the weapons used at 101 California Street were legally manufactured and sold by Navegar, and that they were legally sold to Ferri [in Nevada]," the trial court reasoned that a higher duty could not be imposed on Navegar "under California common law." (Original italics.)
This reasoning is in our view replete with misconceptions and creates a wholesale immunity from liabilityand not just in gun casesthat simply cannot withstand judicial scrutiny. (Sprecher v. Adamson Companies (1981) 30 Cal.3d 358, 363, 178 Cal.Rptr. 783, 636 P.2d 1121.)
The basic misconception is that the AWCA or other gun control laws applicable to the manufacture and sale of firearms necessarily define the scope of the duty or standard of care applicable to gun manufacturers or retailers, and that such persons are exempt from the common law duty to refrain from negligence in marketing and distributing their products to the extent such a duty would impose responsibilities exceeding those imposed by applicable gun control laws.[17] The AWCA does *174 not criminalize out-of-state manufacture and sale of assault weapons only because ordinarily penal statutes have no extraterritorial effect. (People v. Buffum (1953) 40 Cal.2d 709 at p. 716, 256 P.2d 317; [overruled on other grounds in People v. Morante (1999) 20 Cal.4th 403, 84 Cal. Rptr.2d 665, 975 P.2d 1071]; Pen.Code, § 27.) The unremarkable fact that the Act does not criminalize such conduct therefore hardly constitutes affirmative legislative approval or "authorization" of such conduct, nor suggests a legislative intent to insulate the manufacturers of assault weapons from the common law duty to exercise care with respect to such out-of-state activities when they have consequences in California. (See, Bernhard v. Harrah's Club (1976) 16 Cal.3d 313, 128 Cal.Rptr. 215, 546 P.2d 719, discussed, post, at pp. 177-178, in which civil liability was imposed for injuries sustained in California as a result of an act in Nevada in part on the ground that the Nevada act would have been criminal if committed in California.) As will be seen, the fact that Navegar's sale of the two TEC-DC9s implicated in this case were not crimes cannot be allowed to obscure the cardinal question whether Navegar knew or should have known those weapons were likely to be used irresponsibly to injure persons in this state.
Since the decision more than a century ago in Grand Trunk Railway Co. v. Ives (1892) 144 U.S. 408, 12 S.Ct. 679, 36 L.Ed. 485, it has been elemental that a defendant's compliance with a penal or regulatory statute "does not necessarily preclude a finding that the actor was negligent in failing to take additional precautions." (Prosser & Keeton, Torts, supra, § 36, p. 233.) As the California Supreme Court has repeatedly stated, "[W]hen the manufacturer or supplier knows of, or has reason to know of, greater dangers [despite compliance with regulations] its duty ... may not be fulfilled." (Hassan v. Ford Motor Co. (1982) 32 Cal.3d 388, 407, 185 Cal.Rptr. 654, 650 P.2d 1171, quoting Stevens v. Parke, Davis & Co. (1973) 9 Cal.3d 51, 65, 107 Cal.Rptr. 45, 507 P.2d 653; accord, Pobor v. Western Pac. R.R. (1961) 55 Cal.2d 314, 321, 323, 11 Cal.Rptr. 106, 359 P.2d 474.)
The principle applies with equal and perhaps even greater force with respect to firearms. As stated in Hetherton v. Sears, Roebuck & Co. (3d Cir.1979) 593 F.2d 526, "under the appropriate circumstances it may be necessary for an individual to take precautions beyond those required by statute.... This is particularly true in the area of control of dangerous weapons. In some jurisdictions the statutes may not go far enough to establish the standard of due care required by a seller, and in many instances special factors may be present demanding that the seller do more than comply with the statute." (Id., at pp. 531-532, italics added; accord, Hamilton v. Accu-Tek (E.D.N.Y.1996) 935 F.Supp. 1307, 1320 ["Compliance with federal statutes or regulations [pertaining to firearms] does not prevent a court from finding that a defendant acted negligently where a reasonable person would have taken additional precautions"]; see also, James, Statutory Standards and Negligence in Accident Cases (1950) 11 La. L.Rev. 95, 123; cf., Kitchen v. K-Mart Corp. (Fla.1997) 697 So.2d 1200.)[18] In sum, the fact that the *175 two TEC-DC9s used by Ferri were not manufactured or sold in violation of the AWCA does not, ipso facto, relieve Navegar of civil liability for negligence.
In light of the conventional rule that compliance with a regulatory statute does not automatically operate to preclude a finding of negligence, which the Legislature must be deemed to know (Voters for Responsible Retirement v. Board of Supervisors (1994) 8 Cal.4th 765, 779, fn. 3, 35 Cal.Rptr.2d 814, 884 P.2d 645; Bailey v. Superior Court (1977) 19 Cal.3d 970, 977, fn. 10, 140 Cal.Rptr. 669, 568 P.2d 394), a contrary legislative intent would have to be made explicit. "The law of negligence was created by common law judges and, therefore, it is unavoidably the Court's responsibility to continue to develop or limit the development of that body of law absent legislative directive." (Moning v. Alfono, supra, 400 Mich. 425, 254 N.W.2d 759, 764, italics in original.) There is no indication in the AWCA of any intent to relieve gun manufacturers who comply with its provisions of liability for injuries caused by their failure to discharge the common law responsibility to exercise ordinary care here, to avoid increasing the risk of harmin the manufacture, marketing or sale of the regulated weapons they produce. On the contrary, given the language of the statute, and particularly the condemnation of assault weapons set forth in Penal Code section 12275.5, it is difficult to imagine the Legislature harbored any intent whatsoever to exempt the manufacturers of such weapons from such a duty.
In California, the general common law principle applicable to this case has been codified. As earlier noted, section 1714 of the Civil Code, which "serves as the foundation of our negligence law" (Rowland v. Christian, supra, 69 Cal.2d at p. 112, 70 Cal.Rptr. 97, 443 P.2d 561), has long provided that "[e]very one is responsible, not only for the result of his willful acts, but also for an injury occasioned to another by his want of ordinary care or skill in the management of his property or person...." (Civ.Code, § 1714, subd. (a).)
The Legislature has created certain exceptions to this general rule of responsibility, such as the immunity from liability for injury resulting from negligence in the handling of food donated by a nonprofit charitable organization (Civ.Code, § 1714.25), and the abrogation of judicially created civil liability of persons who provide alcoholic beverages to one who injures another. (Bus. & Prof.Code, § 25602.) Navegar claims that Civil Code section 1714.4 (hereafter section 1714.4) provides an exception that effectively bars the imposition of liability in this action.
Subdivision (a) of section 1714.4 provides that: "In a products liability action, no firearm or ammunition shall be deemed defective in design on the basis that the benefits of the product do not outweigh the risk of injury posed by its potential to cause serious injury, damage, or death when discharged." Subdivision (b) of the statute states in material part that: "For purposes of this section: [H] (1) The potential of a firearm or ammunition to cause serious injury, damage, or death when discharged does not make the product defective in design. [¶] (2) Injuries or damages resulting from the discharge of a firearm or ammunition are not proximately caused by its potential to cause serious injury, damage, or death, but are proximately caused by the actual discharge of the product."
As the trial court correctly determined, section 1714.4 has no application to this *176 case, as this is not a "products liability action" involving an allegedly defective product.
The purpose of section 1714.4 was to foreclose the use in gun cases of Barker v. Lull Engineering Co., supra, 20 Cal.3d 413,143 Cal.Rptr. 225, 573 P.2d 443, which approved for products liability cases not just the "consumer expectancy" test but as well the alternative "risk/benefit analysis," which it was felt many firearms could not survive. (Sen. Judiciary Comm. Rep. on Judiciary on Assem. Bill No. 75 (1983-1984 Reg. Sess.).) Although as originally introduced the measure that became section 1714.4 had a grander purpose, it was amended during the legislative process to clarify that the Legislature did not intend to exempt those who manufacture or sell firearms or ammunition from liability for ordinary negligence. As described in detail in the margin below,[19] the Senate eliminated language in the bill pertinent to negligence actions, eliminated reference to "the furnishing of firearms" in the portion of subdivision (b) prohibiting a proximate cause finding, and inserted the precatory language "[i]n a products liability action," as well as the qualifier that "[t]he potential of a firearm to cause serious injury, damage, or death when discharged does not make the product defective in design." The bill ultimately enacted by the Legislature and signed by the Governor preserved the significant changes made in the Senate. The Senate amendments make it clear that section 1714.4 obliges the judicial branch to eschew risk/benefit analysis only with respect to claims of strict liability for an allegedly defective firearm or ammunition, not claims, such as the one before us, of negligent conduct relating to the furnishing of such a product.
The policy expressed in section 1714.4 of insulating firearms from product liability actions based on design defects under the risk/benefit theory expounded in Barker v. Lull Engineering Co., supra, 20 Cal.3d 413, 143 Cal.Rptr. 225, 573 P.2d 443 does not relate to the manner in which nondefective firearms or ammunition are manufactured, marketed, and sold to the public. Nor does it relate specifically to assault weapons, as does the AWCA. The statements *177 in the AWCA that the TEC-9, like other assault weapons, "has such a high rate of fire and capacity for firepower that its function as a legitimate sports or recreational firearm is substantially outweighed by the danger that it can be used to kill and injure human beings" (Pen.Code, § 12275.5), and that such weapons "are particularly dangerous in the hands of criminals and serve no necessary hunting or sporting purpose for honest citizens" (Stats.1989, ch. 19, § 5, pp. 69-70), amount to a legislative risk/benefit analysis. Nothing in section 1714.4 suggests that the judiciary must blind itself to such a legislative declaration when it reflects a policy relevant to determination of the duty to exercise due care in a negligence action.
Contrary to Navegar's claim, and the trial court's conclusion, that the AWCA provides a basis for departing from the finding of duty that would otherwise flow from the policy analysis prescribed in Rowland v. Christian, supra, the AWCA in fact provides a major reason to rigorously enforce in this case the fundamental common law concept of liability for injuries caused by one's want of ordinary care. In effect, Navegar is asking us to convert the AWCA from the sword the Legislature intended into a shield with which to obstruct the goal the Legislature sought to achieve: a lessening of the threat that the irresponsible use of assault weapons poses "to the health, safety, and security of all citizens of this state." (Pen.Code, § 12275.5.) A court cannot ignore such a strong expression of public policy when making a relevant duty determination on the ground that the statute in which the policy is expressed is not directly implicated.
Bernhard v. Harrah's Club, supra, 16 Cal.3d 313, 128 Cal.Rptr. 215, 546 P.2d 719 is instructive on this point. The issue in that case was the civil liability of the defendant tavernkeeper to the plaintiff, a third person, for injuries allegedly caused by the former by furnishing alcoholic beverages in Nevada to intoxicated patrons who subsequently injured the plaintiff in California. The criminal statute involved California Business and Professions Code section 25602, which made it a misdemeanor to sell alcohol to an obviously intoxicated person and established the duty necessary for civil liability under the then prevailing rule of Vesely v. Sager (1971) 5 Cal.3d 153, 95 Cal.Rptr. 623, 486 P.2d 151.[20] The defendant tavernkeeper claimed that liability could not be imposed because the statute had no extraterritorial effect and there was therefore no violation. The Supreme Court disagreed, holding that the interest of California in preventing tavern keepers from selling alcoholic beverages to obviously intoxicated persons who may injure persons in California would be significantly impaired if that policy were not applied under the circumstances alleged, whereas the interest of Nevada in protecting its tavernkeepers from unrestricted civil liability would not be significantly impaired by imposing liability only on those tavernkeepers who solicit California business. (See also, Reida v. Lund, supra, 18 Cal.App.3d 698, 705, 96 Cal.Rptr. 102 [determining that it was actionable negligence under the common law for a parent to fail to secure firearms from minor children by looking to an otherwise inapplicable provision of the Civil Code imposing liability on a parent for an injury caused by the discharge of a firearm by a child where the parent permitted the minor to have the firearm or left it in an accessible place].)
The question in this case is not whether appellants' right to sue can be based on the AWCA, but merely whether the policy reflected in that statute bears upon our *178 duty determination. We think Bernhard is persuasive authority that a legislative determination that assault weapons are dangerous to life and have little or no social value may be judicially employed (together with other pertinent considerations) to support imposition of a duty to exercise care on defendants who manufacture, market and distribute such weaponseven though the statute in which the legislative determination appears was not violated and the allegedly negligent conduct took place outside California.

4. The Imposition of a Duty Does Not Constitute an Impermissible Judicial Ban on Manufacture and Sale.

It is doubtless correct that, in the absence of a special relationship, the manufacture, marketing or distribution of a nondefective product that may legally be sold is rarely found to constitute negligence. But cases are equally rare in which, as in this unusual case, triable issues are presented as to whether a particular product that may legally be sold is nonetheless commonly used for illegal and injurious purposes, and whether the defendant knew or should have known that its targeted marketing of that product increased the likelihood of such harm. In any event, as Justice Holmes once noted, "[w]hat usually is done may be evidence of what ought to be done, but what ought to be done is fixed by a standard of reasonable prudence, whether it usually is complied with or not." (Texas & Pacific Ry. Co. v. Behymer (1903) 189 U.S. 468, 470, 23 S.Ct. 622, 47 L.Ed. 905.) Moreover, we are aware of no tort principle that the marketing or distribution to the public of a product cannot as a matter of law constitute negligence because those activities have not been criminalized, and that is the principle Navegar is advancing at this pretrial stage of the proceedings.
Navegar's insistence that the imposition of a legal duty in this case would constitute an unprecedented "judicial ban" on legal conduct also misapprehends the remedy sought in this case. Appellants are not asking that any of Navegar's commercial activities be enjoined, nor could they; they are simply asking that a jury, after trial, award them damages for the consequences of conductwhich included affirmative acts, not just acts of omission that increased the risk of the harm they suffered.[21] "Making an activity tortious forces the people who derive benefit from it to internalize the costs associated with it, thereby making sure that the activity will only be undertaken if it is desired by enough people to cover its costs. It does not proscribe it altogether. As a result, very different policy considerations go into the decision of whether to forbid something and the decision of whether to find a duty that permits liability for the harm it *179 causes." (McCarthy v. Olin Corp., supra, 119 F.3d at pp. 169-170 (italics added) (dis. op. of Calabresi, J., citing Note, Absolute Liability for Ammunition Manufacturers (1995) 108 Harv. L.Rev. 1679); accord, Moning v. Alfono, supra, 254 N.W.2d. at p. 763.)
As the article cited by Judge Calabresi points out, imposing liability does not reflect as great a condemnation as a criminal or regulatory prohibition. "The primary advantage of [imposing tort liability] is that it will force consumers of ammunition to internalize costs that have heretofore been borne by third parties and society in general. Such internalization will provide manufacturers and consumers with the proper incentives to choose care and activity levels that more closely equate costs and benefits." (108 Harv. L.Rev. 1679, 1691, fn. omitted; see also Hamilton v. Accu-Tek (E.D.N.Y.1999) 62 F.Supp.2d 802 ["Even if some negative impact on costs and price may follow restrictions on merchandising, it is not inappropriate for the price of handguns to be more reflective of their true economic cost to the community in the way of avoidable injuries and deaths."].)
To be sure, it is conceivable such efforts would come too late and that, as a practical matter, exposure to "limitless liability" (McCarthy v. Olin Corp., supra, 119 F.3d at p. 157) might force Navegar out of business or to reorganize under the bankruptcy law, as happened to some manufacturers exposed to liability for injuries sustained as a result of the use of their products. (See, ante, fn. 15.) But, as the imposition of liability in those mass tort cases demonstrates, the possibility a defendant's negligence may require it to pay large damage awards is not a dispositive consideration;[22] indeed it is relevant to the determination of duty only to the extent that the imposition of a duty is unreasonable or may adversely affect the community.
Navegar's unjustified claim that imposition of a duty would invade the prerogative of the Legislature because it would not merely affect the cost of manufacturing, marketing and selling assault weapons but would ban those legal activities also fails to take into account that no matter what decision this court makes it will necessarily represent a value judgment. As has often been stated, "`"[d]uty" is not an immutable fact of nature "`but only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection.'" (Dillon v. Legg (1968) 68 Cal.2d 728, 734 [69 Cal.Rptr. 72, 441 P.2d 912] (Ballard v. Uribe, supra, 41 Cal.3d 564, 572, fn. 6 [224 Cal.Rptr. 664, 715 P.2d 624])" (Parsons v. Crown Disposal Co., supra, 15 Cal.4th at p. 472, 63 Cal.Rptr.2d 291, 936 P.2d 70, italics in original.) A decision that Navegar has no duty, and that the judgment below must be affirmed, would amount to a policy determination that the interest of some in unrestricted access to a particular assault weapon, and the freedom of the manufacturer of that weapon to target the marketing of its product to persons likely to criminally misuse it, transcends society's interest in protecting persons exposed to the risk of harm created by the distribution and marketing of that assault weapon, or that reasonable persons would agree that this risk is not unreasonable. Our decision that there is a legal duty is not a statement that the TEC-DC9 should not be manufactured, or made available to the public or should not be marketed in such a way as to make it particularly desirable to a criminal class. It simply reflects the view that there is a question about the reasonableness of the risk created by Navegar's activities, that public access to the TEC-DC9 and the manner in which *180 that weapon is marketed are not of such overriding social importance that they are entitled to absolute protection as a matter of law, and that it is therefore for a jury to make the ultimate determination whether Navegar's conduct was or was not reasonably prudent in the circumstances, i.e., whether there was breach of the legal duty.
Such a jury determination will, to be sure, also necessitate a value judgmentindeed the ultimate oneas to the risks and social utility of Navegar's conduct. Under our system, the question as to what a reasonably prudent person would have done under the circumstances is to be determined in all doubtful cases by the jury rather than the judge because "[t]he reasonable person represents the general level of community intelligence and perception and the jury, being a cross-section of the community, should best be able to tell what that general level is. Moreover the factors to be evaluated in determining the reasonableness of the risk `are practically not susceptible of any quantitative estimate, and the second two [gravity of the threatened harm, and value of the interest which must be sacrificed to avoid it] are generally not so, even theoretically. For this reason a solution always involves some preference, or choice between incommensurables, and it is consigned to a jury because their decision is thought most likely to accord with commonly accepted standards, real or fancied.'" (3 Harper, James & Gray, The Law of Torts, supra, § 16.10 at pp. 482-483, quoting Learned Hand in Conway v. O'Brien (2d Cir.1940) 111 F.2d 611, 612, revd. on other grounds (1941) 312 U.S. 492, 61 S.Ct. 634, 85 L.Ed. 969; accord, Prosser & Keeton, Torts, supra, § 37, p. 237, fns. omitted.)
It is true that American courts have frequently refused to let juries decide the ultimate question of negligence in gun cases. To some extent this reflects the view, expressed by the trial court in this case, that the regulation of firearms has been preempted by legislatures and is therefore not subject to any higher common law standard of care. (See, e.g., cases cited, ante, at fn. 18.) We do not share that view because, as we have explained at some length, neither Congress nor the California Legislature has expressed any desire to abrogate the operation of the common law as it applies to the conduct of those who manufacture and sell firearms, and the judicial responsibility to faithfully apply the common law cannot otherwise be constrained.
But judicial unwillingness to permit juries to decide whether the conduct of those who manufacture, distribute and sell firearms constitutes negligence is more frequently the result of the failure of plaintiffs to marshal the necessary evidence.[23] *181 Most gun cases do not relate to a firearm that appears to have virtually no legitimate civilian use, and none have presented the strong evidence we have in this case of affirmative acts increasing the risk of harm above and beyond that normally presented by firearms and also increasing the foreseeability of such harm. The singularity of the evidence before this court is best illustrated by comparing it with the much lower quality evidence produced in the gun cases the trial court relied upon when it erroneously denied appellants the right to a trial on the merits of their negligence claim.
The case that most strongly influenced the trial court, and which Navegar relies upon most heavily, is the officially unreported opinion of the United States District Court for the Northern District of California in Casillas v. Auto-Ordnance Corp. (N.D.Cal. May 17, 1996) 1996 WL 276830.[24]
Casillas involved injuries inflicted on the plaintiffs by one Gomez through the use of a Thompson semiautomatic assault pistol manufactured by the defendant. The plaintiffs alleged, among other things, a claim for "negligence in manufacturing a weapon that is disproportionately associated with criminal activity and that has no legitimate sporting or self defense purpose." The plaintiffs did not claim that the weapon was defective, and its sale was licensed by the BATF. The defendant moved for summary judgment "on the ground that a firearm manufacturer cannot be held liable for the criminal misuse of a legal, nondefective firearm." (Id., at p. * 1.) The court granted the motion on the identical ground subsequently relied upon by the trial court here. Predicting that California courts "would not allow a [negligence] claim against a third party's illegal use of a legal and nondefective firearm," (id., at p. *4) the Casillas court stated: "In the absence of any clear legislative or judicial authority, the Court may not expand manufacturers' liability for potentially dangerous products beyond established California law.[25] Further, plaintiffs do not produce admissible evidence on which a trier of fact could find that defendant's breach of duty, if any there were, proximately caused plaintiffs' injuries." (Ibid.)
In reaching this conclusion, the court noted that the plaintiffs provided "no admissible evidence in support of their assertions" that the defendant "`should have known' that the Thompson is `particularly well adapted to a military style assault,' ... that the Thompson is `disproportionately associated with criminal activity,' ... and that `it was reasonably foreseeable that the Thompson would be used to kill or injure innocent people in a violent criminal act....'" (Id., at p. *3.) The Casillas court also found that "[t]he advertisements submitted by plaintiffs do not support the claim that Gomez's actions were foreseen *182 by defendant. Nor do plaintiffs present evidence that the advertisements were targeted to criminals generally or to Gomez specifically, were seen by Gomez, or were somehow the cause of Gomez's violent behavior.... In sum, plaintiffs have not presented sufficient evidence of duty or causation such that any reasonable trier of fact could find that plaintiffs' injuries were a result of defendant's negligence." (Id., at p. *3.)
The factual difference between Casillas and the present case should be readily apparent. Appellants here did present evidence that Navegar knew TEC-DC9s were disproportionately associated with criminal activity and could be used as Ferri used them, that Navegar's promotional activities were targeted to criminals, and that Navegar's marketing strategy increased the risk of harm posed by the weapons it distributed. As will be discussed, appellants also presented evidence raising a triable issue of fact as to whether Navegar's conduct in manufacturing, marketing and distributing the TEC-DC9 was a substantial cause of their injuries. As the critical evidence missing in Casillas is not absent here, Casillas presents no authority for a no-duty finding in this case.
The out-of-state cases relied upon by the trial court, as well as others of which we are aware, refusing to impose liability upon weapons manufacturers, are similarly distinguishable.[26] None of these cases involved sufficient evidence of the combined factors of foreseeability, extraordinary firepower and the targeted marketing of lethal weapons to criminals and others with a fixed propensity to misuse them found in the case before us. Bubalo v. Navegar, Inc. (N.D.Ill. June 13, 1997, No. 96 C 3664) 1997 WL 337218, which did involve allegations like those here, rejected an alleged theory of negligent marketing on causation grounds, without analyzing the duty question.
Bojorquez v. House of Toys, Inc. (1976) 62 Cal.App.3d 930, 133 Cal.Rptr. 483, the only California case the Casillas court relied upon in granting summary judgment on the negligence claim, is also distinguishable. In that case the plaintiff was injured by a projectile shot from a slingshot by a 10-year-old boy who purchased the toy from the defendant retailer. The plaintiff claimed, inter alia, that the retailer and the wholesaler "were negligent in selling slingshots to children who because of their youth are incapable of using them without creating an unreasonable risk of physical harm to others." (Id., at p. 932, 133 Cal. Rptr. 483.) Claiming negligent entrustment (Rest.2d, Torts, § 390), the plaintiff argued that "a wholesaler or retailer [has] a duty to make sure his products are sold only to those persons or classes of persons who will not use them to harm others[.]" (Id., at p. 933, 133 Cal.Rptr. 483.) The trial court entered summary judgment for the defendants and the court of appeal affirmed. As to the negligent entrustment claim, the appellate court stated as follows: "Slingshots have been used as toys and weapons since Old Testament times. A *183 10-cent slingshot is a toy although its use, like the use of other toys, such as baseball bats and bows and arrows, may cause injury to others. The cases we have found under section 390 and the illustrations provided in the Restatement all involve the sale or entrustment of a chattel to a particular individual who allegedly was known to the seller to be too young, inexperienced or incompetent to use the item properly. [¶] Here [plaintiff] wants us to hold the retailer and distributor negligent for selling toy slingshots to the class of persons for whom they were intendedthe young; in effect, she asks us to ban the sale of toy slingshots by judicial fiat. Such a limitation is within the purview of the Legislature, not the judiciary." (Id., at p. 933,133 Cal.Rptr. 483; compare, Moning v. Alfono, supra, 400 Mich. 425, 254 N.W.2d 759, holding that whether a slingshot manufacturer created an unreasonable risk of harm in marketing its products directly to children presents a factual question.)
The very short opinion in Bojorquez refers to no evidence that children generally, a particular class of children, or the child who caused the injury were incompetent to use the slingshot in question, no evidence of widespread criminal misuse of slingshots to kill and injure, no evidence of the foreseeability of the type of injury that occurred, and no evidence that the defendants advertised the slingshot or, if they did, that the advertising was targeted to a class of children likely to misuse the device and injure others. Nor was there any claim in Bojorquez of affirmative acts increasing the risk of harm above and beyond that ordinarily presented by slingshots. Moreover, the California Legislature has not restricted the manufacture and sale of slingshots, as it has assault weapons, and California courts have not subjected the provision of slingshots to the "highest standard of due care," as they have firearms. (Reida v. Lund, supra, 18 Cal.App.3d 698, 704, 96 Cal.Rptr. 102, citing Jensen v. Minard, supra, 44 Cal.2d 325, 328, 282 P.2d 7.) The facts and policy considerations relied on in Bojorquez are therefore very different from those applicable here.
McCarthy v. Olin Corp., supra, 119 F.3d 148, upon which Navegar relies for the first time on appeal, is also distinguishable. That case was an action against the manufacturer of the "Black Talon" hollowpoint bullets used in the massacre of passengers on a Long Island Railroad train. The plaintiffs' negligence claim included the allegation that because of the severe wounding capacity of the bullets Olin should have restricted sales to law enforcement agencies. The plaintiffs also argued that "Olin should have known that their advertising, which highlighted the ripping and tearing characteristics of the bullet, would attract `many types of sadistic, unstable and criminal personalities.'" (Id., at p. 156.) A two-judge majority found no duty, confident the New York Court of Appeals would not impose a duty on ammunition manufacturers to protect against criminal misuse of their products because that "would likely force ammunition products which legislatures have not proscribed, and which concededly are not defectively designed or manufactured and have some socially valuable usesoff the market due to the threat of limitless liability." (Id. at p. 157.)
We believe the dissenting opinion of Judge Calabresi is more persuasive than Judge Meskill's majority opinion with respect to this policy question. McCarthy is, in any event, distinguishable on both factual and legal grounds. Unlike the hollow point bullets at issue in McCarthy, assault weapons have been legislatively proscribed in California and the TEC-DC9 is not employed by law enforcement agencies and has not been shown to have any other socially valuable use. Moreover, under New York law foreseeability relates not to the existence of a duty, as it does under our law, but only to the scope of that duty ""after it has been determined that there is a duty." (Id., at p. 156, italics added, citing Pulka v. Edelman (1976) 40 N.Y.2d *184 781, 390 N.Y.S.2d 393, 358 N.E.2d 1019.) In California, foreseeability is "of prime concern" in the initial determination of duty. (Dillon v. Legg (1968) 68 Cal.2d 728, 740, 69 Cal.Rptr. 72, 441 P.2d 912; Weirum v. RKO General, Inc., supra, 15 Cal.3d at p. 46, 123 Cal.Rptr. 468, 539 P.2d 36.)
Unlike the cases relied upon by the trial court, here the strength of the evidence that the harm appellants suffered was or should have been foreseeable, the equally strong evidence Navegar's marketing increased the risk of such harm, and the evidence that there is no legitimate civilian use for the TEC-DC9, provide strong support for the imposition of a legal duty not to manufacture, market and distribute this weapon in a manner that increases the risk of harm inherent in the presence of handguns in society. We make no suggestion (nor do appellants) that the manufacture of the TEC-DC9, even with all the features supplying its military combat style and appeal to a criminal element, alone could be found to constitute negligence. Rather, it is the combination of such manufacture with distribution of the weapon to the general public and marketing targeted to persons most likely to misuse it that supports a cause of action for negligence.
Imposition of liability upon the manufacturer of a nondefective but potentially dangerous product based upon the manner in which it furnished the product to the public, despite the manufacturer's compliance with all pertinent regulatory restrictions and despite the intervening act of a third party, is not unprecedented in California, even with respect to a product that clearly has social value.
In Stevens v. Parke, Davis & Co., supra, 9 Cal.3d 51, 107 Cal.Rptr. 45, 507 P.2d 653, the plaintiffs were the survivors of a woman who died as a result of ingesting Chloromycetin, a toxic antibiotic produced and distributed by the defendant manufacturer and prescribed by the defendant physician. The plaintiffs' wrongful death action sought to impose liability on the manufacturer for negligence in the "overpromotion" of the drug. Parke, Davis claimed, as does Navegar here, that its conduct comported with all applicable federal regulations, that the evidence failed to show that its advertising "overpromoted" the drug and that, in any event, the intervening acts of the prescribing physician were superseding acts. Rejecting all of these claims, a unanimous Supreme Court answered that compliance with federal regulations or directives as to warnings "may not be sufficient to immunize the manufacturer or supplier of the drug from liability" (id., at p. 65, 107 Cal.Rptr. 45, 507 P.2d 653), and pointed out that "an adequate warning to the profession may be eroded or even nullified by overpromotion of the drug through a vigorous sales program which may have the effect of persuading the prescribing doctor to disregard the warnings given." (Ibid., citing Love v. Wolf (1964) 226 Cal.App.2d 378, 396, 38 Cal.Rptr. 183; Yarrow v. Sterling Drug, Inc. (D.S.Dak.1967) 263 F.Supp. 159, 162-163, affd. sub nom. Sterling Drug, Inc. v. Yarrow (8th Cir.1969) 408 F.2d 978; Incollingo v. Ewing (1971) 444 Pa. 263, 282 A.2d 206, 220.) The court concluded the case was properly presented to the trier of fact, whose implied finding of negligent over-promotion was supported by the evidence. "Parke, Davis had reason to know of the drug's dangerous propensities. Nevertheless, calendars and other `give-aways' distributed by Parke, Davis and advertisements placed by it in magazines constantly reminded physicians of the alleged effectiveness of the drug without mentioning its dangers" (id., at p. 66, 107 Cal.Rptr. 45, 507 P.2d 653), and the warnings that were given "were not so clearly effective as to defeat, as a matter of law, the inference that they were nullified by overpromotion." (Id., at p. 67, 107 Cal.Rptr. 45, 507 P.2d 653.)
The opinion in Parke, Davis is not exceptional. Other courts have similarly concluded that the furnishing or marketing of a nondefective product that complies *185 with all applicable regulations and may legally be sold can nonetheless constitute negligence for which liability may be imposed. (See, e.g. Suchomajcz v. Hummel Chemical Company (3d Cir.1975) 524 F.2d 19, declined to extend in In re TMJ Implants Products Liability Litigation (1995) 872 F.Supp. 1019; Salmon v. Parke, Davis and Company (4th Cir.1975) 520 F.2d 1359; Hernandez v. Badger Construction Equipment Co. (1994) 28 Cal. App.4th 1791, 34 Cal.Rptr.2d 732; Whitley v. Cubberly (1974) 24 N.C.App. 204, 210 S.E.2d 289.)
The imposition of a duty on Navegar's part not to increase the risk inherently presented by the assault weapon it manufactures, markets and distributes rests on conventional common law principles, infringes no legislative prerogative, and is entirely consistent with policies declared by the Legislature. Recognition of such a duty helps protect the right of the public to be free of the threat of firearms deliberately conceived to be attractive to criminals and promoted in such a way as to increase the likelihood of criminal misuse. It does not require the characterization of all firearms as "unreasonably dangerous per se."[27] (See McClurg, Handguns as Products Unreasonably Dangerous Per se, (1991) 13 U. Ark. Little Rock L.J. 599, 613.) Fundamental fairness requires that those who create and profit from commerce in a potentially dangerous instrumentality should be liable for conduct that unreasonably increases the risk of injury above and beyond that necessarily presented by their enterprise.[28]

B.

Causation
Navegar argues that even if there is a duty to exercise care, no evidence shows that its conduct was the actual cause, or cause-in-fact, of appellants' injuries. The gist of the claim is that Navegar's conduct and Ferri's criminal acts are entirely unrelated.[29] Essentially, *186 Navegar argues there is no evidence Ferri ever saw or was exposed to its advertisements or promotional activities, pointing out that none of the magazines booked into evidence by investigators contained TEC-DC9 advertisements and that investigators did not recall seeing such advertisements at his apartment.
In order to establish that Navegar's conduct was the cause-in-fact of the injuries they sustained, appellants must show that Navegar's conduct was a "substantial factor" in bringing about those injuries, or at least that there is a triable issue as to this question. (Rutherford v. Owens-Illinois, Inc. (1997) 16 Cal.4th 953, 969, 67 Cal.Rptr.2d 16, 941 P.2d 1203); Mitchell v. Gonzales (1991) 54 Cal.3d 1041, 1044, fn. 2, 1052-1053, 1 Cal. Rptr.2d 913, 819 P.2d 872.) The substantial factor standard "subsumes the `but for' test while reaching beyond it to satisfactorily address other situations, such as those involving independent or concurrent causes in fact." (Rutherford, supra, 16 Cal.4th at p. 969, 67 Cal.Rptr.2d 16, 941 P.2d 1203.) It is settled that "[t]he defendant's negligent act need not be the sole cause of injury; it is enough that it be a cause." (6 Witkin, Summary of California Law (9th ed., Torts, § 970, p. 360, original italics.) As has often been noted, "there are many situations in which each of several causes (without the concurrence of any of the others) produces some (but not all the) harm. In such a case it may be hard or even impossible on the facts practically available to tell just how much of the harm each of these causes brought about, but at least in theory (i.e., to the eye of omniscience) they are capable of separation. Where this is the case, each of the defendants responsible for these causes may still be liable for the whole injury." (4 Harper, James & Gray, The Law of Torts (2d ed.) § 20.3, p. 117, original italics; accord, 6 Witkin, Summary of California Law, supra, Torts, § 970, p. 360 and cases there cited.) Where injuries are inflicted by the criminal or negligent acts of a third person, the defendant's conduct may constitute a contributing cause if it created or increased the risk of such criminal or negligent acts even though the defendant did not control the party whose criminal or negligent act most directly caused harm. (See, e.g., Bigbee v. Pacific Tel. & Tel. Co., supra, 34 Cal.3d at p. 58, 192 Cal.Rptr. 857, 665 P.2d 947; Landeros v. Flood, supra, 17 Cal.3d at pp. 411-412, 131 Cal. Rptr. 69, 551 P.2d 389; Weirum v. RKO General Inc., supra, 15 Cal.3d at p. 47, 123 Cal.Rptr. 468, 539 P.2d 36; see also, Braman v. State of California (1994) 28 Cal. App.4th 344, 355-356, 33 Cal.Rptr.2d 608.)
Because it found Navegar had no duty, the trial court never addressed causation in connection with appellants' ordinary negligence claim. The trial court did, however, resolve the causation question in connection with appellants' claim of negligence per se, and Navegar urges us to adopt its reasoning.
In finding that Navegar's violation of the AWCA by offering or exposing a semiautomatic weapon for sale in California (see Pen.Code § 12280, subd. (a)(1)) was not a contributing cause-in-fact of appellants' injuries, the court stated as follows: "Plaintiffs have not shown that the inferences that they contend support their [negligence per se] cause of action (Ferri saw a Navegar ad and was influenced by it to massacre innocent people in the 101 California Street building) are more reasonable or probable than those supporting Navegar (Ferri never saw a Navegar ad or, even if he did, he decided to kill and maim using a TEC-DC9 for personal reasons which are now lost to history)." It was on the basis of this determination that Ferri's acts were a superseding cause that the court granted summary judgment on appellants' claim of negligence per se. We refuse to apply this reasoning to the claim of ordinary negligence.
*187 Even assuming the finding of no-causation made in relation to the negligence per se claim was correct, it was limited to whether Navegar's advertisements in magazines that circulated in California[30] were sufficiently related to the deaths and other injuries at 101 California Street so that proximate cause could be found. (Evid. Code, § 669, subd. (a)(2).) The claim of ordinary negligence raises much broader factual questions, as it relates not just to the effect of Navegar's advertisements offering or exposing the TEC-DC9 for sale in California, but to the effect of promotional activities that did not violate the AWCA, and to the manner in which the weapon was made available to the general public.
In any event, the trial court's determination that the connection between Navegar's magazine advertisements was too attenuated to establish actual cause is in our view hard to reconcile with the opinion of the Supreme Court in Stevens v. Parke, Davis; supra, 9 Cal.3d 51, 107 Cal.Rptr. 45, 507 P.2d 653, which we think the most relevant case.
In Parke, Davis, the physician who prescribed the potentially dangerous drug that caused the plaintiffs death testified that, although he read medical journals in which Parke, Davis allegedly overpromoted the drug, "he could not remember specific instances in which he received any information, promotional or otherwise, directly from Parke, Davis...." (Id., at p. 68, fn. 16, 107 Cal.Rptr. 45, 507 P.2d 653.) Parke, Davis claimed, therefore, that even if its advertisements did dangerously "overpromote" the drug, such overpromotion could not have caused Mrs. Stevens's death because the circumstantial evidence did not show that the prescribing physician, who testified he was cognizant of the dangers, was induced by the advertisements to prescribe the drug for her. The Supreme Court rejected this argument. The court pointed out that the jury was entitled to disbelieve all or portions of the physician's testimony "`and combine the accepted portions with bits of testimony or inferences from the testimony of other witnesses thus weaving a cloth of truth out of selected available material.'" (Id., at pp. 67-68, 107 Cal.Rptr. 45, 507 P.2d 653, quoting Nevarov v. Caldwell (1958) 161 Cal.App.2d 762, 777, 327 P.2d 111.) There was adequate circumstantial evidence in the record, the court stated, "to support a reasonable inference by the jury that Dr. Beland was induced to prescribe the drug for Mrs. Stevens because of Parke, Davis' overpromotion. Like many others of the profession, he had been exposed to the promotional tactics employed by Parke, Davis. It is reasonable to assume that the company's efforts consciously or subconsciously influenced him. In addition, plaintiff introduced expert testimony by a physician that the advertising and promotion of the drug `played a role' in inducing physicians to prescribe it when it was not sound practice to do so. The jury could reasonably infer from the above circumstantial evidence that Dr. Beland was induced by the manufacturer's activities to prescribe the drug and were entitled to reject Dr. Beland's testimony to the contrary. [Citation.]" (Id., at p. 68, 107 Cal. Rptr. 45, 507 P.2d 653, fns. omitted.)[31]
*188 It was harder in Parke, Davis than it is here to find sufficient evidence that the defendant's promotional acts influenced the plaintiffs' injuries. First, the person who most directly inflicted the injuries in this case, Ferri, could not testify, as did Dr. Beland, that he was not influenced by the manufacturer's advertisements. Moreover, we know that Ferri read many of the magazines in which Navegar advertised the TEC-DC9. It is undisputed that investigators Hendrix and Sanders found numerous gun, ammunition, "Soldier of Fortune," and "survivalist-type" magazines at Ferri's apartment, and that they selected only a "couple" to book into evidence in connection with their investigation. It is also undisputed that Navegar advertised the TEC-9 in the October 1991, March 1992 and October 1992 issues of Guns & Ammo magazine; that Guns magazine advertisements featured the TEC-9; that Navegar advertised the TEC-9 in the July 1991, November 1991, and September 1992 issues of Handguns magazine; that Navegar purchased the first page of every issue of Guns magazine from May 1992 through May 1993 and the 1992 Annual of Heavy Metal Weapons to promote its products; that Navegar took out four-page spreads for the TEC-9 and its other products in the 1991 and 1992 Buyer's Guides of Shooting Industry and the inside front cover of the July 1992 issue; and that Navegar advertised the TEC-9 and TEC-DC9 in a wide variety of other national publications sold in California. Navegar promoted this weapon by giving away, loaning, or selling TEC-9s or TEC-DC9s for use in numerous movies and television programs. It also promoted the weapon at the type of gun shows Ferri was known to attend. Finally, Navegar also touted the "high volume of firepower" and speed of "this radically new type of semi-automatic pistol" in its owner's manual, two copies of which were found by the police in Ferri's apartment.
The testimony of appellants' expert, Dr. Meloy, provided evidence that the nature of Navegar's magazine advertisements of the TEC-DC9 as well as its other promotional activities, "likely emboldened Ferri to undertake mass killings without fear of failure," and was for these reasons "a substantial factor in his decision to carry out his mass murder in a predatory assault at 101 California."
Given the foregoing evidence, we cannot say that the inferences appellants rely upon, when combined with other evidence they have introduced, are any more conjectural than the combination of inferences and evidence condoned in Parke, Davis to *189 show a causal connection between the marketing of a potentially dangerous product and its use in a particular case.[32]
We also have little difficulty concluding that there is also at least a triable issue as to whether the manufacture and sale to the general public of the TEC-DC9 was a cause-in-fact of appellants' injuries. Chief Supenski and Inspectors Hendrix and Sanders all provided evidence that certain features of the TEC-DC9 which Navegar promoted made it particularly lethal in the assault carried out at 101 California Street: the concealability of the weapon; the large capacity, staggered (double column) detachable magazine making it possible to fire many rounds without the need for reloading and designed to deliver a level of firepower associated with military or police, but not civilian, shooting requirements; and the sling swivel designed to accommodate a "combat sling" allowing two TEC-DC9s to be hung from each shoulder and "spray fired" rapidly from the hip simultaneously.
Both of the TEC-DC9s recovered from Ferri's body were equipped with the "Hell-Fire" trigger system, combat slings, and large capacity detachable magazines which could accommodate the 250 rounds of 9-millimeter ammunition he carried in 40- and 50-round clips. According to Hendrix, the high firepower of the TEC-DC9s allowed Ferri to "lay down a field of fire that would either wound or immobilize his victims before using the .45-caliber pistol [to] finish them off in a more direct and personal manner." Hendrix concluded that the TEC-DC9s allowed Ferri to fire more shots more quickly than he would have been able to do with a conventional semiautomatic pistol and consequently allowed him to arrive on the 33rd and 32nd floors sooner than he would have otherwise. These extended magazines enabled him to lay down a "blanket of fire" covering a large area, and "cutting the chances of intended targets to escape." The timeline of Ferri's assault provided by Inspectors Hendrix and Sanders also suggests that if Ferri had not been able to kill or immobilize the victims on the 34th floor of 101 California Street as quickly as his TEC-DC9s permitted, the victims on the 33rd floor, who knew of the shootings on the 34th floor and were attempting to flee the premises, would likely have escaped.
Keeping in mind that, unless reasonable minds could draw only one conclusion from the plaintiffs allegations, the issue of actual causation must be left for the jury (Braman v. State of California, supra, 28 Cal. App.4th 344 at pp. 355-356, 33 Cal.Rptr.2d 608; Constance B. v. State of California (1986) 178 Cal.App.3d 200, 207-208, 223 Cal.Rptr. 645), we conclude there are triable issues as to whether Ferri would have engaged in the conduct at 101 California Street, and could have killed and injured as many people as he did, if the TEC-DC9 had not been promoted by Navegar as it was and made available to persons like him.
For the foregoing reasons, the grant of summary judgment as to the cause of action for ordinary negligence was error and reversal is warranted.
We turn, finally, to appellants' contention that the trial court erred in ruling that Navegar's conduct in manufacturing and marketing the TEC-DC9 did not subject it to strict liability for carrying on an ultrahazardous activity.

*190 III.

Strict Liability for Ultrahazardous Activity
Generally, an activity is deemed ultrahazardous if it "`necessarily involves a risk of serious harm to the person ... of others which cannot be eliminated by the exercise of the utmost care, ...'" (Luthringer v. Moore, supra, 31 Cal.2d at p. 498, 190 P.2d 1; Edwards v. Post Transportation Co. (1991) 228 Cal.App.3d 980, 279 Cal.Rptr. 231.) This determination is a question of law for the trial court. (Luthringer v. Moore, supra, 31 Cal.2d at p. 496, 190 P.2d 1; Ahrens v. Superior Court (1988) 197 Cal.App.3d 1134, 1142, 243 Cal. Rptr. 420.)
California courts generally look to the Restatement Second of Torts to determine whether an activity is ultrahazardous or, to use the term preferred by the Restatement, "abnormally dangerous." (Ahrens v. Superior Court, supra.)[33]
Section 519 of the Restatement Second of Torts provides: "(1) One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm, [¶] (2) This strict liability is limited to the kind of harm, the possibility of which makes the activity abnormally dangerous." (Rest.2d Torts, § 519.)
In evaluating individual cases, courts look to the six factors set forth in the Restatement Second of Torts, which provides: "In determining whether an activity is abnormally dangerous, the following factors are to be considered: [¶] (a) existence of a high degree of risk of some harm to the person, land or chattels of others; [¶] (b) likelihood that the harm that results from it will be great; [¶] (c) inability to eliminate the risk by the exercise of reasonable care; [¶] (d) extent to which the activity is not a matter of common usage; [¶] (e) inappropriateness of the activity to the place where it is carried on; and [¶] (f) extent to which its value to the community is outweighed by its dangerous attributes." (Rest.2d Torts, § 520; see Ahrens v. Superior Court, supra, 197 Cal.App.3d at p. 1142, fn. 5, 243 Cal.Rptr. 420.) It is not necessary that all of the factors be present in a particular case. (197 Cal.App.3d at p. 1143, 243 Cal.Rptr. 420; Rest.2d Torts, § 520, comment f.)
According to the complaint, Navegar's "abnormally dangerous activity" consists of "making the TEC-9 and TEC-DC9 available for sale to the general public." Appellants maintain that this activity satisfies the first and second factors identified in the Restatement: the "existence of a high degree of risk of some harm to the person, land or chattels of others" and the "likelihood that the harm that results from it will be great." (Rest.2d Torts, § 520.) Though this argument is appealing, it suffers two problems.
First, under the "abnormally dangerous activity" doctrine it is the danger inherent in the activity itself that is the basis for imposition of strict liability. In cases in which the question is one of strict liability, the overwhelming majority of American courts have taken the position that the distribution or sale of a firearm is as safe an activity as the distribution and sale of any other mechanical device. (Note, Kelley v. R.G. Industries: California Caught in the Crossfire (1988) 17 Southwestern Univ. Law Rev. 497, 506.) As stated by the Fifth Circuit: "Every decision in common law jurisdictions of which we are aware has held that the manufacture and sale of handguns to the *191 general public does not constitute an ultrahazardous activity." (Perkins v. F.I.E. Corp. (5th Cir.1985) 762 F.2d 1250, 1266, fn. 43; see also, Martin v. Harrington and Richardson, Inc. (7th Cir.1984) 743 F.2d 1200, 1203-1206; Delahanty v. Hinckley, supra, 564 A.2d at p. 761; Patterson v. Rohm Gesellschaft, supra, 608 F.Supp. at pp. 1214-1215; McClurg, The Tortious Marketing of Handguns: Strict Liability is Dead, Long Live Negligence, supra, 19 Seton Hall Legis. J. 777, 788-790.)
California courts have also uniformly rejected application of ultrahazardous activity liability to manufacturers and users[34] of firearms. (See Moore v. R.G. Industries, Inc. (9th Cir.1986) 789 F.2d 1326, 1327; cf., Orser v. George (1967) 252 Cal.App.2d 660, 672, 60 Cal.Rptr. 708 [no ultrahazardous liability for use of a firearm] Reida v. Lund, supra, 18 Cal.App.3d 698, 96 Cal.Rptr. 102 [same].) In Moore v. R.G. Industries, Inc., supra, the 9th Circuit determined that an ultrahazardous activity claim made by a victim of handgun violence against the manufacturer of "Saturday Night specials" would have failed as a matter of California law not only because handguns are widely used, but also because "the harm they pose comes from their use rather than by the nature of their existence alone." (789 F.2d at p. 1328.)
The contention in appellants' brief that "Navegar's activity of selling the TEC-9 to the public by targeting consumers demanding extraordinary firepower was ultrahazardous" (italics added) redefines the allegedly ultrahazardous activity alleged in the complaint by including not just the making of the TEC-DC9 "available for sale to the general public" but also the manner in which the weapon is marketed or promoted. The manner in which Navegar marketed the TEC-DC9, which is distinct from merely making it available to the public, is, as we have seen, an important element of appellants' cause of action for ordinary negligence; herein lies the second problem with appellants' theory of strict liability.
As previously noted, the doctrine of strict liability for ultrahazardous activity relies in part on the defendant's "inability to eliminate the risk by the exercise of reasonable care." (Rest.2d Torts, § 520(c).) Appellants' ultrahazardous activity claim is therefore based upon an assumption (that the exercise of care would have made no difference) very different from that which is the basis for their negligence claim (that Navegar's failure to exercise care in the marketing and distribution to the general public of the TEC-DC9 was a cause of their injuries).[35] We are unable to conclude that the risk allegedly created by Navegar's conduct could not have been significantly diminished, if not eliminated, by the exercise of care.
Likening Navegar's activity to the aerial spraying of pesticides (e.g., Langan v. Valicopters, Inc. (1977) 88 Wash.2d 855, 567 P.2d 218, 222), appellants contend that *192 Navegar could not eliminate the risk of harm after a sale was concluded because it no longer had control over the product. But this might also be said of any product which could cause harm after it enters the stream of commerce.[36] Moreover, Navegar never lost complete control over the manner in which it marketed the TEC-DC9. Though it did not retain such total control over the persons to whom the weapon could be resold, it nonetheless had the ability to restrict distribution of its weapons. (See McCarthy v. Olin Corp., supra, 119 F.3d at p. 152; Leslie v. United States, supra, 986 F.Supp. at p. 911.) Finally, Navegar possessed complete control of the manner in which its products were marketed. Appellants have provided no persuasive reason to conclude that the exercise of care in distribution or marketing would be altogether inefficacious in reducing the danger inherent in distributing the TEC-DC9.
What is truly ultrahazardous or "abnormally dangerous" is not the activity of manufacturing, distributing, marketing, or selling the TEC-DC9, but the use of the weapon itself. Appellants' attempt to obscure this reality simply "blurs the distinction between strict liability for selling unreasonably dangerous products and strict liability for engaging in ultrahazardous activities by making the sale of a product an activity." (Martin v. Harrington & Richardson, Inc., supra, 743 F.2d at p. 1204.) Our law does not impose liability upon the non-negligent manufacturer of a nondefective product; and the implications of such a policy would be truly dramatic. (See Note, Handguns and Products Liability (1984) 97 Harv.L.Rev.1912, 1923-1924.)
Because the manufacture, distribution, and sale of the TEC-DC9 do not constitute ultrahazardous activities as that doctrine has been interpreted and applied by California courts, we conclude that the trial court properly granted Navegar summary judgment on appellants' cause of action alleging strict liability on the basis of an ultrahazardous activity.

DISPOSITION
For the foregoing reasons, the judgment granting summary judgment as to appellants' claim of ordinary negligence is reversed; in all other respects, the judgment is affirmed. Appellants are awarded costs on appeal.
LAMBDEN, J., concurring opinion.
I concur without reservation in the lead opinion's analysis of the negligence claim. However, I concur only in the result reached by the lead opinion in affirming the dismissal of appellants' claim premised upon strict liability for injuries resulting from the conduct of an abnormally dangerous activity.
There are legal precedents, as well as compelling public policy reasons, supporting application of strict liability concepts to handgun manufacturers. However, we are prevented from applying these concepts, even though they have long been routinely applied to a myriad of other less dangerous products, because the Legislature has enacted a statute that shelters handgun manufacturers from such liability. It is apparent from the legislative history of Civil Code section 1714.4, discussed at length in the lead opinion, that the Legislature's intent was to protect firearms manufacturers from all forms of strict liability, whether based upon the doctrine of abnormally dangerous activities or upon *193 the more recently developed doctrine of strict product liability; and there is nothing to suggest any exception was intended for claims based upon abnormally dangerous activities.
I have concluded that both types of claims are barred by Civil Code section 1714.4 because the statute was aimed at the practice of theoretically comparing risk to utility, which is a policy question fundamental to both branches of the theory of strict liability. However, I do not agree that strict liability based on abnormally dangerous activities is otherwise necessarily barred in California. Accordingly, I concur in the result, but not in the reasoning, of the lead opinion on this point.
HAERLE, J., concurring in part and dissenting in part.
I concur with that portion of lead opinion which sustains the trial court's grant of summary judgment on appellants' cause of action alleging ultrahazardous activities.
I strongly dissent, however, from the balance of the lead opinion dealing with liability for ordinary negligence. By that portion of its opinion, this court has become the first appellate court anywhere in this land to declare that, in an ordinary negligence action, a gun manufacturer owes a duty of care to persons injured and the survivors of others killed by the criminal misuse of its product by a remote purchaser. In so doing, I sadly conclude, it has undertaken what I believe to be an egregious exercise in judicial legislation.
In the course of that exercise, the lead opinion makes many legal and analytical errors. Among other things, its opinion (1) mischaracterizes the trial court's holding concerning the issue of "duty," (2) improperly substitutes the lead opinion's own theory of duty in lieu of that specifically pled by appellants and ruled on by the trial court, (3) posits a definition of duty which is unsupported by precedent, (4) creates a new California tort which it denominates "negligent manufacture, marketing, and distribution" but then effectively converts into one of "negligent marketing," (5) holds, contrary to well-established precedent, that there may be a duty to protect against the criminal act of a third party, (6) disregards an unbroken line of appellate precedent in both state and federal courts declining to impose a duty on gun manufacturers in ordinary negligence actions, (7) mischaracterizes the holdings and the factors underlying them in authorities it purports to distinguish, (8) ignores a primary basis for those authorities, the principle that legislatures, not courts, should make gun control policy, and (9) on the issue of causation, ignores appellants' repeated disclaimer of any need to show reliance by Ferri on Navegar's advertisements or marketing tactics.
I will address these points in approximately the order just noted.

I. The Lead Opinion's Errors Regarding the Element of "Duty."

I find the lead opinion's treatment of the key issue of duty incorrect in several important respects:

A. The lead opinion misstates the trial court's holding regarding duty.

The first major problem in the lead opinion's analysis of duty is its plainly inaccurate summary of the trial court's holdings on that issue. The lead opinion mischaracterizes that holding in two respects.
First of all, the lead opinion implies that, in its decision granting summary judgment, the trial court "revisited" its entire earlier Rowland v. Christian analysis. (Rowland v. Christian (1968) 69 Cal.2d 108, 70 Cal.Rptr. 97, 443 P.2d 561.) (Lead opn. at p. 159.) This is simply incorrect. In fact, it discussed only the two Rowland factors with respect to which Navegar claimed it had erred in its earlier ruling on demurrer, namely, moral blame and foreseeability. As the lead opinion notes, the trial court indicated it found Navegar's arguments on these two points unpersuasive. *194 However, as the lead opinion neglects to note, it specifically cautioned that the two issues it discussed were "not dispositive of the pending motion" and, thereafter, did not revisit any of the remaining Rowland factors.
However, it is the lead opinion's second mischaracterization of the trial court's holding that is by far the more grievous. Propping up a patent strawman, the lead opinion declares that "[i]n essence, the trial court viewed the judicial branch as lacking authority to impose upon a gun manufacturer a duty or standard of care relative to the manufacture, distribution or sale of firearms which exceeds the duty or standard of care imposed on such a person by applicable gun control laws." (Lead opn. at p. 160.) At several later points, the lead opinion repeats the same characterization in slightly different words, contending the trial court concluded "that the AWCA provides a basis for departing from the finding of duty that would otherwise flow from the policy analysis prescribed in Rowland v. Christian...." (Lead opn. at p. 177; see also pp. 173-174.) The lead opinion then devotes an entire section of its opinion (see lead opn. at pp. 172-177) to vigorously demolishing this strawman.
The lead opinion totally mischaracterizes the trial court's opinion. As a reading of the relevant portion of its opinion will disclose, the trial court did not, "in essence" or in fact, rely on the AWCA in declining to impose a duty on Navegar. In that portion, the trial court used the term "common law" no less than three times. By so doing, it stressed it was talking about all law, not just legislation, much less the AWCA. Indeed, in the relevant three paragraphs of the trial court's opinion, the only substantive reference to that statute is to its non-applicability to salessuch as those involved hereoccurring outside of California.[1]

B. The lead opinion improperly substitutes its own theory of duty for that consistently asserted by appellants.

The lead opinion also substantially mischaracterizes the "duty" alleged by appellants in this case and then abruptly substitutes its own. In an apparent effort to conform appellants' position to its own quite different position, the lead opinion states: "Appellants' complaint can best be understood as presenting a theory of negligence based on Navegar's breach of a duty to use due care not to increase the risk beyond that inherent in the presence of firearms in our society." (Lead opn. at p. 163.)
I have a different view. I submit (to borrow the lead opinion's exquisitely obfuscatory phraseology) that appellants' "complaint can best be understood as presenting a theory of negligence based on Navegar's breach of a duty" precisely as pleaded by them. This is especially so because these appellants have been both consistent and clear regarding the duty they wish imposed on Navegar. In paragraph 70 of their complaint, they dealfor the first and only time in itwith the element of "duty." They there allege: "[N]otwithstanding their duty not to advertise the TEC-9 and TEC-DC9 for sale to the general public, defendants ... proceeded and continued to do so in breach of such duty." That is the only allegation in appellants' complaint on the issue of duty.
Consistent with this, both in the court below and before us, appellants have over and over and over again argued that the overriding issue is Navegar's negligence in distributing these guns to the general public. Thus, they contended to the trial court: "From the start, plaintiffs have made clear their ordinary negligence claim is not based on Navegar's negligent advertising but rather [on] its decision to `make available for sale to the general public *195 guns ... which [it] knew or should have known have "no legitimate sporting or self-defense purpose" and which are "particularly well-adapted to a military-style assault on large numbers of people Simply put, Navegar breached a duty of care by making the TEC-9 available to the general public." They then summed up their contention unambiguously: "Plaintiffs' actual claim asserts Navegar's duty not to sell the TEC-9 to the general public. It is Navegar's breach of that duty that plaintiffs assert was casually connected to the shootings at 101 California Street." (Italics in original.)
This consistent position formed the basis of the trial court's critical ruling on the issue of duty. That ruling specifically identified the issue before the court as "whether plaintiffs can show a duty under California common law not to manufacture or sell assault weapons." It reiterated this definition of the duty element before it at six separate and distinct points in the course of the pertinent pages of its opinion. But this definition, which is the whole premise of the ruling being appealed, is disregarded by the lead opinion.
At over a dozen points in their briefs to this court, appellants stress that Navegar was negligent in "selling a military-style assault weapon to the general public...." And in oral argument before us, appellants' counsel specifically confirmed that (1) paragraph 70, quoted above, was appellants' only allegation regarding duty and (2) their position on that critical issue was that Navegar had a duty not to sell this particular weapon to the general public.
The lead opinion, though, changes all this. It substitutes for the duty so specifically pled and argued by appellants and ruled on by the trial court a new formulation of that element: a duty "not to increase risks" (lead opn. at pp. 163-165, 172, 175, 183, 184.) But since appellants cannot now change the duty element to something other than that pled in the trial court, I don't think an appellate court should do so on their behalf.
We have twice held recently that an appellant from a grant of summary judgment cannot change its theory of liability from that originally pleaded and ruled on by the trial court. (See 580 Folsom Associates v. Prometheus Development Co. (1990) 223 Cal.App.3d 1, 18, 272 Cal.Rptr. 227, and Leibert v. Transworld Systems, Inc. (1995) 32 Cal.App.4th 1693, 1699, 39 Cal.Rptr.2d 65 [Presiding Justice Kline concurring in the latter case].) This principle is simply a corollary of the "no new theories on appeal" rule. (See, generally, 1 Eisenberg et al., Cal. Practice Guide, Civil Appeals & Writs (The Rutter Group 1998) ¶ 8:229 et seq.) That doctrine was first enunciated in Ernst v. Searle (1933) 218 Cal. 233, 240-241, 22 P.2d 715, and has continued in full force and effect to the present. Thus, in North Coast Business Park v. Nielsen Construction Co. (1993) 17 Cal.App.4th 22, 21 Cal.Rptr.2d 104, the appellate court gave this principle the label of "`theory of the trial'" and held: "`A party is not permitted to change his position and adopt a new and different theory on appeal. To permit him to do so would not only be unfair to the trial court, but manifestly unjust to the opposing party.' [Citation.] The principles of `theory of the trial' apply to motions [citation], including summary judgment motions. [Citation.] Here the summary judgment motion focused on the drainage problem as the relevant defect. The matter was resolved on that theory, with North Coast claiming that despite its knowledge of the drainage problem it was still entitled to recover because the drainage defect fell under the 10-year statute of limitations. It would be manifestly unjust to the opposing parties, unfair to the trial court, and contrary to judicial economy to permit a change of theory on appeal." (Id. at p. 29, 21 Cal. Rptr.2d 104.) (To the same effect, see, e.g., Richmond v. Dart Industries, Inc. (1987) 196 Cal.App.3d 869, 874, 242 Cal. Rptr. 184, and Mattco Forge, Inc. v. Arthur Young & Co. (1997) 52 Cal.App.4th 820, 847, 60 Cal.Rptr.2d 780.)
*196 If an appellant is bound by this rule, a fortiori so is an appellate court. A familiar principle to such courts is that they "should affirm the judgment of the trial court if it is correct on any theory of law applicable to the case, including but not limited to the theory adopted by the trial court." (Western Mutual Ins. Co. v. Yamamoto (1994) 29 Cal.App.4th 1474, 1481, 35 Cal.Rptr.2d 698.) The lead opinion takes this well-known maxim and stands it on its head. Its opinion necessarily means that an appellate court may reverse a trial court's grant of summary judgment in an ordinary negligence case on the strength of a definition of duty not pleaded or argued by appellants nor considered or ruled on by the trial court. I surely hope this is not the law.

C. The lead opinion relies on dubious precedent for its substituted definition of duty.

The new definition of duty proffered by the lead opinion is, as noted, "a duty not to increase the risks." It derives this definition from a portion of the Supreme Court's plurality opinion in an assumption of risk case, Knight v. Jewett (1992) 3 Cal.4th 296, 11 Cal.Rptr.2d 2, 834 P.2d 696 (Knight). It then repeatedly asserts that appellants' case is based on this definition of duty. (Lead opn. at pp. 163-165.)
The lead opinion is putting not just words but entire concepts in appellants' mouths. If Knight was the key to liability for them, someone forgot to tell the many experienced and able counsel representing appellants,[2] as the case is nowhere cited in the 92 pages of briefs submitted by appellants to this court. Even more importantly, at no time have appellants argued an "increased risks" theory based on Knight or otherwise to either this court or the trial court.
One possible reason appellants did not cite Knight might be that it simply doesn't stand for the proposition the lead opinion says it does. The lead opinion contends that Knight "held" that defendants have a duty not to increase the risks inherent in a sport itself. In fact, and as the lead opinion notes, the Knight plurality held that a participant in a touch football game was barred by the doctrine of assumption of risk from recovering for injuries she suffered during that game. The only issue presented was the effect of the adoption of the comparative negligence principle on the assumption of risk doctrine. (Knight, supra, 3 Cal.4th at pp. 300-301, 303, 305, 314, 11 Cal.Rptr.2d 2, 834 P.2d 696.) The plurality opinion,[3] from which the lead opinion purports to extract support, concluded that the assumption of risk doctrine bars recovery by plaintiffs in "primary assumption of risk" cases where the defendant owes no legal duty to protect the plaintiff from a particular risk, but that the doctrine is merged into the comparative fault scheme, and does not operate to bar recovery, in "secondary assumption of risk" cases where the defendant does owe a legal duty of care to the plaintiff who proceeds to encounter a known risk. (Id. at pp. 314-315, 11 Cal.Rptr.2d 2, 834 P.2d 696.)
It was in this very discrete context (i.e., the determination of whether a case presents a primary or secondary assumption of risk situation) that the Knight plurality noted that, while there is generally no duty to protect a participant in a sport from risks inherent in that sport, defendants do have a duty not to increase the risks to a *197 participant over and above those inherent in that sport. (Knight, supra, 3 Cal.4th at pp. 315-316, 11 Cal.Rptr.2d 2, 834 P.2d 696.)
All the plurality opinion was talking about at the point the lead opinion quotes from it was how the definition of duty necessarily varies when the asserted negligence implicates participant sports. Thus, in the sentences immediately preceding the phrase the majority grasps onto, the plurality opinion explained: "[O]ur resolution of this issue turns on whether, in light of the nature of the sporting activity in which defendant and plaintiff were engaged, defendant's conduct breached a legal duty of care to plaintiff. ... [¶] As a general rule, persons have a duty to use due care to avoid injury to others, and may be held liable if their careless conduct injures another person. [Citation.] Thus, for example, a property owner ordinarily is required to use due care to eliminate dangerous conditions on his or her property. (See, e.g., Rowland v. Christian (1968) 69 Cal.2d 108, 70 Cal.Rptr. 97, 443 P.2d 561.) In the sports setting, however, conditions or conduct that otherwise might be viewed as dangerous often are an integral part of the sport itself. Thus, although moguls on a ski run pose a risk of harm to skiers that might not exist were these configurations removed, the challenge and risks posed by the moguls are part of the sport of skiing, and a ski resort has no duty to eliminate them. [Citation.] In this respect, the nature of a sport is highly relevant in defining the duty of care owed by the particular defendant." (Knight, supra, 3 Cal.4th at p. 315, 11 Cal.Rptr.2d 2, 834 P.2d 696; italics supplied.)
Then the plurality opinion gets to the "increased risk" point, which I believe warrants a full quotation: "Although defendants generally have no legal duty to eliminate (or protect a plaintiff against) risks inherent in the sport itself, it is well established that defendants generally do have a duty to use due care not to increase the risks to a participant over and above those inherent in the sport. Thus, although a ski resort has no duty to remove moguls from a ski run, it clearly does have a duty to use due care to maintain its towropes in a safe, working condition so as not to expose skiers to an increased risk of harm." (Knight, supra, 3 Cal.4th at pp. 315-316, 11 Cal.Rptr.2d 2, 834 P.2d 696.)
Two things are, I submit, very clear from this complete excerpt from Knight: (1) to the extent the plurality opinion was enunciating any principle of law regarding the element of "duty," it was doing so in the context of participant sports only, and (2) even in that context, when it defined the "scope" of duty it did so with specificity, e.g., "duty to remove moguls from a ski run" versus "duty to maintain its towropes in a safe, working condition." (Knight, supra, 3 Cal.4th at p. 316, 11 Cal.Rptr.2d 2, 834 P.2d 696.)
Indeed, the "increased risk of harm" phrase from Knight has been universally so interpreted and applied. In Branco v. Kearny Moto Park, Inc. (1995) 37 Cal. App.4th 184, 43 Cal.Rptr.2d 392, the court of appeal cited and discussed the several post-Knight cases invoking the "increased risk of harm" language. Each such decision in fact involved participant sports and in each the court in fact defined the duty with specificity, to wit: "a duty to refrain from utilizing BMX jumps which by design pose an extreme risk of injury" (id. at p. 190, 43 Cal.Rptr.2d 392), a "duty to supply horses which were not unduly dangerous, ... the duty not to provide faulty saddles, not to provide dangerous trails, etc." (id. at p. 191, 43 Cal.Rptr.2d 392), a "duty to take care that the jumping array ... was not beyond the capability of the horse and rider" (id. at p. 191-192, 43 Cal.Rptr.2d 392), and "a duty to see that the horse assigned to a student was safe to ride under the conditions the trainer prescribed for that activity." (id. at p. 192, 43 Cal. Rptr.2d 392.) The point is, I think, clear: there is no generalized duty simply "not to increase risks" separate and apart from the facts of the particular case and, where *198 there is such a duty, those facts have always implicated participant sports.[4]
Our appellate courts have long appreciated the need to relate the element of duty applicable in negligence litigation to the facts of the underlying case. This need was most recently and eloquently expressed by the author of the lead opinion, Presiding Justice Kline. In his dissent last year in Adams v. City of Fremont (1998) 68 Cal.App.4th 243, 298, 80 Cal. Rptr.2d 196, a case involving whether a "special relationship" existed between the police and a man who shot himself, he wrote: "Whether the duty exists depends in part upon whether the actor conducted himself in the appropriate manner, which is, of course, a factual question.... [¶] The question of duty cannot be resolved in this case without resort to both the facts of the situation in which the parties found themselves and an evaluation of what the police on the scene should have perceived and should have done in the context of that situation."
I regret that, unlike appellants, the lead opinion in this case has elected not to define its concept of duty in terms of the "facts of the situation in which the parties found themselves." Instead, they have opted to leave the duty element in the rarefied atmosphere of "a duty not to increase risks."
There is one final weakness in the lead opinion's generalized "duty not to increase risks": we are never told, indeed never even given a hint, as to how it is to be applied to the weapons manufacture and distribution business hereafter. For example, and confining myself for the moment to the record before us, would it or would it not apply to the manufacturer of the Norinco .45, also used with such deadly effect by Ferri on the day in question? Would it apply to the Glock semi-automatic 9mm gun Ferri so carefully considered in April 1993 if, hypothetically, he had chosen it for one of his weapons on July 1? Would it apply to the many other semi-automatic assault weapons, similar to the TEC-DC9, mentioned and discussed by Chief Supenski in the declaration the lead opinion relies upon so heavily? Would it apply to assault weapons generally (assuming that such are susceptible to judicial definition)?
In short, I find the lead opinion's conclusion regarding the element of duty to be, at one and the same time, flawed, radical and confusing. It is flawed because it totally disregards how that element was pleaded and argued by appellants throughout this litigation, and because it is based on easily distinguishable precedent. It is radical because it effectively says that, as of now, a manufacturer of a non-defective product may have a tort duty to one injured *199 by the criminal misuse of that product by a remote vendee. And it is confusing because we are not given the remotest hint as to how this new concept of duty is to be applied hereafter.

II. The Majority's New Tort of "Negligent Manufacture, Marketing and Distribution."

The lead opinion not only imports a new definition of duty into the appellate phase of this litigation, but also a new description of the tort involved. It labels it "negligent manufacture, marketing and distribution." (Lead opn. at pp. 172, 177, 184.) This label is both novel and intriguing. It is novel because neither that phrase nor anything much like it appears in appellants' briefs to this court. It is intriguing because, when discussing it, the lead opinion focuses entirely on the "marketing" element and not at all on either "manufacture" or "distribution." And that focus is fatally undermined, I submit, by the fact that the appellants have plainly disclaimed a "negligent marketing" theory of recovery.
To elaborate: the lead opinion never even hints how and in what manner Navegar could have negligently "manufactured" the TEC-DC9 (and especially how it did so in a facility regulated by a United States government agency). This omission is understandable, as it is elemental in California law that "negligent manufacture" means, almost by definition, a defective product or product liability case. (See, e.g., Soule v. General Motors Corp. (1994) 8 Cal.4th 548, 560-567, 34 Cal.Rptr.2d 607, 882 P.2d 298.) Nothing like that is or ever has been asserted by these appellants.
And the only specific things the lead opinion tells us about the distribution of the TEC-DC9 is in a non-controversial part of its statement of facts, to wit, that Navegar produced the guns at its Miami, Florida, facility, and then distributed them via two different routes. One gun went via a BATF-licensed distributor in Arizona to the BATF-licensed Super Pawn store in Las Vegas from which Ferri bought it; the other went to an Ohio BATF-licensed distributor to a Utah based BATF-licensed dealer (and gun show exhibitor), thence to a BATF-licensed Nevada retailer, and thence to Ferri. The lead opinion does not suggest anything remotely tortious about this distribution chain, either generally or as regards the two guns in question.
The lead opinion ignores anything to do with "manufacture" or "distribution" because, I believe, it really wants to focus on the quite different issue of marketing. This is apparent from the overwhelmingly amount of attention it devotes to Navegar's marketing and promotional tactics regarding this gun, including specific language used in its promotional material (even promotional material that could not possibly have come to Ferri's attention),[5] and the sorts of publications in which it advertised. (Lead opn. at pp. 155-156, 156-157, 162-163.)
The lead opinion, however, cites no authority establishing or even discussing a tort of "negligent marketing." It references only Judge Calabresi's dissent in McCarthy v. Olin Corp. (2d Cir.1997) 119 F.3d 148, 157 (McCarthy) (lead opn. at pp. *200 178, 183), but even that distinguished jurist conceded that the imposition of a duty in gun-distribution cases is "problematic." (McCarthy, supra, 119 F.3d at p. 165.) And my own research has found no California case using or considering the terms "negligent marketing" or "negligent manufacture, marketing and distribution."[6]
In any event, the overwhelming emphasis by the lead opinion on the marketing, promotional and advertising element is undercut by appellants' unequivocal and deliberate non-reliance on that element. I quote again from appellants' pleading in the trial court: "From the start, plaintiffs have made clear their ordinary negligence claim is not based on Navegar's negligent advertising but rather [on] its decision to `make available for sale to the general public [these] guns....' [¶] Navegar's advertising is only material to the ordinary negligence claim in that it underscores that the criminal use of the weapon was foreseeable to Navegar." This point was reaffirmed repeatedly in appellants' briefs to this court and at oral argument before us, when appellants' counsel specifically disclaimed reliance on a negligent marketing theory of liability.
Notwithstanding all these disclaimers,[7] the lead opinion apparently wishes to salvage a negligent marketing theory and thus avoid appearing to embrace appellants' candid position that there is a judicially-enforceable tort duty not to distribute to the general public weapons such as those involved here. I submit that this inconsistency between theory urged and theory adopted substantially undermines the lead's opinion.

III. The Lead Opinion Disregards Precedent Declining to Impose a Duty to Guard Against Criminal Acts.

The lead opinion substantially ignores a whole body of law, including precedent from this Division, holding that, generally, a court may not impose a duty to guard against criminal acts by third parties.[8]
*201 The seminal California case on this subject is Richards v. Stanley (1954) 43 Cal.2d 60, 271 P.2d 23 (Richards). The plaintiff in that case was injured when the defendants' car, driven by a thief, hit his motorcycle; he sued claiming defendants were negligent in leaving their car unattended and unlocked and with the keys in the ignition, all in violation of the San Francisco Municipal Code. Writing for the majority, Justice Traynor first noted that "a duty to prevent such harm would involve more than just the duty to control the car, it would involve a duty to prevent action of a third person. Ordinarily, however, in the absence of a special relationship between the parties, there is no duty to control the conduct of a third person so as to prevent him from causing harm to another." (Id. at p. 65, 271 P.2d 23.) He then concluded that, under the circumstances presented, Mrs. Stanley's "duty to exercise reasonable care in the management of her automobile did not encompass a duty to protect plaintiff from the negligent driving of a thief." (Id. at p. 66, 271 P.2d 23.)
Richards is still good law in this state.[9] This court summarized its holding succinctly in Totten v. More Oakland Residential Housing, Inc. (1976) 63 Cal.App.3d 538, 541, 134 Cal.Rptr. 29 (Totten), as follows: "As a basic general principle, in the absence of a special relationship or circumstance, a private person has no duty to protect another from a criminal attack by a third person." And, a few years later, we relied on Totten to support essentially the same conclusion. (See Bill v. Superior Court (1982) 137 Cal.App.3d 1002, 1014, 187 Cal.Rptr. 625.) In that case, then Presiding Justice Grodin summarized the general rule to be: "`As a general rule, one owes no duty to control the conduct of another, nor to warn those endangered by such conduct.'" (Id. at p. 1011, 187 Cal.Rptr. 625.) (See also, to the same effect, Anaya v. Turk (1984) 151 Cal.App.3d 1092, 1097-1098, 199 Cal.Rptr. 187 (Anaya); Rodriguez v. Inglewood Unified School Dist. (1986) 186 Cal.App.3d 707, 712, 230 Cal.Rptr. 823; Chaney v. Superior Court (1995) 39 Cal.App.4th 152, 157, 46 Cal.Rptr.2d 73.)[10]
Justice Chin, when he was in Division Three of this District, thoroughly reviewed both Richards and several similar decisions in Avis Rent a Car System, Inc. v. Superior Court (1993) 12 Cal.App.4th 221, 15 Cal.Rptr.2d 711. He not only confirmed that Richards was still good law, but also held that subsequent court of appeal cases which had tried to bypass its rule via invocation of a "special circumstances" exception were aberrant. In the course of so doing, Justice Chin specifically focused on the foreseeability factor, a factor to which the lead opinion gives great weight. He first noted that the famous footnote in Ballard v. Uribe (1986) 41 Cal.3d 564, 572, footnote 6, 224 Cal.Rptr. 664, 715 P.2d 624, "explained that foreseeability of harm is only one factor in the calculus for determining duty and that the court's task is not to decide whether a particular plaintiffs injury was reasonably foreseeable in light of a particular defendant's conduct, but to evaluate `generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may *202 appropriately be imposed on the negligent party.'" (Avis Rent a Car System, Inc. v. Superior Court, supra, 12 Cal.App.4th at p. 232, 15 Cal.Rptr.2d 711.)
From this, he concluded that putting the paramount focus on foreseeability can lead to legal error: "Richards and the decisions following it have confirmed that, however foreseeable car theft and an accident by the thief may be, leaving an ordinary automobile unattended on the street with a key in the ignition does not create a duty to protect other motorists from the negligent driving of a thief." (Avis Rent a Car System, Inc. v. Superior Court, supra, 12 Cal.App.4th at pp. 232-233, 15 Cal.Rptr.2d 711.)
Justice Chin's counsel against relying too heavily on the foreseeability factor was echoed just a few months ago by our Supreme Court. In Erlich v. Menezes (1999) 21 Cal.4th 543, 87 Cal.Rptr.2d 886, 981 P.2d 978, Justice Brown, writing for an effectively unanimous court,[11] noted: "[F]oreseeability alone is not sufficient to create an independent tort duty.... In short, foreseeability is not synonymous with duty; nor is it a substitute." (Id. at p. 552, 87 Cal.Rptr.2d 886, 981 P.2d 978.)
The only case the lead opinion cites from the Richards line of authority is Richardson v. Ham (1955) 44 Cal.2d 772, 285 P.2d 269, a case involving a defendant contractor who left a bulldozer partially unlocked at a construction site, with the result that several inebriates ran it into the plaintiffs' home. (Lead opn. at pp. 167-168.) That case has, however, been denominated a "special circumstances" case three times since by our Supreme Court. (See Hergenrether v. East (1964) 61 Cal.2d 440, 445, 39 Cal.Rptr. 4, 393 P.2d 164; Palma v. U.S. Industrial Fasteners, Inc. (1984) 36 Cal.3d 171, 183-186, 203 Cal.Rptr. 626, 681 P.2d 893, and Ballard v. Uribe, supra, 41 Cal.3d at p. 573, 224 Cal.Rptr. 664, 715 P.2d 624; see also Avis Rent-a-Car System. Inc. v. Superior Court, supra, 12 Cal.App.4th at pp. 225-228, 15 Cal.Rptr.2d 711.) I do not understand the lead opinion to be saying that this is a "special circumstances" case.
Not only does the lead opinion substantially overlook the Richards line of precedent, but it tries to avoid the principle it represents by invoking law from the entirely separate area of causation. The lead opinion states: "California courts have rejected the blanket rule that an intervening criminal act is by its very nature a superseding cause." (Lead opn. at p. 169.) It then proceeds to cite four cases, none of which support that proposition insofar as it implicates the element of duty. Two of the four are cases dealing with the issue of causation, not duty. The two which deal with duty, Richardson v. Ham, supra, 44 Cal.2d 772, 285 P.2d 269 and Bigbee v. Pacific Tel. & Tel. Co. (1983) 34 Cal.3d 49, 58, 192 Cal.Rptr. 857, 665 P.2d 947, involved negligent acts, not criminal acts. The only one of the four cases cited which implicates a criminal act, Rosh v. Cave Imaging Systems, Inc. (1994) 26 Cal. App.4th 1225, 1236, 32 Cal.Rptr.2d 136, deals with it as a problem of causation, not duty. Even the Restatement of Torts Second section cited by the lead opinion, section 449, involves causation, not duty.
Aside from a torts textbook, the lead opinion cites no authority suggesting that there is an applicable exception to the general rule established by Richards and its progeny. This is understandable: looking at matters commercially, Ferri was a remote vendee, two steps down a standard mercantile chain of distribution from Navegar as to one gun and three down as to the other. And geographically, he was a continent away from Navegar's Miami facility. There is no evidence anyone at Navegar knew Ferri existed nor, as the trial court observed, is there any evidence *203 that Ferri ever saw any of the promotional material issued by it. This is clearly not the sort of stuff from which exceptions to the general rule of Richards are made.

IV. The Lead Opinion Ignores or Mischaracterizes Unanimous Precedent Declining to Impose a Duty Not to Make or Sell a Gun

The lead opinion includes in its discussion of prior precedent in this area two statements which deserve note: "It is doubtless correct that, in the absence of a special relationship, the manufacture, marketing or distribution of a nondefective product that may legally be sold is rarely found to constitute negligence." (Lead opn. at p. 178.) And: "It is true that American courts have frequently refused to let juries decide the ultimate question of negligence in gun cases." (Lead opn. at p. 180.)
These two sentences comprise significant understatements. The fact of the matter is that the lead opinion's ruling is completely without any appellate precedent whatsoever. In addition to those cited by the trial court, the following cases hold that, in an ordinary negligence action, a court should not impose a duty on a gun or ammunition manufacturer or distributor not to manufacture or sell its products: Valentine v. On Target, Inc. (1999) 353 Md. 544, 727 A.2d 947, 949-953; First Commercial Trust Co. v. Lorcin Engineering, Inc. (1995) 321 Ark. 210, 900 S.W.2d 202, 204-205; Buczkowski v. McKay (1992) 441 Mich. 96, 490 N.W.2d 330, 332-337; Knott v. Liberty Jewelry and Loan, Inc. (1988) 50 Wash.App. 267, 748 P.2d 661, 664; Resteiner v. Sturm, Ruger & Company, Inc. (1997) 223 Mich.App. 374, 566 N.W.2d 53, 56; King v. R.G. Industries, Inc. (1990) 182 Mich.App. 343, 451 N.W.2d 874, 875-876; Riordan v. International Armament Corp. (1985) 132 Ill. App.3d 642, 87 Ill.Dec. 765, 477 N.E.2d 1293, 1295-1296; Linton v. Smith & Wesson, Inc. (1984) 127 Ill.App.3d 676, 82 Ill. Dec. 805, 469 N.E.2d 339, 340; Forni v. Ferguson (N.Y.App.Div.1996) 232 A.D.2d 176, 648 N.Y.S.2d 73, 74; Leslie v. United States (D.N.J.1997) 986 F.Supp. 900, 911-913, affd. (3d Cir.1999) 178 F.3d 1279.[12]
When added to the six decisions cited by the trial court (see lead opn. at pp. 181-183), the total is 16 decisions issued since 1983, including decisions from the Supreme Courts of Michigan, Arkansas and (this year) Maryland, plus the federal Court of Appeals for the Second, Third, Tenth and Eleventh Circuits. They universally hold the opposite of the lead opinion here, as several law review writers have recently confirmed.[13] Likewise supportive *204 of this conclusion is the dissenting opinion of Judge Calabresi in one of those decisions, McCarthy, supra, 119 F.3d 148, a dissent cited approvingly by the lead opinion no less than three times. (Lead opn. at pp. 161, 179, 183.) In it, Judge Calabresi conceded that the issue of the existence of a duty in that case was, in his view, "problematic." (McCarthy, supra, 119 F.3d at p. 165.) Such being the case, he did not urge his Second Circuit panel to declare that such a duty existed. Rather, in an example of admirable judicial restraint, he advocated a formal reference of the issue to the New York Court of Appeals. (Id. at pp. 166-170.)
Further, in the course of discussing similar cases, the lead opinion mischaracterizes many of those relied on by the trial court. Those cases did not, says the lead opinion, involve the factors which obtain here, thus making this an "unusual case." (Lead opn. at p. 178.) Once again, the lead opinion is manifestly incorrect.
I shall start with the California federal court opinion, Casillas v. Auto-Ordnance Corp. (N.D.Cal.1996) 1996 WL 276830 1 (Casillas), a case the lead opinion vainly attempts to distinguish on this basis. (Lead opn. at pp. 181-182.) Casillas was, as the majority points out, an opinion on summary judgment issued by the Honorable Fern M. Smith of the United States District Court for the Northern District of California. Judge Smith had before her a motion for summary judgment by the manufacturer of a Thompson semi-automatic pistol which was used (by the son of the purchaser) to shoot "in rapid succession" four members of a family; all were seriously injured and one is a paraplegic. (Casillas, supra, 1996 WL 276830 at p. *1.) The plaintiffs claimed the manufacturer of the gun was liable on both ordinary negligence and strict liability theories. They asserted, precisely as appellants do here, that (a) the Thompson gun had no "legitimate sporting or self-defense purpose," (Id. at p. *2) (b) it had been disproportionately "associated with criminal activity," and (c) it was "`particularly well adapted to a military style assault.'" (Id. at p. *3). Applying principally two California negligent entrustment cases mentioned by the majority, Judge Smith concluded that summary judgment in favor of the gun manufacturer was appropriate. She first noted that, "[i]n general, California law does not impose a duty on manufacturers to insure against third party misuse of their nondefective products" (id. at *2) and then went on to hold: "Further, there is no legal authority for imposing a duty in this case.... [¶] ... The advertisements submitted by plaintiffs do not support the claim that Gomez's actions were foreseen by defendant. Nor do plaintiffs present evidence that the advertisements were targeted to criminals generally or to Gomez specifically, were seen by Gomez, or were somehow the cause of Gomez's violent behavior...." (Id. at p. *3.)
In short, precisely the same claims being asserted here were asserted in Casillas: disproportionate association with criminal activity, no legitimate sporting or self-defense purpose, the ready adaptability of the weapon of a military-style assault, and foreseeability. Nonetheless, Judge Smith found no precedent suggesting that a duty would or should be imposed under California law; indeed, she found there was ample contrary precedent, both in California and nationally. She concluded: "In sum, California statutory and caselaw persuade the Court that the California Supreme *205 Court would not allow a claim against a firearm manufacturer for damages caused by a third party's illegal use of a legal and nondefective firearm, whether under a product liability or a negligence theory. In the absence of any clear legislative or judicial authority, the Court may not expand manufacturers' liability for potentially dangerous products beyond established California law." (Casillas, supra, 1996 WL 276830 at p. *4.)
The lead opinion argues that this case is different because here Judge Warren "found" certain facts (lead opn. at p. 182) which fill the gaps it contends Judge Smith found critical. There are, as I have already suggested, all sorts of things wrong with this analysis. In the first place, Judge Warren "found" no such facts for the obvious reason that trial courts do not make "findings" in ruling on motions for summary judgment. Second, Judge Warren did not conclude that appellants had established that Navegar had targeted its marketing to criminals; he specifically concluded only that a factual dispute existed as to this. Third, Judge Smith's conclusion in Casillas that those plaintiffs had not provided "admissible evidence ... that Gomez's actions were foreseen by defendant [or that its] advertisements ... were seen by Gomez, or were somehow the cause of Gomez's violent behavior" (Casillas, supra, 1996 WL 276830 at p. *3) are almost exactly the same as Judge Warren's conclusions on the record before him. Fourth and finally, Judge Smith's decision in Casillas clearly rests much more on the state of California (and national, for that matter) law in this area than on anything absent from the record before her.
The lead opinion similarly either misreads or mischaracterizes the overwhelming number of similar out-of-state decisions in its cursory dismissal of them as not involving the sorts of factors involved here, e.g., evidence of foreseeability, "the targeted marketing of lethal weapons to criminals" and the alleged absence of any "legitimate civilian use."[14] (Lead opn. at, e.g., pp. 171, 181, 182, 183.) In fact, almost all of the out-of-state precedent relied *206 on by the trial court, and several of the additional decisions cited above, involved many (and some all) of these factors.
Thus, in Armijo v. Ex Cam, Inc. (D.N.M.1987) 656 F.Supp. 771, one of the cases relied on by Judge Warren, a federal district court applying New Mexico law dismissed an action brought by the widow of a man who had been killed by a person using a "Saturday Night Special" manufactured and distributed by the defendants. With respect to her negligence claim, the plaintiff argued that a duty arose because the defendants had marketed "a product which carried some degree of risk that it might be used in a criminal enterprise." (Id. at p. 775.) The court concluded that such a cause of action was not viable under New Mexico law: "In the absence of any legislative action, or specific guidance from the New Mexico courts, this Court will not impose a `duty' upon manufacturers of firearms not to sell their products, merely because such products have the potential to be misused for purposes of criminal activity." (Ibid.) A year later, the Tenth Circuit Court of Appeals affirmed this ruling. (Armijo v. Ex Cam, Inc. (10th Cir. 1988) 843 F.2d 406, 407 (Armijo).)
A similar theory of liability was presented to the District of Columbia Court of Appeals a year later in another case relied on by the trial court and similarly brushed aside by the lead opinion. A man shot when John Hinckley tried to assassinate President Reagan, and the man's wife, sued the gun manufacturer and its parent corporation. Their allegations as to those defendants substantially mirror the contentions of appellants here: "Hinckley needed an easily concealable weapon for his assassination attempt; the gun manufactured by Roehm and R.G. Industries, Inc., is an easily concealable, inexpensive handgun; the gun is poorly constructed, unreliable, and therefore not useful for legitimate purposes such as military use, target practice, or self-defense; as a result of the gun's low price, it is used for criminal purposes; and the manufacturers knew of the gun's criminal uses." (Delahanty v. Hinckley (D.C.Ct.App.1989) 564 A.2d 758, 759.)
Citing, among other decisions, Armijo, the appellate court held: "On consideration of this question, we conclude that traditional tort theories ... provide no basis for holding the gun manufacturer liable." (Delahanty v. Hinckley, supra, 564 A.2d at pp. 759-760.) With specific regard to the negligence claim, the court noted that, under applicable precedent, no tort liability generally exists for harm resulting from the criminal acts of third parties. (Id. at p. 762.)
And in McCarthy, supra, discussed at several points by the lead opinion, the Second Circuit's majority specifically noted the same sort of marketing issues relied on by appellants and the lead opinion. It briefly summarized the plaintiffs' negligence theory as follows: "The crux of appellants' negligence theory is that Olin negligently marketed and placed the Black Talon ammunition for sale to the general public. Appellants argue that because of the severe wounding power of the bullets, Olin should have restricted sales to law enforcement agencies, for whom the bullet was originally designed. They also argue that Olin should have known that their advertising, which highlighted the ripping and tearing characteristics of the bullet, would attract `many types of sadistic, unstable and criminal personalities,' such as Ferguson." (119 F.3d at p. 156.)
But it is a 1997 decision of an Illinois federal district court in a suit brought against Navegar regarding the TEC-DC9 that especially undermines the lead opinion's attempt to segregate this as "unusual case." (Lead opn. at p. 178.) In Bubalo v. Navegar, Inc. (N.D.Ill.1997) 1997 WL 337218, a Chicago police officer injured, and the survivors of another officer killed, by a criminal using a TEC-DC9 sued Navegar for, among other theories, ordinary negligence. Navegar moved for summary judgment, although the court treated the motion as one to dismiss under rule 12(b)(6) of the Federal Rules of Civil Procedure. *207 The court ultimately granted Navegar's motion, principally on causation grounds (see post), but in the course of its opinion cited virtually all of the factors relied upon by the lead opinion here, to wit, the "assault" characteristics of the gun, the appeal to a "criminal element" issue, th
e "exceptional resistance to fingerprints" marketing claim, and the deposition admissions of Navegar's former marketing director. (Id., 1997 WL 337218.)[15] If nothing else, this decision utterly demolishes the lead opinion's "this case is unusual" premise.
In sum, the lead opinion is demonstrably incorrect in its repeated assertion that the contentions of and evidence adduced by these appellants make this an "unusual case" (lead opn. at p. 178) as compared with prior, unanimously contrary, precedent.

V. The Lead Opinion Ignores Policy Considerations Underlying Existing Precedent.

In the line of authority just discussed, I am impressed by the many times the relevant court has declared that invitations to impose a duty not to produce or market a given gun or ammunition are properly addressed to the appropriate legislative body rather than the courts.[16] And such is not an outside-of-California phenomenon. Over two decades ago, and when the item as to which the judicial ban was sought was a mere slingshot, then Presiding Justice Gerald Brown declared: "Such a limitation is within the purview of the Legislature, not the judiciary." (Bojorquez v. House of Toys, Inc. (1976) 62 Cal.App.3d 930, 933, 133 Cal.Rptr. 483.) This sentiment was reiterated by the trial court here in words that bear repetition: "If plaintiffs want to change the law as it relates to the manufacture and sale of firearms, the way is through the Capitol, not the Court."
The lead opinion is apparently uncomfortable with this philosophy. I am not. I especially embrace it as it pertains to the issue of gun control because, prior to or during the litigation below, both our Legislature, by its passage of the AWCA in 1989, and the United States Congress, by its passage in 1994 of a law banning the "manufacture, transfer, or possession]" of semi-automatic assault weapons (including specifically the TEC-9 and TEC-DC9),[17] signaled both their understanding that this issue is one within their competence and their willingness to affirmatively address it.
And, subsequent to the litigation below, indeed the very week of oral argument on this appeal, the elected policymakers of our state finalized even more strict California assault weapons control legislation. Specifically, on July 19 of this year Governor Davis signed into law Senate Bill 23 which, among other things, adds a new section 12276.1 and amends sections 12280, 12285, 12287 and 12289 of the Penal Code, dealing with the manufacture, sale and possession, and expanding the definition, of assault weapons. (Sen. Bill No. 23, approved by Governor July 19, 1999, § 7 [adding Pen.Code, § 12276.1], § 8 [amending *208 Pen.Code, § 12280], § 9 [amending Pen.Code, § 12285], § 10 [amending Pen. Code, § 12287], § 11 [amending Pen.Code, § 12289].) It is unnecessary to go into all of its provisions and ramifications, but suffice it to say that its passage and signature by the Governor makes crystal-clear that our elected officials are very much "on top of the issue appellants have made the crux of this litigation: the sale of assault weapons to the general public. If, arguably, there was previously a need for the appellate judiciary of this state to intrude into this issue, that need clearly no longer exists.[18]
I submit that a major reason so many courts have declined to impose a duty in similar cases and, rather, have deferred to their respective legislatures is the problem of line-drawing. As applied to the case before us, that problem becomes: which weapons are covered by the "duty" the lead opinion would impose and which are not? This question is underlined by the lead opinion's descriptions of what is covered by their newly-minted "duty," descriptions which make manifest that it is focused on more than the TEC-DC9s involved here. Thus, at several points, the lead opinion suggests strongly that its focus is "assault weapons" generally. (Lead opn. at pp. 172, 179, 184.) What does that term mean? Does it, for example, mean the same thing as it means in the recent California legislation just noted? How would a trial court, attempting to follow precedent, apply it? For example, would it, in the instant case, include the Norinco .45 with which Ferri killed and wounded six of the 14 victims of July 1? Would it include the Glock 9mm which Ferri carefully considered both before and on April 25?
I suggest there isand should be overwhelming doubt as to the competence of the judiciary to develop and then apply criteria such as marketing tactics, appearance and design of a gun, language in the promotional material, and legitimacy of usage for civilian purposes, to distinguish between guns as to which either a generalized "duty not to increase risks" (the lead opinion) or a specific "duty not to sell to the general public" (appellants) exists and those as to which it does not. And, I suggest, that is precisely the reason every other court which has considered this issue has declined to embark on such a perilous journey.
Gun control is certainly not the only arena in which this philosophy of social restraint has prevailed. Thus, in Ohio v. Wyandotte Chemicals Corp. (1971) 401 U.S. 493, 91 S.Ct. 1005, 28 L.Ed.2d 256, the State of Ohio filed a motion in the United States Supreme Court seeking to invoke that Court's original jurisdiction against several defendant chemical companies. The proposed action sought to abate *209 what Ohio termed a "public nuisance," the contamination of Lake Erie by, principally, mercury contamination caused by discharges from plants located in other states. The Court declined to get involved. Justice Harlan, speaking for an eight-justice majority, first noted "the sense of futility that has accompanied this Court's attempts to treat with the complex technical and political matters that inhere in all disputes of the kind at hand." (Id. at p. 502, 91 S.Ct. 1005.) He then concluded in these words, words that I believe are strikingly applicable here: "What has been said here cannot, of course, be taken as denigrating in the slightest the public importance of the underlying problem Ohio would have us tackle. Reversing the increasing contamination of our environment is manifestly a matter of fundamental import and utmost urgency. What is dealt with above are only considerations respecting the appropriate role this Court can assume in efforts to eradicate such environmental blights. We mean only to suggest that our competence is necessarily limited, not that our concern should be kept within narrow bounds." (Id. at p. 505, 91 S.Ct. 1005.)
Those words were, as noted, written in 1971. Shortly thereafter a plethora of federal environmental laws and regulations were promulgated.[19] Somehow, I suspect that mercury contamination hasn't been a problem in Lake Erie for several decades.

VI. The Issue of Causation.

As the lead opinion notes, the trial court granted Navegar summary judgment on the appellants' negligence per se cause of action, a cause of action essentially based on Navegar's alleged violation of California's AWCA. Its basis for so doing was that appellants could not, other than by an "impermissibly speculative" path, show that Navegar's marketing of its TEC-DC9 was the legal cause of Ferri's purchase and later lethal use of it. It indicated its agreement with Navegar's contention that "only a series of unsupportable assumptions could lead a jury to conclude: first, that Ferri saw a Navegar advertisement; second, that that advertisement caused Ferri to purchase its assault firearms; and third, that the advertisements further caused Ferri to use those firearms at 101 California Street to inflict such incomprehensible destruction." (Italics in original.)
Because the trial court found no duty owing from Navegar to appellants regarding the ordinary negligence claim, it never addressed the causation issue as to that cause of action. But I conclude, contrary to the lead opinion, that the issue of causation is also fatal to the appealed ordinary negligence cause of action.
Early in this decade, our Supreme Court looked carefully at how the elusive element of "proximate cause" was being defined to juries via two then-operative jury instructions. In Mitchell v. Gonzales (1991) 54 Cal.3d 1041, 1048-1054, 1 Cal.Rptr.2d 913, 819 P.2d 872 (Mitchell), it disapproved of one but generally approved of another (BAJI No. 3.76). In the course of doing so, it noted: "One of the concepts included in the term proximate cause is cause in fact, also referred to as actual cause." (Id. at p. 1049, 1 Cal.Rptr.2d 913, 819 P.2d 872.) The court then went on to specifically approve of the definition of "cause in fact" provided in BAJI 3.76. to wit, *210 "`whether the defendant's conduct was a substantial factor in bringing about the injury.'" (Ibid.) The court concluded by noting that the "substantial factor" test in that instruction subsumed within it the competing "but for" test and also substantially resolved the problem of "independent causes." (Id. at pp. 1052-1053, 1 Cal.Rptr.2d 913, 819 P.2d 872; see also Maupin v. Widling (1987) 192 Cal.App.3d 568, 574-575, 237 Cal.Rptr. 521; Osborn v. Irwin Memorial Blood Bank (1992) 5 Cal. App.4th 234, 252-253, 7 Cal.Rptr.2d 101 (Osborn).)
That, of course, leaves the question of what "substantial" means in this context. Another Court of Appeal addressed this issue recently: "Unfortunately, we do not have much guidance as to what the term `substantial' means. The Supreme Court, in Mitchell v. Gonzales, supra, did not attempt to define the term. However, in an earlier criminal case, that court quoted the following language with approval: `No cause will receive juridical recognition if the part it played was so infinitesimal or so theoretical that it cannot properly be regarded as a substantial factor in bringing about the particular result.' [Citation.] We agree with the comment of the BAJI Committee ... when it noted, `While there is no judicially approved definition of what is a substantial factor for causation purposes, it seems to be something which is more than a slight, trivial, negligible, or theoretical factor in producing a particular result.' (Com. to BAJI No. 3.76 (8th ed.1994 bound vol.) p. 99.)" (Espinosa v. Little Co. of Mary Hospital (1995) 31 Cal. App.4th 1304, 1314, 37 Cal.Rptr.2d 541 (Espinosa).)
In the course of discussing the "cause in fact" or "substantial factor" test, both our Supreme Court and other appellate courts have approvingly cited section 431(a) of the Restatement, Second, Torts. (See Mitchell, supra, 54 Cal.3d at p. 1052, 1 Cal.Rptr.2d 913, 819 P.2d 872; Rutherford v. Owens-Illinois, Inc. (1997) 16 Cal.4th 953, 969, 67 Cal.Rptr.2d 16, 941 P.2d 1203; Osborn, supra, 5 Cal.App.4th at p. 252, 7 Cal.Rptr.2d 101; see also Espinosa, supra, 31 Cal.App.4th at p. 1314, 37 Cal.Rptr.2d 541.) A comment to the immediately following section of the Restatement, section 432, deals with this issue as follows: "If, without the actor's negligent conduct the other would have sustained harm, the same in character and extent as that which he receives, the actor's conduct ... is not even its necessary antecedent, and so is not a substantial factor in bringing it about." (Rest.2d Torts, § 432, com. a.)
The "substantial factor" principle was applied in the recent case of Leslie G. v. Perry & Associates (1996) 43 Cal.App.4th 472, 50 Cal.Rptr.2d 785 (Leslie G.). There, a tenant, who had been raped while in her apartment, sued her landlord for her injuries and trauma on the basis of an expert opinion that the rapist had been attracted to and entered the premises because of a broken gate. (Id. at pp. 481-482, 50 Cal.Rptr.2d 785.) In affirming summary judgment for the landlord, the court observed: "Although proof of causation may be by direct or circumstantial evidence, it must be by `substantial' evidence, and evidence `which leaves the determination of these essential facts in the realm of mere speculation and conjecture is insufficient.' (Showalter v. Western Pacific R.R. Co. (1940) 16 Cal.2d 460, 471, 106 P.2d 895; see also Prosser & Keeton, Torts (5th ed.1984) § 41, p. 269 [a mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to determine the issue in favor of the defendant as a matter of law].)" (Id. at p. 484, 50 Cal. Rptr.2d 785.) Applying this rule to the case at hand, the court concluded: [w]here, as here, there is evidence that the assault could have occurred even in the absence of the landlord's negligence, proof of causation cannot be based on mere speculation, conjecture and inferences drawn from other inferences to reach a conclusion *211 unsupported by any real evidence...." (Id. at p. 488,106 P.2d 895.)
In its ruling on the negligence per se cause of action, the trial court stated: "The question is not only whether Ferri ever saw a Navegar ad, but whether the ad influenced him to purchase [a Navegar] assault weapon andand this is a big "and"whether those ads were a legal cause, i.e., a substantial factor, in bringing about plaintiffs' injuries." (Italics in original.) Citing Leslie G., it observed that, in order to defeat summary judgment, there must be some substantial evidence of a fact that the plaintiff will ultimately be required to prove at trialnot mere speculation or conjecture. It put the appellants showing into the latter category, observing that "the links that plaintiffs seek to establish between advertisements and carnage amount to little more than guesswork."
I agree with this reasoning, but conclude it applies with equal force to the ordinary negligence cause of action. The basis of my conclusion is the same as the trial court's regarding the negligence per se cause of action, to wit, that any connection between any of Navegar's marketing conduct and Ferri's purchase and subsequent criminal use of the two TEC-9s is entirely speculative. In support of this conclusion I offer the following summary of the relevant facts which, I respectfully submit, is more complete and balanced than that provided by the majority.
During January and February 1993, Ferri, then a resident of Woodland Hills in Southern California, made three or four visits to the Pawn and Gun Shop in Henderson, Nevada. During these visits, he examined and made inquiries concerning "a wide variety of guns" available for purchase. However, he apparently made no purchases in the course of these visits.
Several month later, probably in April 1993, Ferri paid another visit to the same store. This time, after several more hours examining and discussing guns, he purchased a used TEC-9. However, later that day he returned the weapon, stating that he had decided he wanted a new, rather than a used, gun. Over the course of all of these visits, the Henderson store salesperson with whom Ferri mostly dealt testified that he discussed "[m]aybe 10" guns with Ferri overall.
As noted by the majority, on April 25, 1993, Ferri visited another Nevada gun store, Super Pawn in Las Vegas. He told both a salesperson and another customer, a man named Messing, that he wanted to buy a gun for target practice ("plinking"). Among the several weapons the salesperson showed Ferri was a TEC-DC9. After considerable discussion with the salesperson and Messing, he narrowed the choice down to it and a very similar, albeit substantially more expensive, weapon manufactured by Glock. He ultimately chose the TEC-DC9.
Three separate witnesses testified via deposition that the factor Ferri seemed mainly focused on in the course of this extensive shopping was price. Thus, the salesperson at the Henderson store where Ferri bought and then returned the used gun in February so testified repeatedly, as did customer Messing from the Las Vegas store. Finally, the dealer at the May gun show in Las Vegas concluded that price was a significant factor in Ferri's decision to purchase the second TEC-DC9 he bought and kept.
Ferri paid less than $300 for each of the TEC-DC9s that he bought and kept. The Glock, which he considered at length on April 25, was priced at over $500.
A second, albeit related, factual issue very much downplayed by the lead opinion is the role of the third weapon Ferri had and used in his rampage, the Norinco .45. Six of the 14 dead and wounded were, according to both admissions by some of the appellants and the medical evidence, killed or wounded not by 9mm bullets from a TEC-DC9, but by .45 caliber bullets fired from the Norinco pistol. These six included two victims who were shot with both weapons, but apparently fatally *212 wounded by bullets from the Norinco, two others who were killed with the Norinco, and two who were wounded by its bullets.
In sum, the record makes clear that, for a period of almost six months, from January until late June 1993, Ferri shopped extensively for guns at several locations in southern Nevada. He visited not only several towns (Henderson and Las Vegas), but several stores. He made at least four forays to one, the Pawn & Gun Shop in Henderson, before buying the first TEC-9, the used one he returned the same day. During these forays, and the ones in April and May during which he bought the two TEC-DC9s he used on July 1, he asked many questions of salespersons and at least one other customer regarding guns in general; none of the other participants in these conversations recalled that he placed any particular emphasis on Navegar products, or on any feature of the TEC-DC9. Indeed, and as mentioned above, three witnesses testified that his motivating consideration appeared to be price. And, finally, six months after his Nevada "gun shopping" started but just six days before he came to San Francisco, he made one last trip there to purchase a non-Navegar gun, the .45 caliber Norinco semi-automatic pistol, which he also used with lethal effect on the tragic day.[20]
The conclusion to be drawn from all of this is, I submit, obvious: Ferri was going to buy some gun to commit his planned carnage; he did not commit it because he had two TEC-DC9s as opposed to some other model of weapon. Put another way, clearly neither the identity of the gun nor the gun manufacturer was a critical matter to him.[21]
Whether causation exists in a negligence case is, of course, a question of fact. (6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 967, and cases cited therein.) But, like any other question of fact, it is susceptible of resolution in a summary judgment process. And, even in that context, the burden of proof regarding that factor can be shifted to appellants. (See Leslie G, supra, 43 Cal.App.4th at p. 482, 50 Cal.Rptr.2d 785.) By pointing to the absence of any credible evidence regarding causation, Navegar shifted to appellants *213 the burden to present evidence showing that there is a triable issue of fact as to that critical element. (Ibid.; see also Scheiding v. Dinwiddie Construction Co. (1999) 69 Cal.App.4th 64, 81-84, 81 Cal. Rptr.2d 360.) I believe that, as the trial court concluded regarding the negligence per se cause of action, appellants did not sustain this burden. To the contrary, (a) the role of the Norinco gun in the carnage of July 1, (b) Ferri's six months of shopping for guns in southern Nevada, (c) the large number of guns he examined and discussed, and (d) his preoccupation with price as the paramount factor in his purchasing decision all combine to foreclose any conclusion that Navegar's manufacture, marketing and distribution of the TEC-DC9 was a "substantial factor" in the carnage of July 1.
As a sort of "add on" factor, the lead opinion notes that many features of the TEC-DC9 "made it particularly lethal in the assault carried out at 101 California Street." (Lead opn. at p. 189.) It then specifies several of the characteristics of this gun identified by Chief Supenski in his declaration. However, in the same section of that declaration, Chief Supenski makes clear that there are many other, similar weapons. And, as previously discussed, Ferri looked at many such weapons during his six-months of gun shopping in southern Nevada. This combination of facts would seem to make clear that Ferri could have achieved the same lethal effects with many guns other than the TEC-DC9.
Another reason causation is not present here is because appellants have explicitly disclaimed any reliance by Ferri on any of Navegar's advertisements. First of all, nowhere did appellants allege any sort of reliance in the ordinary negligence cause of action of their First Amended Model Complaint. Additionally, and as I have already noted, they explicitly disclaimed such in the trial court. They told that court that "on the issue of causation, whether Ferri actually saw or was influenced by any particular Navegar advertising is immaterial." (Italics in original.) Before us, they were consistent. Thus, in their briefs they stated: "[Plaintiffs' case is not dependent on proof that Ferri saw these advertisements or that they influenced him to buy the TEC-9." (Italics in original.) And at oral argument, appellants' counsel reconfirmed that appellants' position was that there was no need to show "a causal connection between that advertising and Mr. Ferri's conduct."
But the only cases of which I am aware that have even remotely considered this issue have flatly held that, if the theory is "negligent marketing" (as it clearly is for the lead opinion, see ante, part II), both allegations and evidence of reliance are essential. Thus, in the recent decision of Bubalo v. Navegar, Inc., supra, 1997 WL 337218, a federal district court in Chicago dismissed a negligent marketing case against Navegar involving the death of one and wounding of a second police officer by a criminal wielding a TEC-DC9. (Id. at p. *1) In so doing, the court held (in reliance on both Illinois Supreme Court and other federal court decisions) that the plaintiffs in that case had not alleged the "`requisite causal relation' between Navegar's alleged negligence in marketing the firearm and the officers' actual injuries." (Id. at p. *8; see also Pitts v. Basile (1966) 35 Ill.2d 49, 219 N.E.2d 472, 475.)
The Illinois federal court found support for this conclusion in negligent misrepresentation cases (e.g., Lowe v. Sporicidin Intern. (4th Cir.1995) 47 F.3d 124, 131-132) holding that admissions by a plaintiff of non-reliance on the advertisements alleged to be false precluded recovery. It reasoned that, if reliance is critical for the tort of negligent misrepresentation, the same follows for any tort such as "negligent marketing." (Bubalo v. Navegar, Inc., supra, 1997 WL 337218 at p. *9.) I agree, observing as I do so that California also requires an allegation and showing of reliance to sustain a negligent misrepresentation claim. (See, e.g., Blankenheim *214 v. E.F. Hutton & Co. (1990) 217 Cal. App.3d 1463, 1473, 266 Cal.Rptr. 593.)
For all of the foregoing reasons, I submit that summary judgment could and should have been granted as to appellants' ordinary negligence cause of action for failure to adduce any plausible evidence of causation.

VII. Conclusion.

The terrible tragedy of July 1, 1993, in San Francisco will not soon be forgotten, nor should it be. But something else which needs to be kept in mind is the whole issue of responsibility, a concept too often minimized in some contemporary legal discourse. I quote again from the court of appeal decision in Wise v. Superior Court, supra, 222 Cal.App.3d at pp. 1015-1016, 272 Cal.Rptr. 222: "[T]he responsibility for tortious acts should lie with the individual who commits those acts; absent facts which clearly give rise to a legal duty, that responsibility should not be shifted to a third party."
Gian Luigi Ferri organized and executed every aspect of the tragedy underlying this litigation. Heand he aloneplanned it for at least six months, down to such exquisite detail as combat slings, Hell Fire triggers, satchels in which to carry the guns, etc. Neither Carlos Garcia, Michael Solodovnick or anyone else at Navegar's Florida facility, no matter how appalling their judgment or callous their sensitivities, pulled a trigger at 101 California Street on July 1, 1993. Even as a lay value judgment, we should be reluctant to allow understandable bitterness regarding the losses inflicted on so many innocent people and the invidious nature of Navegar's products to combine to divert attention from where the singular responsibility for those losses rests. And we should be even more reluctant to do so via judicial improvisations on such significant legal concepts as duty and causation.
And improvisations are, I submit, what the lead opinion provides. Because it is unwilling to declare Navegar strictly liable under an ultrahazardous activity theory or otherwise, it attempts to achieve the same result by defining "duty" both very generally and in a way quite different from that alleged and consistently asserted by appellants. Implicitly acknowledging that there is no precedent for imposing a duty not to manufacture and sell a particular gunthe duty appellants pled and consistently argued for and the duty the trial court ruled onthe lead opinion tries to solve appellants' problem by providing an entirely different definition of that element for purposes of this case.
More importantly, the lead opinion's improvisations seem plainly premised on value judgments. These are framed variously, but the most pronounced is: "[W]here the defendant's conduct has little or no social utility, and the imposition of liability would therefore have minimal adverse social consequences, it is correspondingly easier to reach the legal conclusion that he or she has a duty to exercise care not to increase or encourage the risk of foreseeable injuries." (Lead opn. at p. 171.) At many other points the lead opinioin similarly decries the lack of "social value" or "social utility" of such weapons (lead opn. at pp. 171-172, 180, 183) and, at still others, asserts that "public access to the TEC-DC9 and the manner in which that weapon is marketed are not of such overriding social importance that they are entitled to absolute protection as a matter of law...." (Lead opn. at pp. 179-180.)
This veritable hailstorm of value judgments calls to mind a quotation from Justice Felix Frankfurter: "It is not easy to stand aloof and allow want of wisdom to prevail, to disregard one's own strongly held view of what is wise in the conduct of affairs. But it is not the business of this Court to pronounce policy. It must observe a fastidious regard for limitations on its own power, and this precludes the Court's giving effect to its own notions of what is wise or politic. That self-restraint is of the essence in the observance of the judicial oath...." (Trop v. Dulles (1958) 356 U.S. 86, 120, 78 S.Ct. 590, 2 L.Ed.2d *215 630 (dis. opn. of Frankfurter, J.).) Several decades earlier, Justice Brandeis made the same point when he cautioned that "... we must ever be on our guard, lest we erect our prejudices into legal principles." (New State Ice Co. v. Liebmann (1932) 285 U.S. 262, 311, 52 S.Ct. 371, 76 L.Ed. 747 (dis. opn. of Brandeis, J.).)
It takes, I submit, no great insight to discern that the TEC-DC9 is far from either a necessary or desirable product in our society. I not only share the lead opinion obvious distaste for the people who design, manufacture and market such instruments, I am also bewildered regarding the mental processes of those who purchase them. But I am simply not willing to transpose these personal opinions into judicial doctrine. That unwillingness stems both from my understanding that we are not elected policymakers of the State of California and from my respect for the principle summed up so eloquently by Justices Brandeis and Frankfurter, that of judicial restraint. I regrettably conclude that, by its opinion of today, the lead opinion has abandoned that important principle.
NOTES
[1] Its manufacturing facility is licensed by the federal Bureau of Alcohol, Tobacco & Firearms (BATF).
[2] Federal law defines a "semiautomatic assault weapon" as, inter alia, "a semiautomatic pistol that has an ability to accept a detachable magazine and has at least 2 of[¶] (i) an ammunition magazine that attaches to the pistol outside of the pistol grip; [¶] (ii) a threaded barrel capable of accepting a barrel extender, flash suppressor, forward handgrip, or silencer; [¶] (iii) a shroud that is attached to, or partially or completely encircles, the barrel and that permits the shooter to hold the firearm with the nontrigger hand without being burned; [¶] (iv) a manufactured weight of 50 ounces or more when the pistol is unloaded; and [¶] (v) a semiautomatic version of an automatic firearm." (18 U.S.C. § 921(a)(30)(C).) The TEC-9 and TEC-DC9 are both specifically identified as "semiautomatic assault weapons" under federal law. (18 U.S.C. § 921(a)(30)(A)(viii).)
[3] The only difference between the TEC-9 and the TEC-DC9, is that the latter, which Navegar refers to as the "successor model," has a "side sling catch," a very minor modification which appears to have been intended only to evade a ban on the TEC-9 legislated by the District of Columbia. The TEC-9 is specifically banned in California (Pen.Code, § 12276, subd. (b)(4)) and the TEC-DC9 impliedly banned (Id., § 12276, subd. (e).) Our separate reference to the TEC-9 and TEDC9 throughout this opinion should not obscure the fact that, as relevant to the issues raised in this appeal, the weapons are materially indistinguishable.
[4] Whether Ferri was primarily focused on price during his gun shopping is in dispute. The salesperson from the Pawn and Gun Shop in Henderson where Ferri bought and then returned the used gun in February so opined. Ferri "had already made up his mind" on the TEC-9. The salesperson thought the price range of the gun appealed to Ferri, but acknowledged he was "guessing about that." He admitted that because the used TEC-9 was the only TEC-9 in stock, it could have been that Ferri bought it, not because of its price, but because he wanted a TEC-9. He also acknowledged having told an investigator that Ferri seemed mainly interested in a highcapacity type weapon. Messing (the customer at the Las Vegas store where Ferri purchased the first TEC-DC9 he bought and kept) testified Ferri "seemed to be quite conscious of the price of the things when he was buying it." However, Messing acknowledged that he, himself, was very price conscious and really had "no idea what [Ferri] was thinking." The dealer at the May Las Vegas gun show where Ferri purchased the second TEC-DC9 thought Ferri purchased the particular firearm because the dealer's price was "the best price [on the TEC-DC9] in the show." Asked whether he had any reason to believe Ferri purchased the particular firearm rather than another type of firearm because of the price, the dealer answered, "I don't know."
[5] In 1994, after Ferri purchased the two TEC-DC9s he used at 101 California Street, Congress made the manufacture, transfer, or possession of "a semiautomatic assault weapon" unlawful (18 U.S.C. 922(v)(1)) and specifically referred to the TEC-DC9. (Id., § 921(a)(30)(A)(viii).)
[6] Six of the 14 dead and wounded were killed or wounded by .45-caliber bullets fired from the Norinco pistol. Of these, deceased victims Jody Sposato and Jack Berman were shot with both weapons, but were apparently fatally wounded by bullets from the Norinco .45.
[7] We do not share the view of the dissent that this explication of appellants' theory of negligence amounts to a change of legal theory on appeal. This formulation of the duty at issue does not raise any new or different legal or factual issues; if anything, it narrows the scope of the duty alleged by clarifying the nature of the conduct that could support a finding of negligence.
[8] Pamela L. held that minors who allegedly had been sexually molested stated a cause of action against the wife of the alleged molester based on her conduct in actively encouraging and enticing the girls to come to her home to swim supervised only by her husband, whom she knew to have a history of sexually molesting children. While Pamela L., at the end of the opinion, alternatively stated that a special relationship could be inferred from the facts of that case, the opinion first analyzed the problem without reference to the existence of a special relationship. Unlike Wise v. Superior Court (1990) 222 Cal.App.3d 1008, 1014-1015, 272 Cal.Rptr. 222, which subsequently distinguished Pamela L. in refusing to find a duty in the case of a defendant whose husband mounted a sniper attack from the roof or their home, Pamela L. involved affirmative acts increasing the risk of harm rather than merely a failure to protect against harm. (See, Hansra v. Superior Court (1992) 7 Cal. App.4th 630, 642, 9 Cal.Rptr.2d 216.) In any event, as with Knight v. Jewett, supra, our point is not that the cases discussed in the text provide on-point authority for the imposition of duty in the present case, but merely that the concept of increasing the harm as a component of a duty analysis is neither unprecedented nor necessarily limited to a particular factual situation.
[9] This is in contrast to the situation in which duty is posited on a special relationship. (See, e.g., Tarasoff v. Regents of University of California, supra, 17 Cal.3d at pp. 432-435, 131 Cal.Rptr. 14, 551 P.2d 334.) In order for there to be liability in that case "the relationship involved must put one on notice that a specific, rather than a generalized, risk exists. Moreover, one must know that the target of the risk is an identifiable and foreseeable victim." (Hooks v. Southern Cal. Permanente Medical Group (1980) 107 Cal.App.3d 435, 444, 165 Cal.Rptr. 741.)
[10] Although the "sporting purpose" test arising under U.S.C. section 925(d)(3) relates to imported semiautomatic rifles, the cited study also discusses semiautomatic assault pistols, such as the TEC-9 and TEC-DC9, restricted under 18 U.S.C. section 922(a). (See also, H.R.Rep. No. 103-489, 2d Sess., p. 17 (1994).)
[11] The authors of this treatise add that "[perhaps the most significant trend that has taken place in this particular field, in recent years, has been the increasing liberalization in allowing the wrongs of other people to be regarded as foreseeable where the facts warrant that conclusion if they are looked at naturally and not through the lens of some artificial archaic notion." (Id., at p. 496.)
[12] While the Restatement of Torts section cited in the text appears in its discussion of causation rather than duty, and some of the cases cited deal with causation, the issues of duty and proximate cause involve very similar considerations, both doctrines asking "whether the interests of the plaintiff are to be protected against the particular invasion by the defendant's conduct." (Prosser & Keeton, supra, § 53, p. 358.) Indeed, the two concepts are often conflated in judicial discussions of negligence. (E.g., Bigbee v. Pacific Tel. & Tel. Co., supra, 34 Cal.3d at pp. 56-57, 192 Cal. Rptr. 857, 665 P.2d 947.)
[13] The parties apparently do not consider it necessary to inquire as to the remaining Rowland factors"the degree of certainty that [appellants] suffered injury," "the closeness of the connection between the defendant's conduct and the injury suffered," and "the availability, cost, and prevalence of insurance for the risk involved," (Rowland, supra, 69 Cal.2d at p. 113, 70 Cal.Rptr. 97, 443 P.2d 561)as they did not pursue these issues as they relate to legal duty either in the trial court or in this court.
[14] The formulation is articulated in the Restatement as follows: "Where an act is one which a reasonable man would recognize as involving a risk of harm to another, the risk is unreasonable and the act is negligent if the risk is of such magnitude as to outweigh what the law regards as the utility of the act or of the particular manner in which it is done." (Rest.2d Torts, supra, § 291.) Under the Restatement, one of the most important factors to be considered in balancing the utility of the conduct in question against the magnitude of the risk is "the social value which the law attaches to the interests which are imperiled." (Rest.2d Torts, supra, § 293, subd.(a).)
[15] See National Bankruptcy Review Commission, Final Report, Bankruptcy The Next Twenty Years (Oct. 20, 1997) p. 315 ["At least 15 asbestos manufacturers ... have reorganized or liquidated in attempts to address massive numbers of known and unknown asbestos claimants using the Bankruptcy Code."]; Sobol, Bending the Law: The Story of the Dalkon Shield Bankruptcy (1991); Smith, A Capital Markets Approach to Mass Tort Bankruptcy (1994) 104 Yale L.J. 367, 372 ["Bankruptcies caused by mass torts ... have already become a permanent feature of modern economic and legal life."]; Note, Mass Tort Claims and the Corporate Tortfeasor: Bankruptcy Reorganization and Legislative Compensation Versus the Common-Law Tort System (1983) 61 Texas L.Rev. 1297.
[16] As explained, post, at pp. 175-177, the legislative prohibition against finding a firearm defective in a product liability action by means of a risk/benefit analysis (Civ.Code, § 1714.4), does not apply here, as this is not a product liability action and the TEC-DC9 is not claimed to be a defective product.
[17] The two cases Navegar relies upon, Patterson v. Gesellschaft (N.D.Tex. 1985) 608 F.Supp. 1206 and King v. R.G. Industries, Inc. (1990) 182 Mich.App. 343, 451 N.W.2d 874, were not simple negligence cases but product liability actions involving "Saturday night specials" in which the plaintiffs' efforts to impose strict liability failed because they could not show the products were defective. The court in King noted that "[p]laintiffs in this case have not alleged that defendants have intentionally marketed Saturday night specials to known criminals" (451 N.W.2d at p. 876), and on that basis distinguished the case from Moning v. Alfono (1977) 400 Mich. 425, 254 N.W.2d 759 (limited by Glittenberg v. Doughboy Recreational Industries (1992) 441 Mich. 379, 491 N.W.2d 208, 212, fn. 8), in which the Michigan Supreme Court sustained a cause of action for negligence in the targeted marketing of a slingshot.
[18] We are aware that intermediate appellate courts in a few other states have indicated a different view. (See, e.g., Linton v. Smith & Wesson, Etc. (1984) 127 Ill.App.3d 676, 82 Ill.Dec. 805, 469 N.E.2d 339, 340 [suggesting that the reason "[n]o Illinois decision has imposed a duty upon the manufacturer of a non-defective firearm to control the distribution of that product to the general public" is that "such regulation [has] been undertaken by Congress, the Illinois General Assembly and several local legislative bodies"]; Knott v. Liberty Jewelry and Loan, Inc. (1988) 50 Wash.App. 267, 748 P.2d 661, 665 ["legislature ... has preempted the field of regulating handguns"]; Trespalacios v. Valor Corp. of Florida (Fla.App.1986) 486 So.2d 649, 650 [indicating no duty because "manufacture or distribution of the weapon is not unlawful pursuant to either state law or the Federal Gun Control Act of 1968"].) We decline to follow these cases not only because they conflict with the view of the United States Supreme Court, our own Supreme Court, and most other courts that have expressed themselves on the subject, but also because they contain little or no reasoning.
[19] The operative provision of the original version of Assembly Bill No. 75, the vehicle through which the Legislature ultimately enacted section 1714.4 in 1983, was not limited to product liability actions and provided as follows: "The furnishing of firearms or ammunition, with or without consideration, is not the proximate cause of injuries resulting from the use of firearms or ammunition, but rather the wrongful misuse of firearms or ammunition is the proximate cause of injuries inflicted upon another by the use of a firearm or ammunition."

The foregoing language was amended out of the bill in the Assembly on May 11, 1983, and replaced by the following new language, which was also not limited to product liability actions: "Except where there is a manufacturing or design defect which causes a firearm or ammunition to malfunction or where the furnishing of a firearm or ammunition is prohibited by statute, no person, organization, or public or business entity of any kind may be held legally accountable for damages of any type, whether to persons, property, or for the death of any person, suffered as the result of the furnishing, with or without consideration, of a firearm or ammunition."
The language added by the Assembly on May 11, 1983, as well as the additional (and somewhat inexplicable) statement that "Nothing herein shall be construed to modify the negligent entrustment doctrine as enunciated by California case law and statute," which was added by the Assembly on May 25 of that year, was eliminated in the Senate on August 24, 1983, and replaced with the very different language that now appears in section 1714.4.
The prevailing Senate version eliminated the statement in the Assembly bill that "`[t]he furnishing of firearms' is not the proximate cause of injuries resulting from the use of firearms ... [etc.]" (italics added) and replaced it with the statement that "[i]njuries or damages resulting from the discharge of a firearm or ammunition are not proximately caused by its potential to cause serious injury, damage, or death, but are proximately caused by the actual discharge of the product."
The only change made in Assembly Bill No. 75 by the Conference Committee, which met on September 15, 1983, was to eliminate language declaring that this act "is an urgency statute ... within the meaning of article TV of the Constitution and shall go into immediate effect."
[20] The Legislature subsequently changed the substantive rule regarding the liability of a person who furnishes alcoholic beverages, thereby abrogating the holdings in Vesely and Bernhard. (See Bus. & Prof.Code § 25602, subd. (c); Cory v. Shierloh (1981) 29 Cal.3d 430, 174 Cal.Rptr. 500, 629 P.2d 8.) This change does not affect the relationship of a court to the Legislature, as discussed in Bernhard.
[21] For this reason, we have no difficulty dismissing Navegar's assertion that the imposition of liability here "would place an impermissible burden on legal, interstate business." As appellants point out, the cases Navegar relies upon for this proposition all involved the attempted extraterritorial application of state regulatory or penal statutes. (Edgar v. MITE Corp. (1982) 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269; Southern Pacific Co. v. Arizona (1945) 325 U.S. 761, 65 S.Ct. 1515, 89 L.Ed. 1915; People v. Eller Telecasting Co. (1970) 13 Cal.App.3d 296, 91 Cal.Rptr. 468; People v. McGowan (1932) 127 Cal.App. 39, 14 P.2d 1036.) This action involves no more an attempt to apply the AWCA extraterritorially than did Bemhard v. Harrah's Club, supra, 16 Cal.3d 313, 128 Cal.Rptr. 215, 546 P.2d 719 involve an effort to apply California's dram shop law beyond the borders of this state. Such application of a California statute does not offend the Commerce Clause or any otner provision of the United States Constitution. As the United States Supreme Court has made clear, "[a] person who sets in motion in one state the means by which injury is inflicted in another may, consistently with the due process clause, be made liable for that injury whether the means employed be a responsible agent or an irresponsible instrument. The cases are many in which a person acting outside the state may be held responsible according to the law of the state for injurious consequences within it." (Young v. Masci (1933) 289 U.S. 253, 258-259, 53 S.Ct. 599, 77 L.Ed. 1158; see also, Sibley v. Superior Court (1976) 16 Cal.3d 442, 445, 128 Cal.Rptr. 34, 546 P.2d 322.)
[22] Moreover, by allowing this case to go to trial we are hardly insuring appellants will establish liability and receive any award of damages, let alone a large one. (See Lytton, Halberstam v. Daniel and the Uncertain Future of Negligent Marketing Claims Against Firearms Manufacturers, 64 Bklyn. L.Rev. 681 (1998).)
[23] The absence of sufficient evidence of foreseeability is the most important reason plaintiffs commonly fail to establish liability for negligence in suits against the manufacturers or sellers of guns. (See, Lytton, Halberstam v. Daniel and The Uncertain Future of Negligent Marketing Claims Against Firearms Manufacturers, supra, 64 Bklyn. L.Rev. 681; McNicholas & McNicholas, Ultrahazardous Products Liability: Providing Victims of Well-Made Firearms Ammunition to Fire Back at Gun Manufacturers (1997) 30 Loy. L.A. L.Rev. 1599; Mackarevich, Manufacturers' Strict Liability for Injuries From a Well-Made Handgun (1983) 24 Wm. & Mary L.Rev. 467.) As a practical matter, it is exceedingly difficult in such cases, which ordinarily claim a special relationship under the doctrine of negligent entrustment, to prove that the defendant possessed actual or constructive knowledge that the person or class of persons who were supplied a firearm and used it to injure themselves or others could not be trusted to use it safely. (See, e.g., Jacoves v. United Merchandising Corp., supra, 9 Cal.App.4th 88, 11 Cal. Rptr.2d 468 [retailer had no reason to expect young man to whom it sold rifle would use weapon to commit suicide]; Stephan v. Martin Firearms Company (2d Cir. 1965) 353 F.2d 819 [father and dealer who sold him gun with knowledge of intended use by son not negligent because neither knew of child's carelessness]; Hetherton v. Sears Roebuck & Co. (1978) 445 F.Supp. 294, revd. on other grounds (3d Cir.1979) 593 F.2d 526 [defendant lacked actual knowledge of gun purchaser's criminal record]; Sabatinelli v. Butler (1973) 363 Mass. 565, 296 N.E.2d 190 [father who permitted adult son to have gun not negligent because no evidence he knew or should have known of son's propensity to misuse the weapon]; compare, Reida v. Lund, supra, 18 Cal.App.3d 698, 96 Cal.Rptr. 102 [victims of shooting stated cause of action for negligent safeguard of firearm against father of 16-year-old shooter]; Semeniuk v. Chentis (1954) 1 Ill.App.2d 508, 117 N.E.2d 883 [cause of action for negligence stated by victim of shooting with BB pellet against retailer who sold air rifle and ammunition to parents of shooter, knowing they would be used by young boy].) In the present case, as explained above, the evidence of foreseeability is compelling.
[24] Rule 977 of the California Rules of Court permits citation of an "opinion of any court [other than an unpublished opinion of a California court] that is available only in a computer-based source of decisional law" if, as is the case here, the opinion has been furnished to the court and all parties by counsel.
[25] For the reasons discussed, ante, at pp. 175-177, we disagree with the additional statement in Casillas, that "California law on liability of firearm manufacturers under a product liability theory [i.e., Civ.Code, § 1714.4] is persuasive on the related but unresolved question of liability of firearm manufacturers based on negligence or strict liability." (Id., at p. *2.)
[26] The trial court cited Armijo v. Ex Cam, Inc. (D.N.M.1987) 656 F.Supp. 771, affd. (10th Cir.1988) 843 F.2d 406; Delahanty v. Hinckley (D.C.Cir.1989) 564 A.2d 758; Shipman v. Jennings Firearms, Inc. (11th Cir. 1986) 791 F.2d 1532; Addison v. Williams (La.App. 1989) 546 So.2d 220, writ den. (La. 1989) 550 So.2d 634; and Trespalacios v. Valor Corp. of Florida, supra, 486 So.2d 649. Other opinions to the same effect are Resteiner v. Sturm, Ruger & Co., Inc. (1997) 223 Mich. App. 374, 566 N.W.2d 53; King v. R.G. Industries, Inc., supra, 182 Mich.App. 343, 451 N.W.2d 874; Buczkowski v. McKay (1992) 441 Mich. 96, 490 N.W.2d 330; Valentine v. On Target, Inc. (1996) 112 Md.App. 679, 686 A.2d 636, judgment affd., by Valentine v. On Target, Inc. (1999) 353 Md. 544, 727 A.2d 947; Knott v. Liberty Jewelry and Loan, Inc., supra, 50 Wash.App. 267, 748 P.2d 661; Riordan v. International Armament Corp. (1985) 132 Ill.App.3d 642, 87 Ill.Dec. 765, 477 N.E.2d 1293; Linton v. Smith & Wesson, supra, 127 Ill.App.3d 676, 82 Ill.Dec. 805, 469 N.E.2d 339; Forni v. Ferguson (N.Y.App.Div. 1996) 232 A.D.2d 176, 648 N.Y.S.2d 73; First Commercial Trust Co. v. Lorcin Engineering, Inc. (1995) 321 Ark. 210, 900 S.W.2d 202; and Leslie v. U.S. (D.N.J.1997) 986 F.Supp. 900, judgment affd. by Leslie v. U.S. (3d Cir. 1999) 178 F.3d 1279.
[27] Contrary to the suggestion of the dissent, there is nothing unusual about judicial differentiation between conduct that may or may not constitute negligence in this context. Such line drawing represents the daily work of our courts, which are as competent to engage it in gun cases as they are in any other type of litigation. (Compare, Jacoves v. United Merchandising Corp., supra, 9 Cal.App.4th at pp. 114-115, 11 Cal.Rptr.2d 468 [no duty on part of seller of gun used by purchaser to commit suicide] and Reida v. Lund, supra, 18 Cal.App.3d 698, 96 Cal.Rptr. 102 [question of fact as to father's negligent safeguard of firearm used by child to injure another].)
[28] We do not discuss the question of breach of the standard of care because summary judgment was not granted on this basis, and no suggestion is made that it should have been.
[29] Focusing on the issue of actual cause, Navegar does not address the question of legal or proximate cause, which is closely related to the question of duty because it also frequently turns on foreseeability. Thus it has been said that "where there is an independent intervening act which is not reasonably foreseeable, the defendant's conduct is not deemed the `legal' or proximate cause .... [because] it would be considered unjust to hold him legally responsible." (6 Witkin, Summary of California Law, supra, Torts, § 968, citing, inter alia, Rest.2d, Torts, §§ 440 et seq., Prosser & Keeton, Torts, supra, § 42, and 100 A.L.R.2d 942 [foreseeability as element of proximate cause].) In connection with our determination of duty, we concluded not simply that Navegar had reason to foresee that TEC-DC9s it manufactured and made available to the general public would be used in violent criminal assaults of the sort carried out by Ferri, so that appellants' injuries were foreseeable, but as well that the foreseeability of such injuries was enhanced by Navegar's promotional activities. These determinations are as relevant to the issue of proximate cause as to that of duty. However, unlike the question of duty, which is for the court alone, factual questions related to causation may be, and usually are, resolved by the trier of fact. (Landeros v. Flood (1976) 17 Cal.3d 399, 411, 131 Cal.Rptr. 69, 551 P.2d 389; Weaver v. Bank of America (1963) 59 Cal.2d 428, 434, 30 Cal.Rptr. 4, 380 P.2d 644; see also, Stevens v. Parke, Davis, supra, 9 Cal.3d at p. 69, 107 Cal.Rptr. 45, 507 P.2d 653.)

Navegar does not argue that proximate cause cannot be established because the TEC-DC9 was legally made available to the public, employing that fact only in connection with its argument, earlier rejected, that legal duty cannot be imposed.
[30] These advertisements were the basis of the court's finding that Navegar violated one of the prohibitions in the AWCA (Pen.Code, § 12280, subd. (a)(1) ["any person who, within this state ... offers or exposes for sale ... any assault weapon ... is guilty of a felony ..."].) As appellants did not appeal the summary judgment on their claim of negligence per se, we have no occasion to review this finding.
[31] We recognize that the federal district court reached a different conclusion with respect to causation in Bubalo v. Navegar, Inc. (N.D.Ill., June 13, 1997) 1997 WL 337218, reconsideration granted on another point in 1998 WL 142359. In Bubalo, the plaintiffs presented a negligent marketing claim against Navegar similar to that here. Unlike the present case, however, the plaintiffs in Bubalo "[did] not present any allegations or evidence to establish that Navegar's marketing style was `a factor' in [the killer's] use of the TEC-DC9 [as required under Illinois law]." (Id., at p. *9) Relying on two cases holding a party's declaration that it did not rely on the manufacturer's advertisements precludes recovery under the theory of negligent misrepresentation, the Bubalo court decided that the same rule should apply to a cause of action for negligent marketing, "since a party's reliance on or inducement by the allegedly negligent marketing techniques is the only rational means on [sic] establishing a causal connection." (Ibid.) As the interviews with the killers in Bubalo "do not reveal [their] motivation for committing the crime or for using or purchasing the TEC-DC9" (id., at p. *2), the court concluded the plaintiffs failed to establish a cause of action under a theory of negligent marketing. Although the Bubalo court conceded that "courts have not specifically defined the `requisite causal relation' between the alleged negligence and the actual injuries suffered under a negligent marketing claim" (ibid.), it reasoned that the preclusion of recovery for negligent misrepresentation "based upon a mere admission of nonreliance on the marketing methods strongly suggests that a significant burden be placed upon Plaintiffs in stating their cause of action [for negligent marketing]," which they did not carry. (Ibid.)

The reasoning in Bubalo unjustifiably credits only direct evidence and discredits circumstantial evidence, no matter how strong, suggesting a causal relationship between a defendant's promotional activities and the injuries suffered by the plaintiff. This reasoning, which cannot be squared with that of our Supreme Court in Stevens v. Parke, Davis, supra, 9 Cal.3d 51, 107 Cal.Rptr. 45, 507 P.2d 653, unfairly penalizes plaintiffs in cases in which the injury is inflicted by a party who is not available because, as here, he killed himself, or for some other reason beyond the control of the plaintiff. For these reasons, we decline to follow it.
[32] Navegar's argument to the contrary is unimpressive. It rests on cases, such as Noble v. Los Angeles Dodgers, Inc. (1985) 168 Cal. App.3d 912, 214 Cal.Rptr. 395 and Leslie G. v. Perry & Associates (1996) 43 Cal.App.4th 472, 50 Cal.Rptr.2d 785, in which the defendants owned premises on which the plaintiffs were injured by the criminal acts of others. The cases are factually inapposite because the allegedly negligent conduct consisted not of acts but omissions and because of the highly speculative nature of the evidence that such omissions were contributing causes of the plaintiffs' injuries, or that there were any reasonable steps that the defendants could have taken to effectively guard against those injuries.
[33] "Whether California has completely adopted the Restatement view of abnormally dangerous activities has been the subject of scholarly comment. (See 1 Levy et al., Cal. Torts (1987) § 7.04[1][b], pp. 7-25.) However, many courts have treated the Restatement factors as relevant to a finding that an activity is abnormally dangerous. [Citations.]" (Ahrens, supra, 197 Cal.App.3d at pp. 1142-1143, fn. 6, 243 Cal.Rptr. 420.)
[34] "The discharge of firearms is not considered an ultrahazardous activity in this state. (Jensen v. Minard, 44 Cal.2d 325, 328-329, 282 P.2d 7; Tucker v. Lombardo, 47 Cal.2d 457, 463, 303 P.2d 1041.)" (Orser v. George (1967) 252 Cal.App.2d 660, 672-673, 60 Cal. Rptr. 708.)

We recognize that, unlike handguns, the TEC-DC9 is not a product commonly in use in the community. Consequently, we do not consider whether the use of a weapon such as the TEC-DC9-might be considered an ultrahazardous activity.
[35] While an ultrahazardous activity may be carried on in a negligent manner (as where blasting in a populous area is conducted in a negligent manner), the doctrinal differences between liability for negligence and strict liability for ultrahazardous activities are among the reasons that when these two claims are concomitantly alleged it is ordinarily in the alternative, as here. Appellants state in their brief that they "do not seek to recover from Navegar under both negligence and ultrahazardous activity liability," but ask us to consider whether Navegar's activities were ultrahazardous "[o]nly if [we] first determine that Navegar's activities were not negligent." (Original italics.)
[36] It appears development of the ultrahazardous liability doctrine may have been truncated by the advancement of the theory of strict liability for the manufacture of defective products. The policy concerns underlying products liability and liability for ultrahazardous activities are the same. However, as we have observed, the California Legislature has refused to allow firearms or ammunition to be "deemed defective in design" in a products liability action "on the basis that the benefits of the product do not outweigh the risk of injury posed by its potential to cause serious injury, damage, or death when discharged." (Civ.Code, § 1714.4.)
[1] The only other reference to that statute anywhere on these pages is in the second paragraph of a footnote quoting from a Navegar brief, a brief which apparently disputed what the trial court had held in its earlier demurrer opinion concerning the interrelationship, if any, between that statute and Civil Code section 1714.4.
[2] In their appeal, appellants are represented by not only the Center to Prevent Handgun Violence in Washington, D.C., but eight San Francisco area law firms, including three of its largest and most prestigious. None of these counsel were able to discern, as the lead opinion has, that a phrase in a Supreme Court plurality opinion concerning assumption of risk provides the basis for the first appellate court opinion in this nation imposing a tort duty in a case such as this.
[3] There was no majority opinion, only a plurality opinion. Four of the seven justices did not join in the portion of the plurality opinion quotedalbeit only partiallyby the lead opinion here.
[4] The lead opinion attempts to bolster its citation of Knight by citing a non-sports case that, it claims, holds essentially the same thing in a more general context. (Pamela L. v. Farmer (1980) 112 Cal.App.3d 206, 209-211, 169 Cal. Rptr. 282.) In that case, a panel of a division of the Second District held that a woman who invited several young girls (the plaintiffs) to come onto premises owned by her husband and her when the girls would be alone with him, and hence more vulnerable to his molestations, could be liable in ordinary negligence even without a finding of a "special relationship." But the lead opinion neglects to note that the Pamela L. decision (1) specifically observed that "[t]he victims were children entitled to more stringent precautions than necessary for an adult" (id. at p. 211, 169 Cal.Rptr. 282) and (2) has since been distinguished on that basis by the authoring court. (See Wise v. Superior Court (1990) 222 Cal. App.3d 1008, 1014-1015, 272 Cal.Rptr. 222 (Wise).) And Wise itself is instructive: it was a suit against the widow of a man who had mounted a sniper attack from the roof of his and the defendant's home with some of the many guns kept there, severely injuring plaintiffs. The same court that decided Pamela L. issued a writ of mandate ordering the sustaining of a demurrer to the complaint on the ground that "[t]he standards of ordinary care are inapplicable." (Id. at p. 1014, 272 Cal. Rptr. 222.) In so holding, that court noted, in words I find singularly applicable here, that "the responsibility for tortious acts should lie with the individual who commits those acts; absent facts which clearly give rise to a legal duty, that responsibility should not be shifted to a third party." (Id. at pp. 1015-1016, 272 Cal.Rptr. 222.)
[5] The lead opinion makes much of two admittedly callous phrases in Navegar literature promoting the TEC-DC-9. One boasted that the TEC-DC9 was as "tough as your toughest customer." As this wording itself suggests, and as appellants in their briefs effectively concede, as and when this phrase was used it was used in promotional material sent to distributors and dealers only, not in anything that went to the public. Thus, not even appellants suggest it could have come to Ferri's attention. The lead opinion dwells even more on Navegar's advertising to the effect that the gun's finish had "excellent resistance to fingerprints." (Lead opn. at pp. 157, 158, 163.) It omits to mention the fact that this promotional language was copied word-for-word from material sent to Navegar by the producer of the finish and, perhaps more importantly, was discontinued prior to any shipment of guns in 1993.
[6] At several different points in its opinion, the lead opinion cites Stevens v. Parke, Davis & Co. (1973) 9 Cal.3d 51, 107 Cal.Rptr. 45, 507 P.2d 653 (Parke, Davis). (Lead opn. at pp. 184-185, 187-189.) At one point (lead opn. at pp. 184-185), it seems to suggest that this seldom cited case supports a "negligent marketing" theory, although not under that specific label. But Parke, Davis is very different from this case. Among other things, no issue of duty was raised: the defendant manufactured, and then recommended to doctors, an antibiotic which the decedent's doctor then prescribed for her but which turned out to be, according to the court, "a dangerous drug." (Parke, Davis, supra, 9 Cal.3d at p. 57, 107 Cal.Rptr. 45, 507 P.2d 653.) The only pertinent issue on appeal was whether there was substantial evidence of negligence to support the jury's verdict in favor of the plaintiff-survivors. The Supreme Court had no difficulty finding that there was, citing in particular the "implied finding of the jury that Parke, Davis negligently failed to provide an adequate warning as to the dangers to [the drug] by so `watering down' its warnings and so overpromoting such drug that members of the medical profession ... were caused to prescribe it when it was not justified." (Id. at p. 66, 107 Cal.Rptr. 45, 507 P.2d 653.) That is, obviously, a far, far cry from this case. In any event, Parke, Davis did not, as the lead opinion incorrectly implies, involve a "nondefective product." (Lead opn. at p. 184.) The Supreme Court specifically noted that there was evidence in the record that the drug involved "was the single most dangerous antibiotic on the market at the time .... [and] did not meet the standard of medical practice of the community' involved. (Parke, Davis, supra, 9 Cal.3d at p. 57, fn. 2, 107 Cal.Rptr. 45, 507 P.2d 653.)
[7] Appellants' briefs suggest that the reason for their disclaimer is the admittedly scant evidence Ferri ever saw any of Navegar's indurate marketing material. That may well be a substantial motivator in these circumstances. But it also seems possible that appellants would prefer to use this case to try to establish nationally-available precedent regarding the "duty not to distribute to the general public" (their approach) rather than rely on factors unique to the marketing of the guns involved here (the lead opinion's quite different approach).
[8] There are, of course, exceptions to this general rule. They are most often found in cases of special relationships, "special circumstances," premises liability (see, e.g., Ann M. v. Pacific Plaza Shopping Center (1993) 6 Cal.4th 666, 25 Cal.Rptr.2d 137, 863 P.2d 207) (Ann M.), and the like. But the lead opinion fails to suggest any exception which might be applicable here.
[9] As it is nationally: see Annotation, Private Person's Duty and Liability for Failure to Protect Another Against Criminal Attack by Third Person, 10 A.L.R.3d 619, 626, § 3 ("As a general principle, and in the absence of special relationships or circumstances, a private person has no duty to protect another from a criminal attack by a third person."); 2 Speiser et al, American Law of Torts (1985) Negligence, § 9:19, p. 1084 ("Generally, there is no duty to protect one against the criminal attacks of third persons.")
[10] Both Totten and Anaya were disapproved on other grounds in Isaacs v. Huntington Memorial Hospital (1985) 38 Cal.3d 112, 125-126, 211 Cal.Rptr. 356, 695 P.2d 653, but query as to the value of Isaacs after Ann M., supra, 6 Cal.4th at pp. 674-678, 25 Cal. Rptr.2d 137, 863 P.2d 207.
[11] Justices Mosk concurred without opinion, and Justice Werdegar concurred in the relevant portion of the opinion.
[12] The only decision on record going the other way seems to be a New York federal district court decision earlier this year issued by a trial judge sometimes described as "famously independent" and at others as a "maverick." (See National Law Journal, February 15, 1999, p. Al and March 1, 1999, p. A6.) That decision, Hamilton v. Accu-Tek (E.D.N.Y.1999) 62 F.Supp.2d 802, is given mercifully short shrift by the lead opinion. (See lead opn. at p. 179.) In it, the trial court imposed a duty on gun manufacturers "to take reasonable steps ... to reduce the possibility that these instruments will fall into the hands of those likely to misuse them." (62 F.Supp.2d 802.) It was able to reach this result notwithstanding the Second Circuit's decision in McCarthy, supra, 119 F.3d 148 by characterizing that case's "negligent marketing" claim as "essentially an alternative pleading of [a] strict products liability claim." (Hamilton v. Accu-Tek, supra, 62 F.Supp.2d 802.) The same district court had similarly characterized the district court opinion in McCarthy in an interim opinion in Hamilton (Hamilton v. Accu-Tek (E.D.N.Y.1996) 935 F.Supp. 1307, 1323). However, the following year Judge Calabresi, in his dissent to the Second Circuit's opinion in McCarthy, rejected that characterization of the negligent marketing claim as "manifestly incorrect." (McCarthy, supra, 119 F.3d at p. 163, fn. 13.) When the trial court in Hamilton revisited McCarthy in its opinion of earlier this year, it paid no attention to Judge Calabresi's views, much less to what would seem to be a controlling opinion, the majority's decision in McCarthy.
[13] The most thorough and balanced law review article on this subject (and also the most recent) is Lytton, Halberstam v. Daniel and the Uncertain Future of Negligent Marketing Claims Against Firearms Manufacturers (1998) 64 Brook. L.Rev. 681; see also Arrow, Kelley v. R.G. Industries: California Caught in the Crossfire (1988) 17 Sw.U. L.Rev. 497.

Another law review writer, an unabashed proponent of expanding liability of gun manufacturers, notes candidly: "Holding Navegar liable for the criminal use of the TEC-DC9 would indeed be a novel ruling." (Pearson, Make It, Market It, and You May Have to Pay for It (1997) 1997 B.Y.U.L.Rev. 131, 167.) I agree.
[14] The lead opinion so opines many times. But, in so doing, it ignores both deposition testimony and several passages from a declaration submitted by appellants suggesting to the contrary. To be specific: the Las Vegas salesperson who sold Ferri the first of the two TEC-DC9s he kept testified that he told her he wanted the gun for "target practice," by which she understood he meant "plinking." She defined "plinking" to mean shooting at tin cans or going "to a rifle range and just shoot." She went on to testify that many of her store's customers purchase hand guns for this purpose, that such is a "fair amount of [our] business," and that, indeed, her store maintained a shooting range "[r]ight behind the store." And customer Messing, to whom Ferri also spoke on April 25, recalled him as indicating the same type of interest, "plinking."

The lead opinion quotes from the Supenski declaration submitted by appellants deprecating the value of the TEC-DC 9 for "plinking" because of the cost of ammunition and its general inaccuracy. But Chief Supenski also declared: "In most gun industry publications, the TEC-9 (and weapons of that ilk) are referred to as `fun guns' or sometimes `plinkers' They are `fun' because they can shoot prodigious amounts of ammunition rapid fire fashion; `plinkers' because you can use them informally to shoot targets from bottles to cans."
I certainly do not question the conclusion of Chief Supenski that the TEC-DC9 is, from an objective standpoint, largely unsuitable for "plinking" and for the two reasons he identifies: its poor accuracy and its expensive ammunition. But, as this record makes clear, from a subjective standpoint, things are different: a lot of people apparently don't know what Chief Supenski does. Indeed, to his credit, Chief Supenski seems to appreciate this knowledgeability gap because the complete quote from his declaration reads: "To someone knowledgeable in firearms, the TEC-9 has no legitimate sporting use." (Italics supplied; the lead opinion has opted to omit the italicized portion.) (Lead opn. at p. 155.) Alternatively or additionally, it is also possible that some people know this and just don't care. Whichever, it is patent that people in fact buy such guns for such purposes. By summarily dismissing this fact of life, the lead opinion effectively holds that these purposes are unworthy, i.e., that buying and using such guns for, e.g., "plinking" is not a "legitimate civilian use." I suggest this reasoning process bespeaks more than a little elitism.
[15] Several other decisions among those cited above or by the trial court also include references to alleged lack of legitimate civilian usage and/or deliberate marketing to a criminal element. (See, e.g., Leslie, supra, 986 F.Supp. at p. 911; Knott, supra, 748 P.2d at p. 664; Shipman v. Jennings Firearms, Inc. (11th Cir.1986) 791 F.2d 1532, 1533 (cited by the trial court and the lead opinion).)
[16] See, e.g., Resteiner v. Sturm, Ruger & Co., Inc., supra, 566 N.W.2d at p. 56; McCarthy v. Sturm, Ruger & Co. (S.D.N.Y.1996) 916 F.Supp. 366, 371, affd. sub nom. McCarthy v. Olin Corp., supra, 119 F.3d 148; Addison v. Williams (La.App. 1989) 546 So.2d 220, 223; Knott, supra, 748 P.2d at p. 665; Caveny v. Raven Arms Co. (S.D.Ohio 1987) 665 F.Supp. 530, 535, affd. (6th Cir.1988) 849 F.2d 608; Perkins v. F.I.E. Corp. (5th Cir.1985) 762 F.2d 1250, 1269; Patterson v. Rohm Gesellschaft (N.D.Tex. 1985) 608 F.Supp. 1206, 1214, 1216; Forni v. Ferguson, supra, 648 N.Y.S.2d at p. 73; Linton v. Smith & Wesson, Inc., supra, 82 Ill.Dec. 805, 469 N.E.2d at p. 340.
[17] See 18 U.S.C. §§ 921(a)(30)(A)(viii) and 922(v)(1).
[18] The lead opinion protests that it is not proposing to "judicially ban" the TEC-DC9, but only to require its manufacturer, Navegar, to "internalize" the costs associated with its distribution. (Lead opn. at pp. 178-179.) I can only say that I find this argument hopelessly academic.

But above and beyond one's opinions on "internalizing costs," I am constrained to note that the authority the lead opinion relies upon to support its view on that esoteric subject is, to be charitable, unfortunate. First is the dissent in McCarthy, supra, a dissent the lead opinion pronounces as "preferable" to the majority opinion. (I, of course, do not agree.) Second is the recent federal district court opinion in Hamilton v. Accu-Tek, supra, as to which see fn. 12, ante. The third is a citation to a 1977 opinion by a divided Michigan Supreme Court, Moning v. Alfono (1977) 400 Mich. 425, 254 N.W.2d 759. The lead opinion cites this case three times (lead opn. at pp. 173, fn. 17, 179, 183) notwithstanding the fact that it has since been relegated to judicial oblivion by the authoring court. (See Buczkowski v. McKay, supra, 490 N.W.2d at p. 334, fn. 8 and Glittenberg v. Doughboy Recreational Ind. (1992) 441 Mich. 379, 491 N.W.2d 208, 212, fn. 8; see also King v. R.G. Industries, Inc., supra, 451 N.W.2d at pp. 875-876.) But it is the final "authority" the lead opinion cites for its "internalizing costs" idea which really lifts one's eyebrows: a student law review note which, when perused, is found to propose "a novel and aggressive way to address the epidemic of firearm injuries," namely a new "Federal Ammunition Manufacturer Liability Act." (See Note, 108 Harv. L.Rev. (1995) 1679, 1689, 1696.)
[19] See, e.g., Anderson, The Environmental Revolution at Twenty-Five, 26 Rutgers L.J. 395, 396-397; Andreen, Beyond Words of Exhortation: The Congressional Prescription for Vigorous Federal Enforcement of the Clean Water Act, 55 Geo.Wash.L.Rev. 202, 222-242; Campbell-Mohn et al., Sustainable Environmental Law (West Pub. Co. 1993) § 1.2(2).

I am not, I hasten to add, suggesting anything like a cause-and-effect relationship between Justice Harlan's expressed sentiments and the mid-1970s burst of Congressional and regulatory activity. I am, however, most emphatically suggesting that (1) the legislative branch is clearly equipped to deal with complex policy issues, while the judiciary is equally clearly not, and (2) when the pertinent legislative body puts its mind to it, it can solve such problems. The judicial branch shouldn't even try.
[20] I am mindful of the fact that the trial court denied Navegar's separate motion for summary judgment based on the contention that certain victims were not shot with either TEC-DC9. I am not suggesting that motion should have been granted, but only that the fact a non-Navegar weapon was also utilized so devastatingly by Ferri on the day in question is instructive on the larger issue of whether Navegar's sale of the TEC-DC9 to the general public was a "substantial factor" in the ensuing tragedy.
[21] In support of its conclusion that there was a triable issue of fact as to whether the characteristics and marketing of the TEC-DC9 was a "substantial factor," the lead opinion relies heavily on the declaration of a San Diego-based psychologist, J. Reid Meloy. (Lead opn. at pp. 158-159, 167, 188.) As the lead opinion notes, Meloy prepared a lengthy declaration dealing with Ferri's conduct before and during the carnage, and identifying and distinguishing concepts such as "affective aggression" and "predatory aggression." Meloy, who of course never met Ferri, concludes that since "Ferri was ... in a predatory mode of aggression ... he was emboldened by the features of the TEC-9 as a necessary tool [and thus] the TEC-9 was necessarily a substantial factor in his decision to carry out his mass murder...." In the first place, I very much doubt that whether something is or is not a "substantial factor" for purposes of a causation determination in a negligence case is a matter for expert opinion. (See, generally, People v. Johnson (1993) 19 Cal. App.4th 778, 786-790, 23 Cal.Rptr.2d 703.) But, more specifically, Meloy was clearly unfamiliar with the extent or duration of Ferri's gun shopping. The subject is discussed hardly at all in his declaration's 21 pages; when it is, it is identified as having commenced in April 1993, when in fact it commenced many months earlier, as the lead opinion concedes. (Lead opn. at p. 152.) Additionally, Meloy never even notes the many, many other guns which Ferri considered and discussed with salespeople and others ("maybe 10" before he bought his first one), and admits that he does not know if Ferri even saw the Navegar advertising which the lead opinion repeatedly stresses. Unlike the lead opinion, I thus find the Meloy declaration to be clearly based on a selective reading of the record and patently speculative.